John Doe, *Pro se At Time of Filing*

FILED BY _*cwe*_ D.C.

JAN 2 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| John Doe, <br><br> Plaintiff, <br> vs. <br><br> Donald J. Trump, <br> Joseph R. Biden, <br> Elephant Duopolists (i.e. Republican National Committee), <br> Donkey Duopolists (i.e. Democratic National Committee), <br> Defendants | **EMERGENCY LLM-ASSISTED LINKED INJUNCTION TO EVALUATE IMPLIED STATUTORY AND CONSTITUTIONAL AGE LIMITATION ON COMMANDER-IN-CHIEF BEFORE (OR VERY SOON AFTER) INAUGURATION** <br><br> **LLM-ASSISTED MOTION FOR AN ANNUAL STATE OF THE CONSTITUTION ADDRESS BY THE JUSTICES OF THE SUPREME COURT** <br><br> **MOTION FOR RELIGIOUSLY COMPULSARY LIFE-PRESERVING JUDICIAL ACTION IN THE MATTERS ABOVE AND ATTORNEYS FEES UNDER THE RELIGIOUS FREEDOM AND RESTORATION ACT** <br><br> **NON-EMERGENCY LLM-ASSISTED LINKED COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT** |

**NATIONWIDE JURY INTAKE REPRESENTATIVE SURVEY SAMPLING**

**REQUESTED OR DEMANDED FOR THE PUBLIC'S DUOPOLISTICALLY**

**RESTRAINED POLITICAL PREFERENCES FOR A STATE OF THE CONSTITUTION**

**ADDRESS BY THE SUPREME COURT AND CONSTITUTIONAL AGE LIMITATIONS**

**ON THE COMMANDER-IN-CHIEF.**

**JURY TRIAL DEMANDED FOR VIOLATIONS OF SHERMAN ANTRITRUST ACT BY ALL DEFENDANTS.**

**INTRODUCTION**[1]

Comes now Plaintiff John Doe, Pro Se, to respectfully submit this motion to the United States Southern District of Florida District Court. This motion addresses four related but distinct issues:

1.  A proposal for the Supreme Court of the United States to regularly and consistently deliver an annual "State of the Constitution" address to foster public awareness and encourage timely constitutional amendments;

2.  A request for an emergency injunction to evaluate and potentially enforce implied statutory and constitutional age limitations on the Commander-in-Chief role before or immediately after the January 20, 02025, Presidential Inauguration. This Motion seeks injunctive relief and a declaratory judgment that Mr. Biden and Mr. Trump, by virtue of their age, are

---

[1] *Note: The Plaintiff is blending together these arguments from his start with the unassisted 12 page draft with revision assistance from one of Google's Gemini models and OpenAI's ChatGPT 4o. Unlike OpenAI's ChatGPT, Google's Gemini refuses to assist the Plaintiff on the Motion for a "State of the Constitution" Address, advising him that Gemini doesn't care to advise on "political questions". Both were willing and perfectly happy to assist on the draft of the Emergency Injunction to Devolve the Commander-in-Chief Role to someone properly aged.*
*This is the final version of the Plaintiff's pleading, but please refer back to the Plaintiff's unassisted draft to understand the claims as that is also part of the main copy of this filing, particularly of the argument for the State of the Constitution Address, in more depth (including a useful, critical draft of a Proposed Amendment 28 or 29), and particularly to show the difference between a Pro Se aided by access to search engines, the internet, and laptop word processing but pre-LLM and that same inquiring Pro Se with access to multi-LLM support. If the Plaintiff were a prisoner-slave in today's American incarceration system, this case could not have been written like so and probably would have faltered or struggled or even been rejected far more than this case with LLM support now will. Please also note that this is not a "pure" LLM draft; the Plaintiff edited the end-product, as you can probably ascertain from the mixed writing style. Those additions the Plaintiff made while stitching together LLM-assisted output have made this Pleading quite ungainly. The Plaintiff asks for support from appointed-Class Counsel or Counsel to pare and repair this Pleading to something more structured, organized, and more fully "baked" again.*

constitutionally and statutorily ineligible to serve in the "Atlassian" position of Commander-in-Chief of the Armed Forces.

3. A request for antitrust relief from duopolistic practices by the Elephant (Republican) and Donkey (Democratic) Parties, including linked Religious Freedom and Restoration Act relief to, among other things, secure a political system that allows a more significant reflection of American consensus on the need for governmentally-guaranteed life-preserving healthcare which Plaintiff is religiously obligated to advocate and associate for and which the cash-hindered political duopoly obstructs in our system that hasn't undergone constitutional maintenance since the passage of the 27th Amendment in 01992 CE.

4. A request that the Courts grant RFRA relief and attorney's fees and to also protect the Plaintiff from any and especially excessive legal fees beyond the cost of preserving life for this Pleading under 42 U.S.C. 1988 for all such enabling political and constitutional reform asked for that connects to life-preserving religious advocacy and needs and enables more complete religious political expression by citizens of the United States through the Courts and safely through minor and not just major parties—from an end to gerrymandering to proportional multimember district representation in Congress.

These proposals seek to address pressing gaps in constitutional governance and ensure the continued effective operation of the federal government in alignment with the nation's best interests.

# I. MOTION FOR AN ANNUAL "STATE OF THE CONSTITUTION" ADDRESS

## A. Legal Basis and Proposal

Plaintiff submits that Article V of the United States Constitution provides the framework for proposing and ratifying amendments, but that the process lacks adequate mechanisms for periodic

review and public discourse. The introduction of an annual "State of the Constitution" address by Supreme Court Justices would:

1. **Highlight Critical Issues**: Each Justice, by seniority, would deliver an address that identifies gaps, challenges, and opportunities for improvement within the Constitution.

2. **Encourage Civic Engagement**: The address would provide a platform for the public to engage with constitutional issues and advocate for timely reforms.

3. **Strengthen Constitutional Governance**: By facilitating regular discourse, the proposed tradition would accelerate necessary reforms and foster greater transparency in constitutional interpretation.

The absence of a structured mechanism for consistent and timely constitutional review has contributed to delays in addressing pressing issues such as:

1. The Equal Rights Amendment's uncertain status;

2. The need for clear age limits for federal officeholders;

3. Modernizing voting rights, criminal responsibility standards, and other critical constitutional provisions.

An annual address would provide a forum for the judiciary to outline "necessary and expedient" measures, complementing the President's existing State of the Union address and Congress's legislative authority. Such a practice would serve as a catalyst for informed public dialogue, encourage the States to exercise their amendment powers under Article V, and enhance judicial accountability without infringing upon the judiciary's independence or separation of powers.

**Proposed Framework**

1.   The Chief Justice initiates the tradition in the first year, followed by other Justices rotated by descending order of seniority to be cyclically repeated.

2.   Each Justice would address topics summarizing:

 A.   Key developments and challenges in constitutional interpretation;

 B.   Observations regarding gaps, ambiguities, or outdated provisions in the Constitution;

 C.   Recommendations for one specific amendment to be considered by Congress and the States.

 D.   Observations from the perch of the Supreme Court on the Nation's legal system and affected populations, including plaintiffs, defendants, offenders, juries, judges, law victims, and law enforcement, and the ongoing experience of any of our 13th Amendment slaves, at the federal, state, and local level.

3.   The annual address would occur before the Supreme Court's summer recess, ensuring timely public and legislative engagement.

4.   Justices would retain the discretion to propose no amendment if they find none necessary.

It is modestly predicted by the Plaintiff that in the first 5, 10, 20, or 30 years of this tradition the appointed Supreme Court Justice will formulate a steady backlog of "necessary and expedient" Amendments to Our Constitution to meet the challenge of, inter alia, Our modern ongoing humanistic, scientific, and technological revolutions. But eventually the rate of suggestions will slow and there may be many long streaks in the next 250 year stretch of Our Independence in which no new Constitutional Amendments are "necessary and expedient"[2].

---

[2] Please see the Pre-LLM filing for much more specific detail on this proposal that the LLMs excised out as encoded in the Plaintiff's proposed draft of Amendment 28 or 29 further enshrining and enabling the mechanics of this Proposed Tradition.

## C. Relief Sought

Plaintiff seeks an advisory recommendation from this Court to encourage the Supreme Court to adopt this tradition. While not binding, such a recommendation would highlight the importance of constitutional maintenance in a rapidly evolving society on the cusp of our Nation's Quarter-Millenial Birthday.

Plaintiff also seek nationwide jury intake survey sampling under the supervision of the Supreme Court and dispassionate social scientists to confirm or disconfirm the theory that the Nation would like to regularly hear from the Supreme Court Justices on the State of the Constitution with up to one Proposed Amendment in each Annual Address, as described in greater detail in the pre-LLM filing under the text of the proposed Amendment 28 or 29. With regular call for Jury Duty, the Judicial Branch has unique access to almost-entirely-representative samples of United States citizens, and should inform *itself* of the latent desire for such a Voice of the Judicial Branch to champion "necessary and expedient" Constitutional Reform without reliance on the Duopolistic Congress or the Executive in the ordinary political process to "jumpstart" such a tradition. The "Right to Petition Government" should include the right for the Plaintiff as a Citizen to directly petition the Judicial Branch for a redress of grievances in the form of a change in national annual judicial *dicta* tradition, as the Plaintiff is doing right here with this Proposal to the Supreme Court.

To further formalize this proposal and tradition, the Plaintiff includes below a proposed first draft of a proposed Amendment 28 (or 29 – the amendment number depends on whether the Equal Rights Amendment has been adequately ratified as President Biden claimed on his way out of Office). Notably, the Judicial Branch can and should act on establishing this Tradition without deadlocking waiting for the tradition to be formalized in a Constitutional Amendment first, as the

Plaintiff believes that such an Amendment adds "necessary and expedient" adaptability to Our Constitution that is long overdue and should be integrated on an expedient basis.

**Proposed Amendment #28 or #29 or Proposed Guidelines**

(a) Starting with the Chief Justice in the year this Amendment is proposed, the Justices of the Supreme Court of the United States shall together convene the State of the Constitution event once a year no later than before the taking of recess at the end of the annual Supreme Court term after all term opinions have been released. In each succeeding year, in cyclic order of descending seniority on the Supreme Court, one appointed Justice shall deliver a State of the Constitution address to the public to describe the status of federal, state, and local laws, the legal system, the accused, victimized, convicted, and enslaved populations, and the United States Constitution as they see fit, as well as recommend to the Consideration of Congress and the States such Measures as she shall judge necessary and expedient. Each year, the appointed Justice shall explicitly highlight and openly propose and endorse or decline to propose or endorse one specific Constitutional Amendment to be further considered by Congress and the States or by the States and a Constitutional Convention as specified in Article V of this Constitution.

(b) Any such Proposed Amendment may be in any form of media including but not limited to writing, a language model, art, audiovisual media, formulae, or code, or any mix thereof. Any Amendment may be presented in any dialect or language but must be accessible and translatable without excessive loss of meaning. All other Justices are encouraged to issue written concurring or dissenting opinions or media to any Amendment so proposed by that year's Appointed Justice.

(c) The People of the United States shall have no more than one year from the date and time of the appointed Justice's "State of the Constitution" presentation to formally propose and fully ratify the Justice's selected Amendment (if any) before the ratification deadline. Any extension of the ratification deadline for the appointed Justice's selected State of the Constitution Amendment will require a 2/3rds majority of each House of Congress or a 2/3rds majority of the States and may not be for greater than two additional months. Any previously proposed State of the Constitution Amendment may be repeated without limitation in future State of the Constitution years if deemed necessary and expedient by that year's appointed Justice even if ratification for that Amendment has failed in the past.

(d) Congress is hereby granted the power to convene any number of Limited Purpose

Constitutional Convention(s) with delineated limits in that Convention's mandate and authority for the purpose of ratifying any recommendation proferred in a State of the Constitution Address or for any other "necessary and expedient" occasion or need mandated by Congress.

---

The following Parts II ("Evaluate And Enforce Age Limitations On the Commander-in-Chief") and III ("The Donkey-Elephant Duopoly: Sparking And Prosecuting a Political Antitrust Case") may or may not be successful on their own. Part I, if granted, I should hope would probably also over enough time succeed in granting eventual relief to Part II and Part III, but given the urgency, gravity, and national security concerns implicated by these issues I plead with the Court for immediate relief on these questions.

If it is the opinion of the Court that these three parts (Part I, Part II, and Part III) should be pled separately or by separate Class Counsel or Counsel, please inform the Plaintiff as such. The Plaintiff would be open for splitting up the cases to make the administration of this case easier, as long as there remains an understanding that these three Parts are inextricably thematically linked, both by life-preserving religiously-compulsory advocacy under the RFRA and by the Part I pleading for the corrective Part I "State of the Constitution" Address.

To be upfront, Part III ("The Donkey-Elephant Duopoly") is the part that Plaintiff feels is the most weakly and informally written and may need the most help from Class Counsel or Counsel.

## II. EMERGENCY MOTION FOR INJUNCTION TO EVALUATE AND ENFORCE AGE LIMITATIONS ON THE COMMANDER-IN-CHIEF TO AVOID RISK OF EVEN MILD COGNITIVE AND PHYSICAL IMPAIRMENT IN THE ATLASSIAN

## COMMANDER-IN-CHIEF

### A. Nature of the Emergency

Particularly in the absence of the State of the Constitution Address tradition suggested above to safeguard all the manifest pledges of the Preamble to Our Constitution, the Inauguration of Donald J. Trump as President on January 20, 02025 and the ongoing remainder of service of Joseph R. Biden, raises significant constitutional and national security concerns to the "domestic Tranquillity" and the "common defense" due to their advanced age, which exceeds the maximally extended statutory retirement age for military flag officers under 10 U.S. Code § 1253 (68 years). The Plaintiff argues that the same concerns underlying this statutory limit—namely, physical and cognitive fitness—should apply to the Atlassian Commander-in-Chief role, which requires rapid and reliable decision-making capabilities. We can not risk again for our Atlassian Commander-in-Chief public misassessment or public concealment by their inner circle and executive echelon and handlers who are trying to protect the President, President-Elect, or Presidential Candidates from loss of Office, Power, and Influence and whom they are shielded from inspection by.

"The President has duties of "unrivaled gravity and breadth."" (Trump v. Cyrus Vance, 591 U. S. 786, 800). This authority has the dutiful quality of the mythical Atlas, upon whose shoulders rested the wellbeing of Earth, and in this case, more narrowly Our Nation and Our Allies, attached Families and attached Friends. The President's "authority is sometimes 'conclusive and preclusive.' Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 585 at 638 (Jackson, J., concurring). When the President exercises such authority, Congress cannot act on, and courts cannot examine, the President's actions." (Trump v United States, Supreme Court 23-939). An example of that "conclusive and preclusive" authority is in her central apex function

as Commander-in-Chief. The Supreme Court places tremendous emphasis on the non-derogable Atlassian quality of the Commander-in-Chief's Presidential command responsibility in the domain of national security. Inferior officers can help support the burden of the President's Office but can not lift the burden, and ultimately every command decision, from military contracting to lethal go/no-go orders, stop at the Atlassian President's Resolute Desk. It stands to reason then that the President herself or himself must at a minimum meet the age-related (dis)qualification bar decided by Congress for a senior military flag officer, given his or her role as the American Atlas at the center, top, and apex of this most lethal command hierarchy, to protect against even subtle age-related physical and cognitive decline that the public and even the President's Cabinet lacks the tools in our modern stage-managed media environment to regularly assess.

Even under the 25th Amendment, as illustrated by our experience with President or Former President Joseph Biden's now publicly obvious growing senility and debility, only apparent widely to the public when forced belatedly by the campaign calendar into a direct debate on June 27, 02024 with his opponent, who largely or only by contrast to President Biden looked more mentally agile then. The debate performance of Joseph Biden was so disastrous that he was forced very slowly and reluctantly, against his will and the will of his inner circle, to withdraw from the Presidential race, but remarkably because of the extraordinary power of incumbency and the timidity of and reluctance of the Cabinet he was not likewise forced to stand down as Commander-in-Chief or from the Presidency!

You can consult the widely available scientifically sound polling evidence to see that former and possibly now President Trump did not look so mentally acute or cognitively agile to the public when facing the military-age-qualified Vice-President Kamala Devi Harris in the only public debate Donald Trump allowed her to have with him on September 10, 02024. Like Joseph Biden did to his challenger Representative Dean Phillips (whom the Plaintiff would have voted

for), Donald Trump abused his duopolistic incumbent position to limit and suppress public debate appearances with his primary challengers (to whom he granted no public debates) and his general election campaign challengers (to whom he granted just one debate each) to limit public reproach and disaffection over his comparative age-related cognitive decline. There has never been in modern times any other Presidential contest limited to just one head-to-head public debate between the established opposing major candidates, and it was by Donald Trump's fearful, non-militarily-age-qualified hand that it was made so throughout the campaign season, including his squashing of debate with the military-age-qualified prominent Republican candidates (in order of gerontocratically-duopoly-suppressed popularity: Nikki Haley, Ron DeSantis, Chris Christie, Vivek Ramaswamy, Tim Scott, and Mike Pence)[3],[4].

## B. STATEMENT OF FACTS

1.  Defendant Joseph R. Biden is the President of the United States until just before noon on January 20, 02025.

2.  Defendant Donald J. Trump is the President-Elect of the United States, scheduled to be inaugurated at noon on January 20, 02025.

3.  President Biden was born on November 20, 01942, and is 82.17 years old, gestation excepted.

4.  President-Elect Trump was born on June 14, 01946, and is 78.58 years old, gestation

---

[3] Governor Asa Hutchinson, Perry Johnson, and Governor Doug Burgum were not military-age-qualified for their anticipated Inauguration Day. If he had prevailed, Former Vice-President Mike Pence would have only been permitted to serve as Commander-in-Chief under military-age-retirement of 10 U.S. Code § 1253 for roughly a two and a half year term until July 1, 02027.

[4] See Part III for the beginnings of an antitrust case against the donkey-elephant duopoly. Class counsel may be better able to develop this anti-duopolistic case further. The donkey-elephant duopoly is a large part of the reason why we were faced with a forced choice in the first place between two gerontocratic non-military-age-qualified Commander-in-Chief candidates.

excepted.

5.   10 U.S. Code § 1253 establishes a maximum age limit for military flag officers, with certain Presidential exceptions extending up to age 68.0 (gestation excepted) at utmost allowable maximum. This statute reflects a recognition that the demands of high-level military command require physical and mental acuity that may decline with advanced age.

6.   President Biden is already 14.17 years above the Presidential exception maximum and President-elect Trump is already 10.58 years above the Presidential exception maximum.

7.   The President of the United States serves as Commander-in-Chief of the Armed Forces, a position of immense responsibility and authority, requiring the ability to make critical decisions regarding national security and the use of military force.

## C. ARGUMENT

**Constitutional and Statutory Ineligibility**

1.   **Implied Constitutional Limitation:** While the Constitution does not explicitly set an age limit for the presidency, this Court should recognize an implied limitation based on the inherent powers and duties of the office. The Commander-in-Chief clause grants the President broad authority over the military, including the power to make life-or-death decisions regarding the use of force. This authority demands exceptional Atlassian physical and mental fitness and responsibility. Mr. Trump, by exceeding the age limit established for high-ranking military officers, raises serious concerns about his ability to fulfill the demanding responsibilities of this office.

2.   **Support from Military Standards:** The age limit for military flag officers in 10 U.S. Code § 1253 provides a relevant standard. This statute reflects a considered judgment by Congress regarding the physical and mental demands of high-level military command. While it

remains up to your discretion whether this is directly applicable to the presidency's Atlassian role as Commander-in-Chief (the "Max-Star + 1 General") in the direct chain-of-command, this statutory standard provides persuasive evidence that advanced age can impair an individual's ability to effectively discharge the duties of such a high-stress, decision-making position.

3. **National Security Concerns:** The potential consequences of an aged and potentially diminished Commander-in-Chief are grave. The safety and security of the nation and its citizens depend on the sound judgment and decisive action of the President in matters of national security. The risk of impaired judgment or diminished capacity in a leader of advanced age poses a serious threat to national security.

4. **Potential Application to the Secretary of Defense:** Just as 10 U.S. Code § 1253 applies to flag officers as high as five-star and putative "Max-Star Generals", the Secretary of Defense, who arguably sits and occupies a central near-apex place within the command hierarchy of the US Armed Forces, should also comply with the mandatory retirement ages of 10 U.S. Code § 1253. The prudence of this is illustrated well by the example of outgoing Secretary of Defense Lloyd Austin (DOB: August 8, 1953, age ATOW: **71.5 years old**). At 71.5 years of age, Secretary Austin surpasses the maximum age of service of a flag officer by 3.5 years. During that 3.5 year period of "overserved" time, Secretary Austin famously underwent necessary prostate surgery to treat prostate cancer[5]. During his surgery and recovery, Secretary Austin was "prostrate" and incapacitated, and had not even notified his Commander-in-Chief Joe Biden at the time, causing a "full-blown national security crisis"[6] with at least three days where the second-in-command of the US Armed Forces was absentee with no acting Secretary of Defense to fill his role. Such

---

[5]
https://zerocancer.org/stay-informed/prostate-cancer-news/prostate-cancer-diagnosis-secretary-lloyd-austin-draws-attention

[6]
https://www.nytimes.com/2024/01/09/us/politics/lloyd-austin-hospitalized-prostate-cancer.html

conditions and health complications are more common with advanced age beyond the 68 year old

retirement limit of 10 U.S. Code § 1253, and such a crisis may have been averted if even the

Secretary of Defense were held subject to the statutory and constitutional mandatory retirement

ages specified by implication from 10 U.S. Code § 1253. That said, the weight of Plaintiff's

argument is focused on the Commander-in-Chief, who bears ultimate Atlassian responsibility

even beyond that of the Secretary of Defense who may serve in a more advisory rather than

Constitutionally-critical Atlassian final command role per the preferences of the

Commander-in-Chief. The outgoing Secretary of Defense is not included here as a Defendant for

that reason, but in light of our experience with Secretary Austin, the Plaintiff asks for this Court's

consideration of the question of whether the Secretary of Defense must also prudently and

mandatorily be within the age limitations specified so clearly by Congress for commissioned

military officers, for the sake of national security.

   5.   As a convicted felon, as long as President-Elect Trump is subject to United States

jurisdiction he is statutorily disqualified from receiving, holding, carrying, or bearing any type of

firearm (anything from a pistol to a rocket-propelled grenade) in domestic or foreign conflicts

under 18 U.S. Code § 922(g)(1). If permitted to serve or continue to serve, he will be the first

Commander-in-Chief of the Armed Forces disqualified from being Armed. At least in theory,

those leading the Armed Forces should be able to "lead from the front" or "charge in from

behind", but President-Elect can now do neither and has done neither, partly due to a developing

case of bone spurs in his youth, while Vice-President-Elect J.D. Vance can bear arms, has a long

record of distinguished military service, and can do (and has done!) both leading from the front

and charging in from behind.

   Is it wise for the Judicial Branch to leave in place a felon disqualified from bearing

firearms in all States, including his primary residential States of Florida, New York, and soon the

territory of Washington, D.C.? The Plaintiff does not rest this case on this point alone–it is a separate and highly severable part of this argument, with the rest of this case designed to survive the fall of this point, particularly since the Supreme Court has previously opined long before this question was this ripe and pregnant for precedential decision that a felony alone is not a disqualification from Constitutional Presidential service–but it is another indicia of dishonorable disqualification from Atlassian leadership responsibility over the Armed Forces and would duly be sufficient cause for ejecting any other military officer in the chain-of-command from ongoing service under constitutional principles and the above-cited federal statute. Notably, nowhere else in this Pleading will this independent argumentative ground be mentioned or reiterated. It is not the Plaintiff's place to embarrass the President-Elect and this is not the Plaintiff's strongest argument – in the Plaintiff's view, the arguments in II (C)(1)-(3) above are stronger grounds on which to disqualify the President-Elect Trump *and* the Outgoing President Biden from responsibility for the Commander-in-Chief role. This information that Trump can't legally carry or transact over a gun was not available to voters who care about law, the Commander-in-Chief's role heading the military, and the 2nd Amendment when Former President Trump was given to us as our only debateless Republican Primary choice and thereby renominated by the Elephant Incumbent Duopoly. It is questionable whether under the laws he will be able to, as Commander-in-Chief, legally add his signature to military arms deals under 18 U.S. Code § 922(g)(1) without exercising his Presidential immunity to protect himself from prosecution during his time in Office. An arms deal signed and authored by Trump as Presiding Officer of the United States would seem to be in real violation of 18 U.S. Code § 922(g)(1).

Plaintiff respectfully invokes the following criteria for the issuance of an emergency injunction:

1. **Likelihood of Success on the Merits**: The Plaintiff asserts that the implied constitutional

principle of fitness for duty supports the evaluation of age-related limitations for high federal offices.

2. **Irreparable Harm**: Allowing an individual who may lack the requisite physical and cognitive capabilities to serve as Commander-in-Chief endangers national security and public trust.

3. **Balance of Equities**: The proposed injunction serves the public interest by prioritizing national security over political considerations.

4. **Public Interest**: Ensuring that federal officials meet fitness standards is essential to maintaining the integrity of constitutional governance.

**Supporting Precedents and Evidence**

Plaintiff cites the following:

1. **10 U.S. Code § 1253**: Establishing age limits for military officers as a benchmark for evaluating leadership fitness.

2. **Case Law**: Precedents such as *Youngstown Sheet & Tube Co. v. Sawyer* (343 U.S. 579) emphasize the importance of checks and balances in executive power.

3. **Public Record**: Widespread public concerns about the capacity of senior officeholders underscore the urgency of this issue.

**C. Relief Sought**

Plaintiff requests:

**Injunctive Relief:** This Court should issue a preliminary injunction prohibiting Defendant Donald J. Trump from assuming the duties and responsibilities of Commander-in-Chief of the Armed Forces. This injunction should remain in effect pending a full hearing on the merits of this

Motion.

**Temporary Delegation:** Temporary delegation of Commander-in-Chief responsibilities to the respective Vice President (Kamala Devi Harris or James David Vance) during the pendency of this proceeding and more permanently on an emergency basis to protect our national security following briefing;

**Declaratory Judgment:** This Court should issue a declaratory judgment finding that Defendant Donald J. Trump is ineligible to serve as President of the United States, or at least specifically with respect to the powers and duties of Commander-in-Chief.

**Declaratory Relief:** In the alternative, a declaratory ruling that statutory age-related limitations are constitutionally permissible and necessary for the Commander-in-Chief role to meet the overriding concern for national security attendant to even mild physical and cognitive impairment risk in an Atlassian Commander-in-Chief outside the boundaries of statutory military age qualification.

## III. THE DONKEY-ELEPHANT DUOPOLY: SPARKING AND PROSECUTING A POLITICAL ANTITRUST CASE[7]

## INTRODUCTION

1.   This is a civil action brought under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, to remedy unlawful restraints on trade and monopolization of the political process by the Democratic National Committee ("DNC") and the Republican National Committee ("RNC").

---

[7] Note: For the record, I started drafting this Part with the help of an LLM somewhere between 11:15 and 11:30 AM on January 20, 02025, 30-45 minutes before the Inauguration of President Trump as Head Elephant, taking over from Head Donkey.

2.   Plaintiff alleges that Defendants have engaged in coordinated and unilateral practices that unlawfully exclude competition from third-party and independent political candidates, harm voter choice, and undermine the democratic process in violation of federal antitrust law.

PARTIES

3.   Plaintiff John Doe is a resident of the Southern District of Florida who has been directly harmed by the exclusionary practices of Defendants, including the inability to access alternative political representation or fair competition in the political sphere, and the inability to start a minor Party affordably facing the incumbent duopolist competition under current duopoly-preserving rules and practices with a true, actual hope of achieving Presidential or even Congressional Representation. The Plaintiff as a common citizen can not even get a timely meeting with any of his federal representatives or their staffs on *any* issue the Plaintiff justly considers pressing[8] and life-preserving, including regarding the development of technology for sexual assault prevention, the need for a life-preserving "mosquito genocide" campaign to make the mosquito globally extinct, or other life-preserving policy objectives in the United States like governmentally guaranteed healthcare for every United States citizen (let alone the stretch objective of one day covering every legal resident also).

4.   Defendant Democratic National Committee is a national political organization headquartered at 430 S. Capitol Street SE, Washington, D.C.

5.   Defendant Republican National Committee is a national political organization headquartered at 310 First Street SE, Washington, D.C.

---

[8] the Donkey and Elephant duopoly lacks adequate political access for consistent civic engagement unless, perhaps, you experiment with playing the Elon Musk donor game and airdrop kilos (thousands) or millibillions (millions) of cash on candidates to sterically hinder them to guarantee your own access and contract on the direction of your policy preferences with cash forces more powerful than simple speech.

JURISDICTION AND VENUE

6.   This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337 because this case arises under the Sherman Antitrust Act.

7.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business and have significant influence within this District.

FACTUAL ALLEGATIONS

A. The Political Marketplace

8.   The political system in the United States constitutes a de facto marketplace of ideas and representation in which candidates and political parties compete to offer solutions to voters.

9.   Access to this marketplace is essential to ensuring free and fair elections, as guaranteed under democratic principles.

B. Defendants' Anticompetitive Conduct

10. The DNC and RNC have unlawfully coordinated and engaged in practices that suppress competition in the political marketplace. Examples include:

a. Enforcing restrictive ballot access laws that disproportionately burden third-party and independent candidates.

b. Controlling the Commission on Presidential Debates to exclude non-major party candidates, and then even jettisoning  the Commission on Presidential Debates to form bilateral collusive agreements with each other directly with television networks to exclude any alternative minor party candidates from similar public exposure, debate, and equal or equitable opportunity in the

political marketplace.

c. Coordinating gerrymandering efforts to ensure dominance in specific geographic regions.

d. Exerting influence over campaign finance structures to favor their candidates.

11. These actions have collectively created a duopoly that stifles competition, excludes alternative political voices, and prevents voters from accessing meaningful choices in elections.

C. Harm to Competition and Consumers (Voters)

12. As a result of Defendants' conduct, third-party and independent candidates face insurmountable barriers to entry, leaving voters with artificially limited options.

13. Voters are denied the benefits of competition, including diverse ideas, innovative policies, and accountability through electoral choice.

14. Defendants' practices harm not only individual candidates and voters but also the broader democratic process by entrenching a two-party system.

CAUSES OF ACTION

COUNT I: Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)

15. Plaintiff incorporates by reference the allegations in paragraphs 1–14 as though fully set forth herein.

16. Defendants have entered into agreements, combinations, or conspiracies that unreasonably restrain trade and competition in the political marketplace.

17. These restraints lack any legitimate pro-competitive justification and have directly harmed competition and voter choice.

COUNT II: Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)

18. Plaintiff incorporates by reference the allegations in paragraphs 1–14 as though fully set forth herein.

19. Defendants have unlawfully monopolized, attempted to monopolize, or conspired to monopolize the political marketplace, excluding competition and entrenching their dominance.

20. This monopolization harms voters by suppressing competition and eliminating viable alternatives.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare that Defendants' conduct violates Sections 1 and 2 of the Sherman Antitrust Act;

B. Enter injunctive relief to prevent further anticompetitive practices, including reforms to ballot access, debate participation, and campaign finance laws;

C. Award treble damages to Plaintiff and other affected parties as provided under 15 U.S.C. § 15;

D. Award reasonable attorneys' fees and costs; and

E. Grant any other relief the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues regarding the Elephant and Donkey Duopoly System so triable.

FURTHER ANTITRUST ARGUMENTATION IN MORE PERSONAL VOICE

In this country, since Millard Fillmore last occupied office as a Whig Party member in 01853, we only effectively have two choices of political product: Donkey (Democratic Party) or Elephant (Republican Party), for the last 172 years. The political system has been remarkably "stable" (like a corpse), and remarkably homeostatic (as homeostatic as a deadened duopoly crime victim), with a lack of Challenger Party dynamism since 01853. Even our "close" brushes with Minor Parties, like Ross Perot in 01992, barely budged and arguably reinforced the lasting balance of counterposed duopolistic forces largely self-apportioned between the Donkeys and Elephants (the "Donkeyphants"). I will only refer to these two parties by Donkey and Elephant or Donkeyphant during this argument to make it more clear that we only have two Products (if that -- there's only one Donkeyphant Product available when they predominantly conspire or collude, as they do in the campaign finance system) offered to us, without any of the customary "normalness" of this D/R situation we've gotten used to by referring to them by their more formal anodyne names that pass with less notice. The names of the major political parties are innocuous-seeming but conceal severe ongoing politically suppressive harm, in such a way as the rename of the killer tobacco company Philip Morris to the more anodyne Altria does. Let's call them the Donkeys and the Elephants, the political equivalent of the Crips and the Bloods. I will argue that there are no real political chances for new entrants in our political system under the Commission for Presidential Debates, First Past the Post Non-Fractionally Proportioned Elections, and Party Registration and Ballot Presentment Standards as currently organized and regulated like the Bears, the Squirrels, the Deer, the Wolves, or my own preferred Newly Entrant Party, the Miracle Berries[SM][9], the Party that the Plaintiff for 10 years wanted to start

---

[9] The Miracle Berries[SM] party reserves the exclusive right, as part of our nascent Service Mark, to use literal miracle berry fruit to change the public's taste perception in explaining our politics of turning "political lemons" into sweet-tasting political lemonade. If it's constitutionally permissible and legal, the Plaintiff would like to bar all other political parties from using the species *Synsepalum dulcificum* and its miracle berry fruit and derivatives as an element in their organizing, campaigning, and governance efforts. The Plaintiff doesn't know for certain if doing so

pseudonymously and serve, the party that dedicates itself to using physical science, technology, engineering, and the social sciences to chemically change the public's tastes and the conversable political Overton Windows to something more radically centrist, in supporting inventive positions that are novel, useful, and nonobvious.

Example initiatives of the Miracle Berries include this challenge to the Duopolitic Systems of Elephant and Donkey politics, or as an example substantive policy using the Blessings of Genetic Engineering to make the mosquito, annoying summer mosquito bites, and deadly and horrifying mosquito-borne illnesses like Zika (which has caused horrifying microcephaly in American and global babies) and malaria (which kills 600,000 souls a year) globally extinct. How can the Elephant Party continue to claim to be "pro-life" when their inaction pushing for Mosquito Genocide suggests they're also "pro-mosquito"?

Let's start with Party Registration. Why under the Elephants and Donkeys can I only register myself officially for one Political Party with my State Secretary of State and affiliation is not permitted with two or five with an optional dominant one? Does that not breach the 1st Amendment Right to Free Association? Why are Party Primaries organized without ranked-choice voting? Why are Party Primaries closed single-shot single-choice factions rather than ranked-choice with organized drop-off? Why are the Elephants and Donkeys granted prime real estate and extra prominence on ballots and computerized interfaces rather than being an evenly weighted party that is no more convenient to find and select than any other more "Minor" Party? Why do our Ballots not give us the choice of manually reversing the Vice President and President nominees if we wish in intra-party or cross-party ranked-choice votes, so that we could

---

is legal as a matter of service mark public policy, but it's worth the effort to try. Also, this Party might not actually be called the Miracle Berries, it might be called Center Forward or something like that, TBD, but whatever it is called the use of miracle berries is something that the Plaintiff would like to reserve political party service mark ownership practice on.

have collectively promoted the military-age-qualified J.D. Vance if we wished over Donald Trump, or reversed the order of Joseph Biden and Kamala Harris in their original Primary balloting, with concentrated fallback to whichever pattern is most prominent among other voters within our Party or within that Election Contest? All of this is certainly easily feasible with computer-counted paper and electronic ballots, and even on handcounted-paper ballots, the slowest and most inefficient method of counting and ranking votes, would be worth doing to give our Voters these choices to reverse position among Elephants or even mix Elephant or Donkey and Miracle Berry, as the Plaintiff would sometimes like. These missing capabilities in our balloting and vote counting systems are the deliberate outgrowth of a rampant illegal conspiracy to suppress competitive new entrant trade and growth by the dominant Donkeys and Elephants who regulate our political system without adequate Judicial Branch anti-trust incumbency review.

That extends to the system of "plurality or majority take all" district elections and the absence of the more modern proportional representation that many other Countries offer to their citizens as a defense from illegal duopolistic trust practices. More "minor" parties have difficulty safely growing in popularity step by step without inadvertently turning into "spoilers" for the major party that they are most similar to. US voters have been burned by this on several occasions, including the 02000 Election between Al Gore and George W. Bush, when Nader-supporting Green Party voters may have "flipped" the election inadvertently to George W. Bush, who they were ideologically generally opposed to, because they had not participated in the artificially forced binary choice of Elephant or Donkey in this non-ranked-choice, non-proportionated voting system. As a person wishing to create a Minor Party, it horrifies me that in building a Minor Party that I might cause voters to inadvertently betray their compromised fundamental objectives in such a dog-eat-dog Major Party-dominated contest by choosing to risk

voting for the Miracle Berries℠ in the middle of a survivalist knife fight between the Donkeys and Elephants, when, for lack of proportional Congressional representation and coalition Presidential governance, their choice to dedicate their vote to the Miracle Berries and refrain from voting for the Elephant or Donkey they would next support could swing the Country for four years to a policy position advanced by the Major Party they see as most evil rather than the lesser evil of the two. In this system, voters can not safely vote for their true Ideal Party, because doing so risks sloughing off some of the necessary base of support for their less-than-ideal, maybe substantially evil but reluctantly favored Major Party choice.

There is a great deal of research on this issue with our voting systems organized under the topic of "Arrow's Impossibility Theorem". The current system makes it hard or impossible for the center to show its truly concentrated strength since we in the Center are dispersed across the dividing line of the Donkeyphant factions. The Elephants and Donkeys split the political spectrum into two, and then give control of *all* of each Major Party to anyone who can bludgeon the other candidates with *any small* plurality of that half fraction of the Electorate, like Donald Trump did in this past Election against candidates like DeSantis and Haley better liked and admired by many in the Center.

The plot thickened with each incumbent candidate (Trump and Biden) refusal to debate their competition any more than once, *if that*. Joseph Biden never debated his brave military-age-qualified primary competition, Congressional Representative Dean Phillips (DOB: January 20, 01969, age ATOW 56.0 years old), who would have exposed Biden's relative debility openly to the public much earlier in the campaign season had a series of debates taken place for ongoing control of the Democratic Party.

Donald Trump never debated any of his Primary challengers, treating himself as a Party

Incumbent above internal market competition (the Plaintiff argues here that the nomination contests in the Democratic Party and the Republican Party both also internally meet the definition of a modeled market), including the whole list of military-age-qualified candidates who challenged him and found significant-enough measurable launch popularity to meet the criteria for inclusion in the nationally televised debates that Former President Trump refused to attend.

| Candidate | Fractional Age on January 20, 02025 (years) | Primary Votes Received | Delegates Secured |
|---|---|---|---|
| Donald Trump | **78.19** 10 US Code § 1253 Disqualified as Commander-in-Chief | 17,015,756 | 2,260 |
| Nikki Haley | 52.98 | 4,381,799 | 97 |
| Ron DeSantis | 46.34 | 353,615 | 45 |
| Mike Pence | 65.53 * | 404 | 25 |
| Chris Christie | 62.34 ** | 139,541 | 30 |
| Vivek Ramaswamy | 39.45 | 96,954 | 15 |
| Doug Burgum | **68.45** 10 US Code § 1253 Disqualified as Commander-in-Chief | 502 | 10 |
| Asa Hutchinson | **74.56** 10 US Code § 1253 Disqualified as Commander-in-Chief | 22,044 | 5 |
| Ryan Binkley | 56.78 | 100,000 | 2 |
| | | | |

The fact that Nikki Haley, whom the Plaintiff supported in the 02024 Elephant Primary, got 25% of national primary voters' support but only 4.3% of the delegate influence that Donald Trump

did at the Republican National Convention helps show how "rigged" this non-proportional delegate math game had gotten under the rules of the Elephant Party, enforcing Incumbent Dominance in the Elephant Internal Market.

Because it's possible to win nomination and the general election with a fraction of a fraction of real support, even if the Donkey or Republican Nominee achieves a begrudging slim majority within their own Party, they've only really won the begrudging support of one quarter (25%) of the general population electorate. Then those of US in the Center have to decide with whom to affiliate typically between the most extreme "left" quarter's views and the most extreme "right" quarter's views, and the Presidency can be effectually won with 25.01% or less actual semi-enthusiastic popular support, by virtue of winning half of a half to dominate the whole. This only happens because the Center isn't and Minor Parties aren't empowered and given voice by

More, the Duopoly Donkeyphants conspire to effectively suppress the vote. Why is Election Day not Election Weekend and conveniently placed on a Saturday AND Sunday (for every religion's participation) or not, if on a weekday, on a National Holiday that's a corporate day off for almost everyone? This is just a matter of common sense. The Major Parties have it in their power to mandate to most all non-essential places of employment that Election Weekday be a day off work to encourage voting, as attempted in H.R. 7329, the "Election Day Holiday Act of 2024", but it never got passed out of the House Committee on Oversight and Accountability. The Duopoly Donkeyphants have consistently failed to achieve that objective of doing everything in their power to encourage full participation.

The Plaintiff is not interested in trying to apportion blame more or less for this on Donkeys or Elephants -- for long-standing anti-democratic antitrust issues like the well-documented practice of political gerrymandering both Donkeys and Elephants are so heavily responsible there

is no point in trying to split hairs on which is more to blame. And as long as they continue holding their Duopolist static positions due to the dynamics described and discussed herein, the Courts can not, until the antitrust issues are resolved, rely on the political process alone unaided, unguided, and uncatalyzed to resolve this so-called "political" Constitutional issue of politically over-concentrated anti-trust. Minor parties lack a safe platform on which to grow large enough to revise this often very ugly system typified by indefensible practices like gerrymandering, where non-representative representatives pick safe voters rather than voters picking their safest and most representative representatives. The Court system has handled hundreds of cases related to political gerrymandering. Gerrymandering is yet another example of long-standing Constitutional mis-maintenance that could be targeted by one of the Justices in a future State of the Constitution Address, if not rectified before by Court-supervised antitrust review and declaratory and injunctive relief of Our Nation's Political Duopoly.

The fact that Donald Trump got "elected" in this system of compromised and restrained free choice does not disqualify his disqualification as Commander-in-Chief under 10 U.S. Code § 1253 but rather underscores the gerontocratic incumbency that he abused to get himself barely elected, with fewer votes and a lesser vote share of the general registered voter population than any other recent modern President, and such a high unlikeability rating that he never would have been elected in a more free and fair voting system, especially one with compulsory voting for all eligible voters like Australia, where Americans couldn't "slack" our way and get bludgeoned by even higher priority values like many of our commitment to pro-life or pro-choice principles into factioning and sub-factioning off into "electoral support" (read: begrudging and reluctant acceptance) of an age-disqualified insurrectionist candidate, in a Presidential election where fewer people than ever liked their binary Donkeyphant choices.

As a matter of fully remediating these antitrust violations by the Major Parties, the Plaintiff argues that we must move to a system of Proportional Non-Gerrymandered Congressional Representation with Ranked Choice Voting and Coalition Presidential Governance, in a Parliamentary Democratic System like other modern major countries have, with clearly revised Presidential age qualifications and disqualifications. The Plaintiff believes that the reason we lack a public option for healthcare, an option that would substantially preserve life and an option the Plaintiff is obligated to sue for political reform for under the Religious Freedom and Restoration Act, is because we lack such a truly representative political system, a system that would make room for and welcome the competition of a minor party like the Miracle Berries, advancing collaborative, radically centrist technical miracles over duopolist political noise. There's a pathway to that world of public service in the next Presidential Election if we have a State of the Constitution Address before or soon after our 250th Anniversary of Independence. But until we achieve such reforms, through the political process or through the action or assisted support or Voice of the Courts, there is little or no hope of the Miracle Berries or any other Minor Party growing to establish such reforms Ourselves against the wishes and preferences of the RINO ("Republican in Name Only") Elephants and DINO ("Democratic In Name Only") Donkeys that hold our country's leadership in a vice-grip.

But partial remediation and relief is possible and justiciable by Courts' Actions and Voice immediately as requested above.

## IV. JOINED AND CONNECTED IMMEDIATE CIVIL COMPLAINT UNDER THE RELIGIOUS FREEDOM AND RESTORATION ACT

**Introduction**

1. This is a civil action brought under the **Religious Freedom and Restoration Act (RFRA)**, 42 U.S.C. § 2000bb-1, which protects individuals' rights to practice their religion free from substantial governmental burdens, except in cases of compelling government interest pursued through the least restrictive means.

2. Plaintiff, a practicing Jew, is religiously obligated to promote and support policies that preserve human life, consistent with the Jewish principle of *pikuach nefesh*—the imperative to save and sustain lives.

3. Plaintiff alleges that the advanced age of the Commander-in-Chief outside the range of low-risk prudent judgment expected from senior military leaders puts at threat human life in this country and around the globe, and that because military-age-qualification was not enforced previously by the Electoral College or the Courts Plaintiff is religiously obligated to bring this Pleading to ask that Commander-in-Chief responsibility devolve to the age-qualified and qualified Vice-President, J.D. Vance, to prevent risk of likely loss of life.

4. Plaintiff alleges that the current political campaign finance and duopolistic "first past the post" Donkey and Elephant system, which is market-dominated and regulatorily captured on each side of the duopoly by, inter alia, excessive monetary contributions from private industries, including the healthcare sector, creates a substantial burden on the Plaintiff's religious exercise and hinders their ability to advocate for life-preserving policies such as Medicare for All or the Public Option.

---

**Jurisdiction and Venue**

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(4) (civil rights).

5. Venue is proper in this district under 28 U.S.C. § 1391(b) as the events giving rise to this claim occurred within this judicial district.

---

## Parties

6. Plaintiff John Doe is a citizen of the United States residing in the Southern District of Florida and a practicing adherent of Judaism.

7. Defendants and Congress are or were responsible for Commander-in-Chief duties and regulating and operating within the current rules of campaign finance, promoting (or suppressing) "necessary and expedient" changes to campaign finance, and ensuring fair elections.

---

## Factual Background

### A. Religious Obligation to Preserve Life

8. The Jewish principle of *pikuach nefesh* obligates adherents to preserve human life, even overriding most other religious commandments.

9. In modern society, public policies such as Medicare for All or a Public Option are direct manifestations of life-preserving principles, as they ensure access to affordable healthcare for all citizens, and the Commander-in-Chief has an Atlassian duty to safeguard life worldwide.

10. The Plaintiff has a religious duty to advocate for these policies but faces systemic barriers

created by excessive campaign contributions from industries opposing such reforms and can not count on the Electoral College, Congress, the Executive Branch, or the Courts to enforce military-age standards on the Commander-in-Chief.

**B. Public Support for Healthcare Reform**

11. Polling data consistently shows that a majority of Americans support Medicare for All or a Public Option. For instance, a 2020 Gallup poll found that 63% of Americans favor a government-run health plan as an option, and over 50% support a single-payer system. ([source: Gallup])

12. Despite this public consensus, campaign contributions from the healthcare industry impede the ability of citizens to elect candidates who reflect this majority opinion.

**C. Campaign Contributions as Steric Hindrance and Contract**

13. Campaign contributions from the healthcare industry function as steric hindrance by creating undue influence that obstructs the natural legislative process.

14. Just as steric hindrance in chemistry prevents smaller molecules from accessing reactive sites, financial contributions disproportionately shape policy agendas and stifle smaller grassroots campaigns advocating for reform.

15. These contributions also act as contracts, creating implicit agreements between donors and candidates that prioritize industry interests over public health and the democratic will of voters.

---

**Claims for Relief**

## Count I: Violation of the Religious Freedom and Restoration Act

16. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

17. The current political party, electoral, and campaign finance system imposes a substantial burden on Plaintiff's religious exercise by limiting the ability to effectively enforce military-age limits on the Commander-in-Chief and advocate for life-preserving policies such as Medicare for All or the Public Option or Worldwide Mosquito Genocide.

18. This burden is neither in furtherance of a compelling government interest nor the least restrictive means of achieving such an interest.

19. By allowing the healthcare industry to dominate campaign contributions, the Defendant has created a political environment that undermines religiously motivated advocacy for policies like governmentally guaranteed healthcare through the Public Option or Single Payer ("Medicare for All" with the availability of private supplementary contracts and policies) that preserve human life.

## Count II: Denial of Proportional Representation

20. Plaintiff further alleges that excessive financial contributions distort and prevent access to proportional representation, undermining the ability of ordinary citizens to elect candidates proportionally aligned with the majority's support for healthcare reform through a coalition mixture of minor and major party candidates supportive of these life-saving policies.

21. The disproportionate influence of the healthcare industry on campaign financing violates democratic principles and impairs Plaintiff's ability to fulfill their religious obligation to support life-preserving policies.

**Relief Sought**

WHEREFORE, Plaintiff requests the following relief:

a. A declaration that the current campaign finance system and plurality single winner (first past the post) elections imposes a substantial burden and drag force on Plaintiff's and Class religious exercise through the political process in violation of the RFRA;

b. An injunction requiring reforms to ensure a fair and equitable campaign finance system that does not disproportionately favor private industry interests;

c. As authorized by the RFRA, all necessary lawyers' fees for advice and leadership of counsel for these causes of action and all other connected aspects of constitutional and electoral reform pled within this Pleading to facilitate the creation of a political system where the majority support to governmentally guarantee healthcare in the United States through the Public Option or Medicare For All (Gallup Healthcare For All Poll, https://news.gallup.com/poll/468401/majority-say-gov-ensure-healthcare.aspx). That Gallup poll from 02023 establishes that 57% of the American public demand for healthcare to be ensured and governmentally guaranteed for all Americans without exception, while 53% want healthcare to be privately run and 43% prefer a governmentally run system. The Plaintiff is among the minority that prefers a governmentally run system as it seems evident to the Plaintiff based on existing research and working practices in many other similar developed nations to be the best shot at effectively preserving life, and especially in doing so without breaking the bank, curbing down the cost of care so that, inter alia, more care and more effective care can be provided without the interferences of private insurance denials. This is a sincere religious belief. Under the authority of

RFRA, the Plaintiff believes he can ask the Courts on behalf of all Americans that the political barriers to governmentally guaranteed healthcare like steric hindrance caused by hindering cash contributions by the healthcare industry to duopoly politicians be broken down with judicial force. The Plaintiff does sincerely believe that he can ask the Courts to intercede by conducting a thorough review to neutralize and force a Congressional rewrite on any and all laws like campaign finance laws and ballot access laws that unfairly restrict, cap, and restrain the potential growth and equal opportunity of life-preserving minor parties in violation of the Sherman Antitrust Act from achieving the sort of political pressure on the governing Duopoly in Congress and prevail on guaranteed healthcare despite any remaining steric hindrance caused by older and remaining campaign contributions and be implemented by Congress to save actual lives in these United States and Territories.

d.  The judge's declaratory and injunctive cap to lawyers' fees on the part of personal and opposing counsel, to prevent wasteful loss of public or private funds to non-religious purposes shifting cash toward self-enriching abusively-highly-compensated attorneys[10] in case of loss, under strict RFRA review for actual frugality and economy in representing their clients, at levels competitively consistent with annual salaries adjusted to time actually spent ordinary white collar professionals no higher than the 72nd percentile (18 x 4%) ($149,000, aka $149 kilo-dollars per year) or in the Court's judgment if you absolutely deem it compellingly necessary and the least restrictive available means the 90th (18 x 5%) percentile of United States household income ($234,000, aka $234 kilo-dollars per year), limited to one or a reasonably small pair of opposing professionals each rather than massive exorbitantly expensive legal teams. Such 72nd or limited 90th percentile compensation is rich enough for appointed or hired counsel, particularly when the expectation among the middle class and working class today under prevailing judicial standards

---

10

for everyone else in our society is so commonly as a matter of public policy an implied and even often explicit preference for dual-income households, revealed through such Congressional and Judicially-sanctioned policies as a federal minimum wage of $7.25 USD per hour ($15,080 USD per year, 48% of the poverty guidelines for a family of four) too low for a single earner to survive a family of four on.

It is a common tactic of Defendant Trump to try to bury his legal and political opposition in encumbering and financially devastating legal bills. Defendant Trump did so to Stephanie Clifford (Stormy Daniels) repeatedly for instance. The Plaintiff is in fear of suffering a similar fate, and that legal fee abuse tactic chills free speech and the free exercise of religious belief to preserve life through everything from Commander-in-Chief age limits to guarantee fitness and protect against mild cognitive impairment that naturally comes with advanced age to constitutional reform to prudent age limitations on the Commander-in-Chief and a political system that provides a real path for the majority of this country to secure governmentally guaranteed healthcare (whether privately or publicly run) without obstructions like gerrymandering, campaign finance steric hindrance, or suppression of minority party representation through first-past-the-post single member winner-take-all gerry-mandered districts. The Plaintiff does not have the legal resources of a hexa-billionaire as Defendant Trump does. Allowing that "legal fee throat-stuffing" to happen by the hands of any Party to this lawsuit would violate and substantially burden Plaintiff's religious beliefs, robbing the Plaintiff of funds to support religious causes.

**As such, the Plaintiff also asks for an immediate, rapid, emergency determination as to whether the Plaintiff's legal fees for any Court-appointed Class Counsel (or Counsel) will be covered by 42 U.S. § 1988 under the Religious Freedom and Restoration Act as a vindication of civil rights under that section for this case, to prevent legal fees from being**

racked up and stacked up heavily by duopoly opposition and abusively while pleading for this relief. Inasmuch as this Pleading reflects a sincere religious belief that it is life-saving and seeks life-saving and life-preserving Constitutional Reform, the Plaintiff asks for a preliminary award of legal fees under the RFRA to provide an immediate "upfront" budget for further prosecution of this case.

The Plaintiff further asks the Court to declare that the Plaintiff's out-of-pocket cost for Court-appointed legal representation in this case shall not in any case exceed $3,000 - $5,500 USD, the estimated stochastic cost of financing the preservation of a life through a maximally effective global charity listed with GiveWell[11]. That would be where the Plaintiff's residual funds budgeted for this on margin go, and forcing the Plaintiff into a situation where pleading to the Courts on a life-preserving religious need for Constitutional and legal reform runs up a huge bill beyond his bounded religious rationality of $5,500 that stochastically costs units of life. In that sense, the Plaintiff asks the Court to find that RFRA unduly burdens religious expression by delaying the award of legal fees until final judgment rather than being issued immediately on a determination that the "balance of merits" or the interesting, novel religious burden questions that the Plaintiff raises merits financial support of part or all of the Plaintiff's arguments.

e. Any other relief the Court deems just and proper.

## Further Argument on Cash as Contract and Steric Hindrance and Cash As Not Equivalent To A Form of 1st Amendment Speech

1. **Cash is not speech**: While the First Amendment protects freedom of speech, cash in itself is a medium of contractual exchange and does not inherently convey ideas or opinions like

---

[11] "How much does it cost to save a life." GiveWell. January 20, 02025. https://www.givewell.org/how-much-does-it-cost-to-save-a-life

speech or the act of writing or coding does.

2. **Cash is contract**: The transfer of cash in political contributions represents a contractual agreement or exchange, often entailing expectations or obligations between the contributor and the recipient.

3. **Cash is steric hindrance, not speech as the Supreme Court has previously claimed**: Drawing an analogy from chemistry, campaign financial contributions can function as a limiting factor, influencing political processes by imposing constraints analogous to steric hindrance in molecular interactions.

## Explaining Steric Hindrance

Steric hindrance is a concept in chemistry that describes how the physical size and spatial arrangement of atoms or groups in a molecule can interfere with chemical reactions. Larger or bulkier groups can block access to reactive sites, impeding interactions or altering the course of reactions. The diminished rate of reaction for bulkier attached groups versus smaller unattached molecules can often be on the order of two (1/100th rate) or three (1/1000th rate) orders of magnitude.

**Application to Campaign Contributions**: Campaign contributions can be likened to steric hindrance in that large cash donations may act as an external force, constraining political decisions or access to political "reactive sites." For example:

- **Constraining candidate behavior**: Politicians may prioritize the interests of major donors over those of the general public, akin to how a bulky molecular group adjoined to a critical reaction site hinders other alternative natural reactions.

- **Distorting the democratic process**: Excessive financial contributions may limit

opportunities for smaller, less-funded candidates, just as steric hindrance prevents smaller molecules (like, in this analogy, the Plaintiff) from accessing active reactive sites (meetings with his representatives' or their staff).

## Detailed Argument in the Pleading

1. **Cash is not inherently expressive**:

   - Cash itself does not communicate ideas or viewpoints; it merely facilitates exchanges. Unlike speech, which involves the articulation of opinions or thoughts, cash is a tool for economic transactions.
   - The U.S. Supreme Court has ruled that money facilitates speech (e.g., in *Buckley v. Valeo*), but this does not equate cash with speech itself.

2. **Cash as binding and hindering contract**:

   - Financial contributions in the context of campaigns create implicit or explicit agreements. Donors provide financial support with expectations (access, influence, policy alignment), reflecting contractual dynamics.
   - These agreements may conflict with the broader democratic principle of representation for all constituents, as they favor the donor class over the general public.

3. **Cash as steric hindrance**:

   - Campaign contributions introduce "bulk" into the political system, limiting equitable access and creating obstacles for underfunded candidates.
   - The undue influence of large donors can "crowd out" smaller contributions, mirroring how bulky atoms prevent smaller molecules from engaging in reactions.
   - This interference distorts the natural flow of political competition and decision-making,

much like steric hindrance skews molecular behavior.

## Illustrative Example

- **Scenario**: A major donor contributes $10 million to a candidate. The size of this contribution disproportionately impacts the candidate's agenda, steering their policies toward the donor's interests.

- **Steric Hindrance Analogy**: The donor's financial "bulk" restricts the candidate's ability

**Steric Effects**

  

ethyl bromide (1°)    isopropyl bromide (2°)    *t*-butyl bromide (3°)
attack is easy       attack is possible     attack is impossible

to address the needs of smaller donors or the general electorate, just as a bulky chemical group obstructs other molecules from participating in a reaction. "Attack" in the images below corresponds by analogy for me to a successful, meaningful political exchange of life-saving policy ideas leading to a political or policy bond on any lifesaving topic the Plaintiff has expressed an interest in within this Pleading.

**Change in rate as we change the type of substrate**



| | | | | Approximate Rate |
|---|---|---|---|---|
| Secondary | | $Na^{\oplus} {}^{\ominus}C \equiv N$ | | 1 |
| Primary | | $Na^{\oplus} {}^{\ominus}C \equiv N$ | | ~20 |
| Methyl | | $Na^{\oplus} {}^{\ominus}C \equiv N$ | | ~1000 |
| Tertiary | | $Na^{\oplus} {}^{\ominus}C \equiv N$ | | < 0.001 |

**What hypothesis fits best with the experimental results above?**

The approximate reaction rate of these molecules falls with increasing steric hindrance from ~1000 for a single methyl group to <0.001 for tertiary steric blockage, a six (!!) order of magnitude 1,000,000x difference in reaction rate. Similar-sized effects are observed between the Plaintiff's political access as one of 334.9 million United States residents and just one of 244 million eligible voters, and Elon Musk's political access to the President of the United States due in large part to the sterically hindrant effects of $277 million in political campaign contributions to Donald Trump's reelection campaign effort by Elon Musk that bought him or principally contributed to such extraordinary access. Because of the Duopoly's campaign finance policies and practices that Donald Trump sits atop, that give a fast track to the persons with the largest wallet and not, say, to the persons with the most unique undiscussed lifesaving technical priorities and ideas, the only real hope ordinary citizens like the Plaintiff has of reaching an executive like Donald Trump or a an actually influential and effective federal legislator is possibly through the Courts in RFRA, Sherman Antitrust, and any other Constitutional or statutory lawsuits the

Plaintiff can avail himself and other members of the Class of with the help of Class Counsel, and even then only at great cost, expense, and political risk. The Plaintiff pleads that this would not be the case if the Parties had to compete more vigorously for non-gerrymandered voters with fairer ballot access and electoral rules for real minority party alternative options.

## IV. JUSTICIABILITY AND STANDING

Plaintiff asserts standing as a citizen directly impacted by the effective operation of federal government offices. The issues presented are justiciable as they concern the constitutional qualifications and responsibilities of federal officeholders.

1.  **Standing**: Plaintiff's concerns about national security and constitutional integrity confer sufficient personal interest to warrant judicial review. Significant national security concerns such as this devolve on every citizen.

2.  **Justiciability**: The motions address concrete and specific questions of constitutional law, making them appropriate for adjudication by this Court.

## V. JURISDICTION

Plaintiff asserts that jurisdiction is proper because Donald J. Trump, a named and affected individual in this case, is a resident of the Southern District of Florida, famously residing at Mar-a-Lago at 1100 S Ocean Blvd, Palm Beach, FL 33480. The original Plaintiff is also a resident of the Southern District of Florida with his legal mailing address being filed under seal. Joseph R. Biden is going to soon be leaving his residence at 1600 Pennsylvania Avenue NW, Washington, DC to presumably live in his home-state of Delaware. The Southern District's jurisdiction is an appropriate venue for addressing claims of national significance that may impact multiple circuits. Moreover, the constitutional questions raised herein, including those

regarding a State of the Constitution Address in Part I, apply to but also transcend the immediate jurisdiction and have broader implications for federal law and governance.

## VI. CONCLUSION

Plaintiff acknowledges the unprecedented nature of these motions but emphasizes their importance in addressing critical gaps in constitutional governance and ensuring the continued effective operation of the federal government. Accordingly, Plaintiff respectfully requests this Court to:

1. Recommend that the Supreme Court adopt an annual "State of the Constitution" address tradition;

2. Grant an emergency injunction requiring the Commander-in-Chief role to be held during the pendency of this case by the respective age-qualified, vetted Vice-President;

3. Provide any additional relief this Court deems just and proper.

## VII. MOTION FOR CLASS CERTIFICATION

Plaintiff moves this Court to certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

### A. Numerosity

The class is so numerous that joinder of all members is impracticable. The class likely includes all citizens and residents of the United States who are concerned about the potential risks posed by an aged President serving as Commander-in-Chief, and for the Motion for a State of the Constitution all citizens and residents of the United States who are concerned about the vitality of our Constitution and constitutional order when public approval of the Supreme Court of the

United States and the Judicial Branch is at its lowest point in modern public polling in recorded memory[12] ("Confidence in U.S. Courts Plummets", New York Times), as Gallup found that "[b]etween 2020 and 2024, confidence in the judicial system in the United States dropped 24 percentage points, to 35 percent from 59 percent" and "[t]he 35 percent confidence rate for U.S. courts is the lowest in the history of the survey" (Ibid). The class includes all those hopeful that steady, patient constitutional reform of the kind described can restore US from this historical loss of confidence in the Judicial Branch and the other independent but connected Branches of Government organized under Our Constitution.

**B. Commonality**

There are questions of law and fact common to the class, including:

- Whether the Constitution or federal law imposes an implied age limit on the President.
- Whether advanced age can impair a President's ability to effectively discharge the duties of Commander-in-Chief.
- Whether the risks posed by an aged President serving as Commander-in-Chief outweigh the potential harms of judicial intervention.
- Whether a State of the Constitution Address tradition by the Supreme Court can help mitigate and prevent such crises in the future

**C. Typicality**

The claims of the named Plaintiff are typical of the claims of the class. The Plaintiff, as a citizen and resident of the United States, shares the same interest in ensuring that the Constitution

---

[12] "Confidence in U.S. Courts Plummets to Rate Far Below Peer Nations." New York Times reporting on Gallup Polling. December 17, 02024. https://www.nytimes.com/2024/12/17/us/gallup-poll-judiciary-courts.html

reflects and adapts to our Ever More Perfect Union and whether the President is capable of effectively discharging the duties of the office, particularly with respect to national security.

## D. Adequacy of Representation

The Plaintiff and the counsel you shall appoint are adequate representatives of the class. The Plaintiff has a strong interest in the outcome of this litigation and will vigorously pursue the interests of the class. The Counsel you shall appoint for the Plaintiff is experienced in civil litigation and is capable of adequately representing the class.

## E. Superiority

A class action is the superior method for adjudicating the claims of the class. A class action will provide an efficient and economical means of resolving the common questions of law and fact. It will also ensure that the interests of all class members are adequately represented.

## F. Definition of the Class

The class shall be defined as follows:

All citizens and/or residents of the United States who are concerned about the potential risks posed by an aged President serving as Commander-in-Chief, as well as all those separately who see a State of the Constitution Address Tradition of the Supreme Court targeting patient, steady, year-over-year public Constitutional Reform on the doorstep of our Nation's 250th Anniversary of Independence as a mechanism to mitigate, prevent, and solve such crises in the future.

## G. Request for Appointment of Class Counsel

Plaintiff respectfully requests that this Court appoint skilled counsel for the class on an

emergency basis.

## VIII. REQUEST FOR ANONYMITY (PSEUDONYMOUS FILING)

### A. Basis for Request

Plaintiff requests to proceed under the pseudonym "John Doe" to protect himself, his extended family, and other close connections against potential political retaliation, harassment, doxxing, or smear campaigns by high-profile individuals or entities who may take offense at the substance of this litigation.

### B. Legal Authority

Courts have recognized the need to balance the public interest in open judicial proceedings with the privacy and safety of litigants. In *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 01981), the court allowed pseudonymous filings where disclosure of the plaintiff's identity could result in harassment, intimidation, or undue harm. Plaintiff's circumstances are analogous given the politically sensitive nature of this case and the propensity for retaliation by certain public figures.

### C. Justification

The following factors support Plaintiff's request for pseudonymity:

1. **Potential for Retaliation**: Plaintiff's claims directly implicate high-profile political figures with a documented history of retaliatory behavior against perceived critics.

2. **Irreparable Harm**: Public disclosure of Plaintiff's identity could result in personal and professional harm, including threats, harassment, or damage to reputation.

3. **Limited Prejudice**: Allowing pseudonymity will not prejudice Defendants, as they can still challenge the substantive claims without requiring Plaintiff's identity, particularly once Class

Counsel is appointed.

**D. Relief Sought**

Plaintiff respectfully requests this Court grant leave to proceed under the pseudonym "John Doe" for the duration of these proceedings.

**IX. LOCAL RULE 7.1(d) EMERGENCY MOTION CERTIFICATION**

After reviewing the facts and researching applicable legal principles, I certify that this motion on the enforcement of maximum military service age on the Commander-in-Chief role in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

If this Pleading meets initial scrutiny, the Plaintiff asks for the appointment of Class Counsel, financial public assistance under the Religious Freedom and Restoration Act in covering the cost of Class Counsel's services (the RFRA connection can be explained in detail as needed), and a Hearing as soon as practicably possible, and ideally no later than January 20, 02025, the Inauguration Day, or January 31st, 02025, the end of the Inauguration Month.

Because the President and President-Elect and Vice-President and Vice-President-Elect and Supreme Court are so far above and beyond the Plaintiff's level, the Plaintiff found it difficult and practically impossible to consult with them or their counsel before the Filing of this Motion and Proposed Emergency Injunction.

The Plaintiff will work to deliver service on the POTUS, VPOTUS, POTUS-Elect and VPOTUS-Elect as soon as reasonably possible. If you appoint Class Counsel first before I can

manage to serve process, the Plaintiff will work with duly-Appointed Skilled Counsel to finish serving process, a process that the Plaintiff is unfamiliar with particularly for such an emergency petition with unclear instant shifting residency for President Biden and President-Elect Trump.

In a sincere effort to meet this requirement even earlier, the Plaintiff is including two additional printed copies of the filed LLM-Assisted and Pre-LLM documents at time of filing for service by the Courts on POTUS Biden and POTUS-Elect Trump for the more emergency Commander-in-Chief age limit case through any means the Courts may have available to you. Please help assist in serving process on the POTUS and POTUS-Elect.

## X. REGULAR ACCESS TO WORD PROCESSORS AND LLMs FOR THE DETAINED AND IMPRISONED FOR BETTER AFFORDABLE, EFFECTIVE, ACCESSIBLE SELF-EXPRESSION AND ACCESS TO COUNSEL

Please allow those members of the Class Action enslaved or in any form of custodial detention regular access to word processors and LLMs at least for as long as they are working on supporting this or their own legal claims to help give them 1st Amendment Free Speech, 1st Amendment Limited Free Association with Counsel and other Class Members at work on this, and 14th Amendment Equal Protection Under the Laws in this and other Legal Actions. Consider that any of their free, unenslaved opposition has continuous access to the advantageous usage of a wide selection of LLMs; they should have such access afforded to them in all fairness too. Many aspects of this case would have been hard or impossible to mount without LLM access. The first part of the Sherman Antitrust Allegation against the Donkeys and Elephants, the organized part in the most professional voice, was almost entirely generated by an LLM "under prompt".

---

Please forgive small mistakes and errata in this filing and procedure. This filing was prepared without the assistance of human professional counsel. All arguments are joined together by, inter alia, the need for a regular, consistent State of the Constitution Address by a Voice of a Justice of the Supreme Court.

Originally, printed, and signed this 19th Day of January, 02025 CE, reprinted on the 21st Day of January, 02025 CE, filed as soon as practically possible in the Southern District of Florida for a Pro Se on an emergency basis.

_Jonathan Doe_
_____
s/Plaintiff John Doe, *Pro se At Time of Filing*

Added Note: Filing on one version of this case was first attempted one day before the planned Inauguration of Donald John Trump and James David Vance at noon on January 20, 02025 CE. Inauguration Day is also a Federal Court Holiday (Martin Luther King, Jr. Day January 20, 02025). Since the Southern District of Florida apparently lacks dropbox drop-off for Emergency Pro Se cases or any other system of off-hour emergency filing for Pro Ses, this case is therefore only actually slated for filing success on Tuesday, January 21, 02025 post-Inauguration, as there is no way for this Pro Se to get this case before a Judge before then. The case is being kept in its present form as a purer articulation of the case, as it is important to the Plaintiff that it

be clear that Donald Trump is not being singled out (it's a broader case seeking to preclude *anyone* over the outermost age of 10 U.S. Code § 1253 from making us risk and suffer through the uncertainty and debility of subtle age-related cognitive decline, the onset of more severe and noticeable senility, disability, worsening physical health and its denial in the Atlassian Commander-in-Chief role regardless of Political Party, and specifically in response to our very recent regrettable national experience as Joseph Biden and Lloyd Austin worsened in relative concealment and denial), but the Plaintiff acknowledges that the case against Commander-in-Chief Joseph Biden or Secretary Lloyd Austin continuing to hold Atlassian responsibility will by the time of permitted filing be regrettably wholly moot, and unless someone else with electronic emergency filing privileges files a similar case before this Plaintiff does, President-Elect Trump at the age of 78.603 will have been installed as Commander-in-Chief Trump–at least for a day–once more, reaching the age of 78.606 at time of filing, 10.606 years past the final extension of mandatory high-ranking military officer retirement.

      <u>Final Note</u>: Even if this case is dismissed, whether in part or entirely and whether with or without prejudice, please appoint Class Counsel (or Counsel) so that the Plaintiff and all those represented may have legal advice on any further appeals that may be ripe and available.

Attached: Appendix of Original Pre-LLM Filing in Plaintiff's Own Voice (Unassisted by LLM), for supplementary argumentation and for supporting and tracking the need for prisoner access to LLMs on equal protection claims for effective and adequate access to counsel and an effective opportunity to plead for their own wellbeing and defense.