Dear Clerk of Courts for the Southern District of Florida,

Please file the following documents in Case No. **25-CV-60120**, John Doe v President Donald Trump.

If you have any questions, please feel free to call the Plaintiff at +1 (321) 252 - 9626 or write me at the address below.

All the best,

John Doe

John Doe
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626

FILED BY _____ D.C.

FEB 1 9 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

John Doe, *Pro se*

## UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| John Doe,<br><br>            Plaintiff,<br>     vs.<br><br>President Donald J. Trump<br>            Defendant | **CASE 25-CV-60120**<br><br>**MOTION/MANIFESTO TO EXTEND HIPPOCRATIC HANDS RFRA RELIGIOUS CLAIMS AGAINST THE DUOPOLY THAT PRESIDENT TRUMP HEADS FOR ELEPHANTS TO A FAILURE TO PROMPTLY PROMOTE OR PURSUE LIFESAVING POLICIES LIKE A GENERAL NATIONWIDE PROHIBITION ON USE OF TOBACCO (AND ANOTHER FOUR TOPICS), INDICATIVE OF UNWELCOMING SUPPRESSION OF MINORITY PARTY ENTRY AND MINORITY PARTY COMPETITION AND NECESSITATING RELIGIOUS RFRA RULINGS AND LEGAL ACTION TO PROMOTE MEANINGFUL MINOR PARTY COMPETITION** |

**MOTION/MANIFESTO TO EXTEND HIPPOCRATIC HANDS RFRA RELIGIOUSLY**

**MOTIVATED POLITICAL CLAIMS TO A GENERAL NATIONWIDE PROHIBITION**

**ON USE OF TOBACCO (AND BRAIN-DAMAGING CHILDHOOD SPORTS, PLUS**

**OTHER "HARM <u>LESS</u> BUT NOT PERFECTLY HARMLESS"**

**MIRACLE BERRY TOPICS)**

For the sake of the overall argument, I would like to point this Court to a different series of

exemplary policy positions of the Hippocratic Hands *Center Forward* or *Miracle Berries* Party

that the Plaintiff describes as something he wishes to start. There are five major example

positions the Plaintiff will detail here that would qualify under the JFK "*Profiles in Courage*"

stateswoman/statesman standard and be exemplary of what the Miracle Berries may be able to

push for enzymatically sweetened compromises on:

1. A controlled, phased end to all forms of tobacco addiction, like under the United

Kingdom's Tobacco and Vapes Bill, but arguably at a more aggressive rate progressively covering

even current smokers with emergency smoking cessation support services. (*HARMLESS, NO

HARM RATIONALE*)

2. An immediate end to brain-damaging tackle and collision sports in any publicly-funded

educational system, and in all private schools with students under the age of 18. (*HARMLESS,

NO HARM RATIONALE*)

3. A federally- and state-sponsored school experiment in jumpstarting and catalyzing

"copycat criminology and psychology" to rapidly shift school shooters from the use of deadly

lethal firearms to less-injurious, less-lethal paintball on loan from school, at much lesser injury

risk and lesser criminal penalty. (*HARM LESS*, **PREVENTIVE HARM SUBSTITUTION AND

REDUCTION**)

4. Extending voting suffrage under and by force of the *Religious Freedom and Restoration

Act* to all those citizens of the United States aged 14.0 and up, to enable them to freely express

their religious beliefs (including sometimes religiously compulsory life-preserving Hippocratic

religious beliefs) through political action and voting in local, state, and federal elections.

5. A stabilizing absolute maximum age limitation convention in the United States and

territories to 120 years old plus a 2.5 year "Jeanne Calment" grace period, with sponsorship of an

International Convention on medically-assisted dying to fully secure and enforce the same,

including the withdrawal of all life-extending treatments and the support of a dignified death.

1

(*HARM LESS*, **PREVENTIVE HARM SUBSTITUTION AND REDUCTION**)

2

3

4

## 1. A NATIONAL PROHIBITION ON TOBACCO CORPSING

5

The Plaintiff would like for there to be and feels compelled to try to use his limited voice

6

and writing skill to bring into being  immediately a major party or increasingly major minor party

7

in the United States that supports rapidly prohibiting the use of any and all tobacco cigarettes and

8

other carcinogenic tobacco products like tobacco cigars or tobacco chew products as a matter of

9

life-saving emergency need. That legal prohibition might have a gentle onset, but it should be

10

codified in law immediately, so that we might enjoy our first "smoke-free" generation of

11

Americans. The Plaintiff wants to declare "public policy war" on companies like Altria, the

12

company formerly known as Marlboro, before it started attempting to even dodge its own

13

horrible public reputation attached with its name for systematically killing Americans and

14

residents. The Plaintiff would like to forcibly disband and disincorporate Altria, any of its

15

subsidiaries, and all its tobacco competitors, and subject all their corporate structure and all of its

16

17

officers to career-ending public nuisance lawsuits. No one should have a job in the United States

18

that directly causes and functionally intends the deaths of other citizens and residents.

19

With enough prior warning measured over a year or two, not three decades, the Plaintiff

20

would further like to enable emergency services nationwide to accept incoming emergency

21

ambulance phone calls for persons witnessed smoking tobacco products in any public space,

22

treating the smoking of tobacco cigarettes as an immediate reason to hospitalize or otherwise

23

24

institutionalize the smoker (the "corpser", basically) for immediate addiction treatment, until they

25

can operate in public and organized corporate spaces without resorting to life-threatening

26

carcinogenic "corpsing" behavior. With a little more time, the Plaintiff's Party would like to

27

extend that to private spaces as well, making tobacco use as illegal for consumption as crack or

28

cocaine, except for exempted authentic Native American religious ceremonies by those holding provable tribal membership. And no such Native American ceremony has ever required the use of the cigarette format. At the moment, a person reporting a cigarette smoker (corpser) to an ambulance can get arrested for misuse of emergency resources. The Plaintiff has previously been arrested and deprived of his liberty for calling Emergency Services to report a corpsing smoker as an immediate public health emergency and littering-law breaker he directly saw smoking and littering cigarettes on a public road in Florida. This minor party that the Plaintiff wishes to start, the *Hippocratic Hands* or *Miracle Berries* or *Center Forward*, would like to reverse that and make it the corpser who gets arrested for "corpsing" in public, not the whistleblowing party, establishing a category of "corpsing" crimes that are so-classified because they are so dangerous to engage in, whether they be carcinogenic or poisonously liable for overdose or otherwise, that they merit immediate medical or legal treatment by us as a caring and compassionately Hippocratic society concerned in very real ways about everyone's minimum basic health and thriving.

No major party is currently attacking the life-threatening nature of tobacco cigarette and cigar smoke. The incoming Secretary of Health and Human Services, Robert F. Kennedy, is more hung up on attacking life-preserving vaccines than on attacking life-killing public health threats like ongoing public, semi-public, and private carcinogenic tobacco use. Minor parties like the *Miracle Berries (other names: Hippocratic Hands, Center Forward)* could fill the gap, and grow bit by bit to a popular majority by bravely tackling these problems that the major party duopoly seems unable or unwilling to address if the constitutional and political structure made it more feasible for minor parties to safely grow on their fundamentally religious life-preserving beliefs without acting inadvertently as Presidential election spoilers.

Making tobacco bar-none illegal everywhere in the United States and its territories is a

much higher and more practical quantitative public health priority than the Mosquito Genocide I previously referenced in my prior filing. Achieving the goal of a tobacco-free nation would be a great generational and national achievement, particularly if we are first in the world to achieve such, even before countries like France, which more modestly aims to achieve a smoke-free generation of 20-year-olds by 02030 AD.

President Donald Trump and the upcoming Secretary of Health and Human Services Robert F. Kennedy are not tackling tobacco smoke as aggressively as Hippocratic Hands would, even though they profess to be sworn to, under the Constitution's Preamble, "promote the general Welfare" and "secure the Blessings of Liberty to Ourselves and Posterity". President Trump is threatening to use the military to clamp down on the opioid trade worldwide, but he hasn't even broached the idea of using the police forces to clamp down on the tobacco trade domestically, and the Plaintiff believes he dares not for fear of upsetting the delicate duopolistic dance between Democrats and Republicans when in 02021 about 18.7% of all US adults reported using some form of tobacco product, whether cigarette or cigar. For fear of alienating such a large population of potential voters and losing their election to their duopolistic opposition, neither Duopoly Power, neither the Elephants nor the Donkeys, have advanced any bold legislation or executive action to end tobacco corpsing in the United States and territories. But such an unholy, deadly, literally irreligious (for the vast majority of us, Native Americans excepted and exempted) political position should not stand without sudden and severe disruption.

It may be that the Court will be better able to understand the religious nature of the Plaintiff's Religious Freedom and Restoration Act claims regarding minority party growth and optionality in light of this example of the life-saving need for more aggressive anti-tobacco measures, particularly when the political party the Plaintiff wishes to start is prominently labeled and named as the center forward *Hippocratic Hands*, instead of by what our nickname might be,

1
2
3
4
5
6
7
8
9
10
11
12
13
14

the *Miracle Berries* (similar to how the Republican Party is nicknamed as Elephants or Grand Old Party and the Democratic Party is nicknamed as the Donkeys). The Plaintiff is Jewish, but an overwhelming majority of United States Muslims, Protestants, Catholics, Buddhists, Latter-Day Saints, Atheists, and Agnostics have overlapping shared fundamental religious beliefs in the critical importance of fundamentally Hippocratic "Primum non nocere" (*First do no harm*) political, legislative, executive, and juridical action. For all of us, ending practices like corpsing tobacco are a fundamental immediate goal, and we together constitute members of a politically underrepresented Class that deserves representation in Court since, among other things inter alia, second-hand poisonous smoke in our environments, public, semi-public, private incorporated, and fully private continues to substantially burden our religious beliefs in a good, healthy life for us and our loved ones, both in our immediate families and in the relationship circles and businesses around us.

15
16
17
18
19
20

Even on the grounds of Native American casinos on tribal grounds tobacco cigarettes should be as illegal as cocaine is, coming under the supremacy of federal law. Only Native Americans should smoke on tribal grounds and only in the more and most religious forms, cigarettes themselves arguably not being an admissible traditional religious form of Native American community worship.

21
22
23
24
25
26

The transition to a smoke-free generation will not be painless if the rules are applied to those in existing adult generations already addicted to tobacco products, but we have invented so many nicotine patch and other nicotine substitute options for those harboring a preexisting addiction that there is no excuse for us not to make a near-immediate transition to a smoke-free world, beating any other country in the New or Old World to the punch.

27
28

Cigarette corpsing is not the sort of practice where "What happens in Vegas stays in Vegas". Cigarette corpsing affects not just immediate bystanders but also anyone who occupies

1

2

3

the same space (the same hotel room, the same car, the same home) in the future, and it affects

minor children all the time who have no say about which parents they are raised by.

4

5

6

7

8

9

10

11

The Courts could start ordering tomorrow that children in homes where there is cigarette or

cigar smoking and exposure to second-hand smoke be recognized as facing child abuse, and start

breaking up families that expose their children to carcinogenic cigarette smoke second-hand, in

the same way that Courts would separate children from parents who abuse opioids or other

prohibited illegal drugs. That the Courts currently don't is very arguably a deep shame on our

society and reflects the fact that we put the sustenance of tobacco culture in the balance of our

illicit Elephant-Donkey political duopoly above the wellbeing of our Nation's children.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Courts could even conceivably de-sanction cigarette corpsing and all the second-hand

smoke attendant to it under an aggressive interpretation of the Religious Freedom and Restoration

Act on the Plaintiff's behalf and all those similarly situated who hate and are being

health-compromised and threatened by being affected by the endemic air pollution caused by

cigarette and cigar corpsing. The Plaintiff is asthmatic; even incidental exposure to cigarette and

cigar second-hand smoke compromises the Plaintiff's respiratory system over and above the

carcinogenic and respiratory system effects that everyone faces. As a federal judge, you could

rule tomorrow that all the laws protecting tobacco companies from invidious product liability be

knocked down, exposing tobacco companies to punishing, profit-wrecking  lawsuits from every

angle by their users and by residents and citizens suffering second-hand smoke until the

corporations that support tobacco can no longer operate safely or profitably anywhere in the

United States but in very small batch ceremonial production of ancient forms of tobacco for

Native American tribespeople engaged in RFRA-protected religious ceremonies.

27

28

**2. SEEKING AN IMMEDIATE END TO STATE SPONSORSHIP, PARTICIPATION, OR**

## TOLERANCE OF BRAIN-DAMAGING CHILDHOOD SPORTS LIKE TACKLE FOOTBALL, ICE HOCKEY, AND HEADING IN FOOTBALL/SOCCER

Aside from ending tobacco corpsing, the Hippocratic Hands also aims, for example, to end the brain loss associated with known-to-be-brain-damaging sports sponsored in educational settings like elementary, middle, and even high school tackle football[1],[2], let alone tackle football in public universities funded by public educational funds before the frontal cortex has finished forming at age 25 and without fully informed, graphic and direct scientific consent to brain volume loss by those who play such sports and those who support such sports through spectation. The brain damage of youth tackle football occurs even in ordinary "subconcussive" impacts, slowly eroding the foundational organ on which all education rests and relies. It is antithetical to school boards' purpose that they continue approving tackle football and other brain-damaging head-collision sports like ice hockey or the practice of "heading" in soccer in youth sports leagues. This is another subject that the political Duopoly parties seem constitutionally unable and unwilling to "tackle", given in part that tackle football is currently the most popular televised sport on national television and beloved as a spectator "gladiatorial" sport by so many. It is not as much of a priority as, say, tobacco smoke, but it is an extremely high priority to limit, control, and extinguish nonetheless, given how much brain volume loss and chronic traumatic encephalopathy (CTE) is already known to be associated with youth tackle football in our scientific journals and case studies. Consider the links in the footnotes above to familiarize yourself with the extent of our awareness of the problem and the human toll of ignoring this issue further, with Government entities sponsoring and tolerating brain damage, disability and death in

---

[1] "They started playing football as young as age 6. They died in their teens and twenties with C.T.E." New York Times. November 16, 02023.
https://www.nytimes.com/interactive/2023/11/16/us/cte-youth-football.html
[2] "Children should avoid tackle football before high school, report says." Wall Street Journal. September 13, 02018.
https://www.wsj.com/articles/report-children-should-avoid-tackle-football-before-high-school-1536836400

childhood sports.

## *"MIRACLE BERRY" HARM SUBSTITUTION*

## *AND REDUCTION PROGRAMS BEYOND THE*

## *CURRENT OVERTON WINDOWS*

The following two programs (paintball guns in schools and maximum age limit) are not

perfectly harmless; but they're both harm *less*. They are exemplary "miracle berry" program

proposals, in the sense that they taste *sour* on first proposal and are beyond the Overton window

of currently-acceptable political discussion, but are expected to lead to much *sweeter* outcomes

on studious reflection and experimental action for our American society. To institute either of

these programs, they will likely cause some minimal or greater than minimal and

not-perfectly-consensual harm. They will cause enough harm that the Plaintiff has found

safety-focused LLMs like ChatGPT sometimes refuse to even assist in writing this pleading and

policy experiment, believing that there are other safer alternatives, and for that reason this was

almost entirely written without LLM support. LLMs don't like to deal in bloodletting policies like

even school copycat paintball shooting substitution. But the minimal harm these two suggested

experimental programs and policies cause, the Plaintiff argues, will be substantially less harmful

than their natural alternatives, in the same way that just war and military action is justified on the

grounds of ultimately reducing the number of lives lost even when military action costs some

human life upfront. Few in the United States question today sending 405,339 US soldiers to get

slaughtered in World War II with the goal and practice of lethally killing hundreds of thousands

of lives from the Axis powers; we believe we ultimately saved far more lives by annihilating

millions of lives in just war that way, and we don't feel we actually had much of any other choice. We didn't *want* world war, but a second world war was our only choice. Likewise, the Plaintiff doesn't *want* to endanger students in schools with exposure to paintball shooters but the Plaintiff feels there is no other choice for school copycat peace. The Plaintiff also doesn't *want* to sponsor gentle medical assistance for those over age 120 to die peacefully with dignity, and he especially doesn't *want* to support more forcefully intervening to lethally terminate the lives of those over the Jeanne Calment age of 122.5, but there does not seem to be any other real "demographic demarcation line" option to maintain the next few millennia of domestic and international demographic calm under scientifically induced endlessly aging population growth bomb breaking the current natural barrier preventing eight-plus generations from being concurrently alive.

Neither of these programs should ever be as harmful as war (particularly not paintball), both should be fairly limited in actual practice, and both are meant to avert and avoid the expectancy of ongoing (school shootings) or upcoming (civil war over vampire-like-aging) domestic civil war and international military war or their equivalents.

Please do not take and warp these "lesser harm" policy proposals out of context. The Plaintiff is not, for example, proposing "kill squads" or "vigilante assassins" for persons pushing over age 122.5. (At least, not yet.) The most controversial aspect the Plaintiff is proposing are making immediate changes to medical licensure to withhold lifesaving and life-extending medical support and authorize only direct medical aid in dignified dying nationwide for those rare persons (none exist today) between the presently almost unattainable ages of 120.0 to 122.5.

## 3. EXPERIMENTALLY MAKING PAINTBALL "GUNS" AVAILABLE ON "SCHOOL PRINCIPAL LOAN" TO ALL POTENTIAL COPYCAT SCHOOL SHOOTERS TO

# PROMOTE HARM SUBSTITUTION IN THE UNIQUELY AMERICAN PLAGUE OF SCHOOL SHOOTINGS

## ("OUNCE OF PREVENTION OVER POUND OF CURE")

Our United States of America has the highest rate of school shootings *by far* than any country in the world. The United States is an outlier when it comes to school shootings. While such tragedies occur in other countries, the frequency and scale of school shootings in the U.S. are significantly higher. Here's a breakdown of the issue:

**Incidence:**

- A 2018 study found that the U.S. had 57 times more school shootings than all other high-income countries combined[3].
- The U.S. accounts for the vast majority of school shootings worldwide, despite having less than 5% of the global population.

**Contributing Factors:**

- **Gun Availability:** The U.S. has a high rate of gun ownership and relatively lax gun control laws compared to other developed countries. This makes it easier for individuals, including those with mental health issues or violent tendencies, to acquire firearms.
- **Mental Health:** While mental illness is not unique to the U.S., the stigma surrounding mental health issues and the lack of access to mental healthcare can contribute to violence.
- **Culture of Violence:** Some researchers argue that the U.S. has a culture that normalizes violence, particularly gun violence, through media portrayals and societal attitudes.

[3] Rapa LJ, Katsiyannis A, Scott SN, Durham O. School Shootings in the United States: 1997-2022. Pediatrics. 2024 Apr 1;153(4):e2023064311. doi: 10.1542/peds.2023-064311. PMID: 38433681.

**Comparison with Other Countries:**

- Many developed countries have stricter gun control laws and lower rates of gun violence overall. For example, Japan has extremely strict gun control laws and virtually no school shootings.

- Other countries that have experienced school shootings have taken steps to address the issue, such as implementing stricter gun control measures, increasing mental health support, and fostering a culture of non-violence.

The high incidence of school shootings in the U.S. is a complex issue with multiple contributing factors. Addressing gun control, mental health support, and the culture of violence are crucial steps in preventing future tragedies.

But even in the absence of stricter gun control laws similar to other less-violent modern semi-democratic nations like Nippon (Japan) or Canada, the Plaintiff doesn't believe the situation is hopeless. There's a very specific countervailing "harm less" intervention that the Plaintiff would propose for the policy agenda of *Hippocratic Hands*: **waves of copycat paintball, as pushed by principals and school boards, in active psyops partnership with the police**.

The Plaintiff proposes that school boards and the state and local governments in coordination with the federal government can co-opt the "copycat psychology" of mass school shootings by making paintball guns more readily available and encouraged for school shootings in place of firearms, as a method of harm reduction and harm substitution. To make this harm reduction safely take hold in a trustworthy way, this would have to follow a delicate, publicly trusted protocol that balances the overriding rights of students and staff with the semi-anarchic license and limited confidentiality we may allow in limited and proscribed form to potential and

committed *paintball* school shooters.

**Columbine's Influence:** The 1999 Columbine shooting is often cited as a watershed moment. Studies suggest it directly inspired numerous subsequent attacks and thwarted plots. One study estimated at least 21 copycat shootings and 53 planned attacks in the 15 years following Columbine.

**Media Coverage Matters:** Research indicates that extensive media attention to school shootings can increase the likelihood of copycat incidents, particularly in the immediate aftermath. This suggests a "contagion" effect, where media coverage inadvertently inspires vulnerable individuals.

**Long-Term Impact:** Copycat effects aren't always immediate. Some studies show that the influence of a past shooting can linger for years, even decades. This means that the risk of copycat incidents remains a concern long after the initial event.

With the tragic understanding that there were over 1,500 school firearm shootings in the 25 years since the Columbine school shooting (Ibid), and with the knowledge that school shootings have (dysfunctionally) accelerated in the years since Columbine, we should start from the position that the parents of all those thousands of students shot and mortally killed or wounded or directly threatened by a school shooting would trade anything, literally *anything*, to have paintballs switched in for the bullets that their children faced. The Plaintiff doesn't have children, but would much rather have his future children and his prior students (the Plaintiff was for years a public school teacher) face a world where *paintball* school shootings were "common" and where *firearm* school shootings were as rare and improbable as they are in Canada and Japan than the other way around.

1

2    What if Columbine had been a *paintball* shooting instead, copied by 21 copycat paintball

3    shootings and 53 planned *paintball* attacks? The Plaintiff wants for us to live in *that* world, and

4    the Plaintiff believes the Courts, Congress, State Legislatures, and the Executive branches of

5    federal, state, and local government want to live in *that* "paintball copycat" world too.

6

7    The Plaintiff argues that students under current voting age (18.0[4]) would *trade anything* for

8    a world where they regularly drill for the likelihood of limited-license *paintball* school shootings,

9    and even suffer the experience of an actual "live paintball" paintball shooting drill once in their

10   time in middle or high school, instead of their current nightmarish likelihood of facing lethal

11   *firearm* shootings in their schools.

12

13   Here's the Plaintiff's proposal: School principals and school boards buy paintball guns and

14   paintball ammunition to be kept in a safe place in the school, arguably in a locked school trophy

15   cabinet, available to lend out to students who feel disaffected enough to want to channel their

16   rage into a school shooting. That trophy case has a QR code and a URL on it that links to a video

17   educating anyone who wants to conduct a school shooting to ask the school principal to borrow

18   the school paintball gun and paintball ammo, with a brief on what the experience will be like and

19   how their effort will be protected, deprotected, and punished more softly than if they bring a

20   firearm to school, with a practical guarantee of survival and a future, however notorious, if they

21

22   paintball rather than firearm. School staff who learn of a request to borrow the school paintball

23

[4] The Plaintiff wishes that students aged 14.0 and older carried voting suffrage for their suffering (suffering is at the heart of voting suffrage), and could cast ballots in our semi-democratic elections to concretely say what their preferences were on this and many other proposals that affect them. The Plaintiff believes strongly in voting rights for young adults and school shootings like the Parkland Marjorie Stoneman Douglas school shooting are a clear and very public issue where voting rights for youth would help command attention on a boiling, burning issue that directly affects those in their teens much more than adults. The Plaintiff speculates that if youth had a vote, the vast majority would on reflection courageously (albeit reluctantly of course -- even the Plaintiff is proposing this reluctantly) support school paintball shooting license substitutions like those proposed here.

equipment by a student evaluate that student as a potential school shooter channeled toward a safer path, and encourage any such disaffected students to borrow a paintball gun from the school principal rather than using deadly bullets from firearms when seeking "school shooter revenge and notoriety". The school principal and other school staff would have to protect in a limited way the confidentiality of the student requesting a school paintball shooting license, in the greater overriding interest of making sure they show up to their school, and any future school they may enroll in, with a paintball gun instead of a firearm they steal from their parents. School staff would have an opportunity to privately counsel the student who is confidentially requesting a paintball gun about the legal consequences (limited or extensive -- that's for the locality to decide and adjust) the student will face if they follow through with the threat of a paintball shooting. School staff will have a chance to hear what's motivating the student to seek revenge or notoriety, and shall have a chance to work with the student to try to address their concerns confidentially without actualizing their threat.

But the school principal should authorize and loan out to any semi-committed students a paintball gun and paintball "ammunition" to execute their threat if they've considered the alternatives and shown that they're prepared to face the legal consequences afterward. The school staff can counsel and require the "school paintballer", whether her or him, to only shoot fellow students with paintballs on the chest or below to particularly protect innocent students from accidental or intentional grievous eye injury, with a two to four minute permitted "head start" on painting and tagging the school's students. After "loaning out" or "licensing" a school paintball shooter, the school can, if it conforms to policy, inform and warn students openly of a general paintball shooter threat impending, without causing undue panic or anxiety, and without on the other hand artificially "overwarning" and making moot the school paintball shooter's threat

capacity and copycatable potential. The school can also distribute goggles or protective eyewear to students in the week that the school paintball shooter is expected to strike, and prepare school resource staff and neighborhood police to be on the alert and respond to the "active paintball shooter" fairly rapidly with less-lethal force via counterposing paintball, pepper spray, pepper ball, taser, plastic bullets, or the like, according to school and community policy.

But how does this get started to initialize and maximize the wave of "copycat" harm substituting paintball shooters? I would strongly propose that the Government work with survivors and sites of previous school shootings to experimentally trial this concept, by enlisting school shooting survivors in advocacy and even tapping school shooting survivors to be initial "enlisted" paintball shooters supported by supportive, vocal school boards and principals. The Government could ask activists from the March for Our Lives Movement, or from Sandy Hook Promise, to be part of the catalysis of this copycat substitution wave.

The Plaintiff thinks a very well-known survivor and political activist like David Hogg would be most ideal to be the first "paintball shooter". Him, or a survivor or the Sandy Hook shooting, or another school shooter survivor. They could be given a watertight non-prosecution agreement, lots of air cover, and to make it fairly real, a prior agreement to spend one night in jail as putative "punishment" for their handiwork. The school could prepare its students weeks before and the week of, getting students on board for the test through Student Government and School Assemblies, and other school functions. And every kind of press media can be invited to cover the shooting in the national spotlight, all in the hopes of shifting attitudes among school principals, and switching out firearms for paintball guns. You could even organize a televised "show trial" with the first paintball shooters, broadcasting their motives and using the paintball shooting as an opportunity to teach the public about the harms of violent unmonitored firearm

shootings rather than substitution to much less violent and much less harmful school- and community-monitored paintball crime waves in schools. I would love to watch a trial against someone like David Hogg with a defense attorney and Hogg himself defending his decision to participate in the initiating paintball shooting experiment, on the understanding that he would be acquitted and/or pardoned reliably immediately after coming up for "show trial" prosecution publicity. Who could possibly have more moral authority than a former school shooting survivor or victim's family in such a prosecutorial spectacle?

Perhaps an even earlier step would be providing a national educational funding grant to school principals everywhere in the country to purchase a paintball gun and paintball ammunition to be loaned out to potential student shooters, and grants for the development of policy and policy training for all school principals and administrators on how to handle and balance school paintball shooter "rights" and privacy with student, parent, and community rights, in such a way so as to not cause a collapse in the function and motivational matrix of motivated shooters coming out of the woodwork as paintballers rather than lethal killers.

The Plaintiff knows this is a f*ing demented idea. But it's very likely that this demented idea will make for a brilliant and wildly successful psyop that can be proven to save school-aged lives.

An even "better idea", in the Plaintiff's opinion, is reinterpreting or modifying the Second Amendment and restricting and reducing gun access like Canada, Israel, or Japan. But let's be real... in our country that's very unlikely to happen politically without a fundamental political and constitutional realignment (one that, perhaps, Hippocratic Hands or another Minor Party could someday achieve by "breaking through" the political duopoly, if the Courts rule in our favor on better political mechanisms on RFRA grounds). According to Gallup, 56% of Americans

currently support stricter gun laws[5]. But we don't see that translating into meaningfully strict gun control legislation, and the Supreme Court is stymieing efforts by state legislatures to restrict gun access. Neither side of the political duopoly and no one I know vocally on the Supreme Court is advocating for immediate Israeli, Canadian, or Japanese gun control, and any such initiative is currently "dead on arrival" in the US Senate and House, no matter which duopolist party is at that moment in charge.

I hope with this paintballer proposal, we can break through the deadlock and achieve, using unconventional copycat psychology, a rapid shift in the mimetic imitative violence that disaffected students choose to reenact to achieve the revenge or notoriety they seek, with much better survival odds, more counseling support, better offramps, and more limited consequences if they do "pull the trigger" and shoot up their school.

Again, it's a demented idea, but the Plaintiff believes with the right formula it could dramatically shift the equilibrium of copycat shooters toward less lethal but still "loud" less violent alternatives.

The Plaintiff hopes that the Courts and Judges in South Florida, starting with the Honorable Rodney Smith who this is assigned to, might be able to conference on this idea and help organize this with all the contacts you have with law enforcement, prosecutors, defense, and through law enforcement and directly through your contacts, with the broader community. At a minimum, let's test this out in Florida, as a policy laboratory as our United States were always intended to be. If we can show in Florida that paintball gun availability in schools and "spontaneous" paintball shootings can successfully immunize and inure us from firearm shootings, every other state will be eager to copy us as quickly as the evidence comes back showing the solidity of the experimental finding.

---

[5] Surveys on gun-related topics. https://news.gallup.com/poll/1645/guns.aspx

## 4. SUFFRAGE RIGHTS AND RITES FOR 14.0 AND UP UNDER THE RELIGIOUS FREEDOM AND RESTORATION ACT

One last note: Another major change that the Courts could support to make gun control affecting schools more likely is by granting students over the age of 14 the right to vote in all local, state, and federal elections. Suffering is at the heart of suffrage, and students as young as 10.0 and even younger are suffering death at the hand of school shooters and aren't given a voice or a vote in how to prevent the violence. Following Erikson's stages of psychological development, we should be able to radically trust 14.0, 15, 16, and 17 year olds with the right to vote and have a voice in how to prevent school violence, of the sort that legislators couldn't or wouldn't dare ignore. The Plaintiff seriously and strongly supports school youth suffrage for US citizens over or at the age of 14.0, particularly at a formative time when voting habits can be supported and developed in the curriculum and in conversation with parents and community, and hopes that over time such suffrage rights and rites will become more common and widespread. But even some youth are acculturated and normalized to think that voting should only be reserved for "adults".... as if young adults somehow lack the mental prowess to start making informed decisions about which policies and which elected officials best represent them.

**The Plaintiff begs the Court to mandate student suffrage for all those 14.0 and up as a civic and sectarian religious right under the Religious Freedom and Restoration Act.** Students who are mature enough to vote and are prevented by government fiat from voting are seeing their religious beliefs substantially burdened because they can not express themselves religiously in elections on topics like how to reduce school violence or whether abortions should be legal or not up to the end of the first or second trimester, as their own religious community teaches and as their own formed and forming religious beliefs may point them toward. 14 year

olds suffer enough harm and hardship at our hands, and at their own, to enjoy the privileges of suffrage. It would be much easier and much more ethical to meaningfully discuss this proposal of community-catalyzed paintball shootings as a sustainable state or national harm prevention mechanism if students themselves had a guaranteed vote and voice in their local, state, and federal elections, rather than being passive experimental subjects who lack an equal vote over community policy.

There is no "less restrictive means" of supporting the religious expression of youth than by granting them a voice and a vote in all their elections.

The Plaintiff has standing to request this as a founder for a new political party, Hippocratic Hands, that seeks to give students over the age of 14.0 a vote and a voice through suffrage. Students 14.0 and older up to the age of 17.99 are a key part of Hippocratic Hands constituency, and a failure to grant these students a voice and a vote religiously diminishes the capacity of Hippocratic Hands to take root and grow with a population of religiously life-affirming voters who aren't as beholden by habitual practice to the donkey-elephant Republican-Democratic duopoly. It is just this population of potential voters, those 14.0 - 17.99, who would most immediately be subject to a lifetime, permanent "tobacco products and derivatives" ban like what was discussed above in Proposal #1. We must grant them their religious freedom now to vote on religious topics like that which ultimately resolve into questions of "life" and "death" for them, their peers, and their communities. Such voting-as-religious-expression is functionally obligatory in the Jewish faith that the Plaintiff and his future children shall adhere to, and is functionally obligatory for every other major religion in the United States as well.

The Government lacks a compelling need or justification to restrict 14 year olds from voting. They are old enough by 14 years old to be logical and responsible voters. Even if and when they come to later regret their voting choices, that experience of imperfectly voting is

developmental and formative, and the sooner students can start casting their ballot the sooner they can take true, deep responsibility for the world they choose to cocreate and participate fully in the world that they ask for (semi-)democratic leadership from.

Extending suffrage to 14.0 year olds and up makes our community *more* democratic and less *semi*-democratic. One of the reasons historically for extending suffrage to 18 year olds was originally on the logic that if you're old enough to die for your country as a soldier you should be old enough to vote for your Commander-in-Chief. But realistically, unless 14.0 year olds can vote, there is no practical guarantee that a young 17.0 (with parental consent) or 18.0 year old soldier will have had the opportunity to vote for their Commander-in-Chief before they start basic training and take up arms and die in battle. The average 18.0 year old doesn't get a chance to vote in a Presidential Commander-in-Chief election until they turn 20.0, two or three years deep into military service. They can earn a Gold Star and get buried in Arlington National Cemetery before they ever have a chance to help choose a more capable Commander-in-Chief, one who is, for instance, unlike President Donald Trump within the maximum age and mandatory retirement limits of 10 U.S. Code §1253, and one who is, according to their taste, more or less committed to intervention in foreign wars than Donald Trump for emergent or emergency humanitarian or security needs. That a soldier can be buried in Arlington before they vote for Commander-in-Chief is not fair and violates the social contract that Congress set out to broker in lowering the age of suffrage to 18.0. For that reason, and for the reason that 14.0 year olds are fiercely and clearly competent to vote if given the opportunity, the voting age in the United States for citizens should be lowered immediately under RFRA to 14.0, to enable these students' survival and service under consensual social contract as soldiers and to enable their religious expression as civilians.

The 26th Amendment to the United States Constitution says that "The right of citizens of

the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." It sets an age ceiling on voting age restrictions, not an age floor. It doesn't halt the Courts from extending the voting rights floor to 14.0 - 17.99 year olds on religious grounds under the Religious Freedom and Restoration Act to enable youth responsible religious political expression at younger ages. Failing to do so would continue to substantially burden religious expression among youth, and would injure the ability of Hippocratic Hands to grow and sponsor initiatives most ethically for this age demographic like paintball school shootings or better, more thorough Hippocratic sex education and a range of youth rights and responsibilities in the State of Florida, like the proposed lifetime ban on tobacco products and derivatives, or the incredibly sensitive question of a maximum age limit, which will be discussed in the next topic and would, if agreed, should be agreed in discussion with everyone and be binding on everyone alive today, including *participating, voting adolescents* (14.0 - 24.99 year-olds) and young adults (18.0 - 24.99).

Please mandate in a Public Court Order that 14.0 - 17.99 year olds should be enabled to register to vote and vote in the next Florida election for all local, state, and federal offices and initiatives and nationwide under federal RFRA law, by force of RFRA law (42 U.S.C. § 2000bb through 42 U.S.C. § 2000bb-4).

**The Plaintiff, if necessary, is ready to <u>reluctantly</u> compromise on the authorization of only students 16.0 and up to enjoy voting suffrage as a start, like in Argentina, Austria, Brazil, Ecuador, and Nicaragua, without abandoning the goal of eventually securing suffrage for all those 14.0 years old and above. If for any reason you can't immediately take the step of ruling in favor of 14.0 year olds' suffrage, at least take the immediate step of ruling in favor of 16.0+ year olds voting to make our country more democratic (and less semi-democratic).** The notion that 14.0 year olds can't responsibly vote is patently ridiculous

(have you not ever seen the humbling popular quiz show, "Are You Smarter Than A 3rd Grader?" -- such students aged 9.0 - 11.0 and all their peers are often better educated and more educable on topics related to civics than much older adults), but the notion that 16.0 year olds can't is even more ludicrously so. The duopolies are not pursuing or promoting student suffrage; after the Parkland school shootings, it was *abundantly* clear to the Plaintiff that all the students at Parkland should have been granted their voting suffrage for their and their generation's suffering.

From a religious perspective, we can look at both Catholicism and my own religion of Judaism for an indication of what the proper voting age is for full, unimpeded religious expression in engaged religio-political participation. In Catholicism, the ritual of confirmation at typical ages marks the transition of a youth from childhood to adolescence. Catholics hold that the "age of reason" is 7 or 8, and confirmation under United States and Canadian bishops varies between bishops but is typically done at between ages 12.0 - 16.0. At confirmation, Catholic youth are fully initiated into the Church and experience a "Call to Mission", corresponding with an obligation to spread the gospel and serve their communities. Being barred from voting arguably impedes confirmed Catholic youth from living out their mission in their adolescence, being held back politically from engaging in the political contest over the configuration of laws in violation of free RFRA religious expression even when they are safely past the age of reason and fully initiated into the Church.

The Plaintiff doesn't have standing directly through more majoritarian and numerous Catholic or Protestant religious sectarian belief, but he does have standing and experience as a member of a religious minority with strong views on what age constitutes fully responsible legal adulthood as a Jewish adult (a Bar Mitzvah), a Jewish uncle, and a future Jewish father and grandfather.

In the Jewish faith, full legal adulthood is firmly reached at the lunar calendar age of 12.0 -

13.0 for Bat Mitzvah females and 13.0 for Bar Mitzvah males. Past that age, daughters and sons become fully responsible women and men, expected to behave as adults in the practice of all Jewish sectarian and secular laws they are responsible unto. They are also expected to be fully participating members of the Jewish community after reaching this age, including an expectation that they'll be active in *tikkun olam*, or repairing the world, often pursued through a diversity of religious political activism. After reaching Bat and Bar Mitzvah age, Jewish youth are able to enter into contracts under Jewish law just like almost any other Jewish adult, with some allowances that they remain minors under secular law. Jewish youth in general at and beyond Bar and Bat Mitzvah age are highly politically engaged and extremely knowledgeable on matters of policy that affect them, their families, their secular and religious communities, and the world at large. The idea that Jewish young adults, safely over the age of Bat and Bar Mitzvah by the age of 14.0, need to be politically suppressed from expressing their religious values through voting suffrage for at least another 4.0 years (plus, depending on birth date, possibly another 3+ years of time waiting until another major Presidential election happens to be executed, so possibly 7-8+ years in Commander-in-Chief elections)  is in violation of their capability to express themselves fully religiously and religio-politically as young adults on matters of public policy that weigh heavily on and substantially burden the free expression of their religious beliefs as translated into who holds public office and which public initiatives are approved. That's a violation of the guarantees of RFRA that even neutral laws passed by Congress that substantially burden the expression of religious faith be neutralized and replaced with the least restrictive means of achieving a compelling Governmental objective (which I concede of course includes ensuring a mature and reasonable population of voters old enough to be at least treated as legal adults or as adult-like by the religious groups within which they or others similarly situated affiliate -- a compelling Governmental objective which may generally be safely met by not going any lower in

voting age than Jewish Bar and Bat Mitzvah, but also by not setting the minimum mandatory age of eligibility much higher than Bar Mitzvah of 13.0, with 13.0 or 14.0 being an age that the Plaintiff argues might be deemed an acceptable starting compromise for all religious faiths, reinforced by the durable and advisable social compact between the next generation and crop of soldiers and citizens and their guaranteed ability to cast a ballot in the selection of the next Commander-in-Chief *before* the reach the age where their lives become fully forfeit to the suffering of direct involvement in the disciplines of war).

We're talking about suffrage for over 4 million voters, citizens of the United States with religious beliefs that are being substantially burdened for lack of full voting access to political expression and who should be eligible to vote.

And if you grant voting rights and voting suffrage to *any* person or class of citizens under the age of 18.0, for instance Jewish young adults over Bat or Bar Mitzvah age (who I have some standing for) or Catholics above the age of confirmation (whom the Plaintiff as a Jew doesn't have as much standing ground for, except as the founder of a political party seeking to propose youth-directed policies like paintball school shootings copycat psyops), you must also grant suffrage equally to all those who meet that minimum age requirement regardless of their religious (or nonreligious) background, to meet the requirements of the 14th Amendment's guarantee of Equal Protection under the laws.

This is another example of where the duopolies abjectly fail to flex the range of acceptable political belief in our Overton windows, to the injury, disempowerment, and substantial religious burdening of a massive inadequately-consulted religious population in the United States. We need miracle berry action on youth suffrage; it will open up and free so much religious freedom, political expression, and thoughtful service by both our youth and the politicians who claim to listen to them even as they remain voteless and thereby, to existing duopoly politicians, mostly

voiceless in the ways that really count when election year promises and platforms need to be formed and finalized.

## 5. ESTABLISHING A NATIONAL AND WORLDWIDE MAXIMUM AGE LIMIT NOW BEFORE QUESTION BOILS OVER WITH MORE HORRIBLE CHOICES ("OUNCE OF PREVENTION OVER POUND OF CURE")

Speaking of the "maximum religiously permitted age limit", please see Genesis 6:3: "And the Lord said, "Let My spirit not quarrel forever concerning man, because he is also flesh, and his days shall be a hundred and twenty years." Unless an alternative bioethical convention is settled reliably in international and national law before medicine enables age to regularly exceed this level, the Plaintiff expects violent, brutal wars will be fought one day in the very distant future (a hundred plus years from now) to contest or hold to this maximum age limit that practically only Jeanne Clement defied so far. The Government should start wrestling with this question of "allowable maximum age" sooner rather than later, at a time when no one is older than 120 years old rather than at a time when a hundred thousand souls are already past that point of aging and form an important political bloc and constituency. It shall be much easier to discuss and settle in legal convention in 02025 AD than in a hundred years of further medical advances in 02125 AD as some humans seek to defy observed Mosaic age limits and seek to live practically forever undying. On secular grounds, the Plaintiff supports a national and worldwide convention of medically-assisted dying protocol if a person ever surpasses the verified natural age of Jeanne Calment (122 years and 164 days). We should support anyone up to that age, but beyond that point, it is not so "CALM" to continue to support an "Ent" through life.... it is not for us to continue to "quarrel forever" to keep such super-agers alive. It imperils the demographic foundations we build, limits how many children can be born in future generations to experience

1

2

3

the world afresh in their and others' germ lines, and threatens to bury generations under the compounded gerontocratic advantages of the supernaturally aged.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

The United Nations predicts the world population will grow to 10.2 billion souls in 02100 CE. But if organizations like the Methusalah Foundation have their way, human life will become so commonly extenuated by 02100 that our population will slow or stop dying and the population count will rapidly multiply. The Methusalah Foundation believes that the first human who will reach the age of 150.0 years old has already been born. The Plaintiff argues that pushing lifespan to that limit and beyond breaks the cycle of life into a spiral of life, and the Plaintiff argues that that spiral will lead to quite chaotic, unfavorable outcomes, particularly if pushed to extremes with even more than 7 generations living on top of one another, competing for and sharing the same limited resources. I know it feels premature to host a Hearing on this question of what maximum lifespan ought to be, but will it really be easier when medical advances creep up on us and there are deca-millions or hecto-millions or billions of people over the age of 122.5 years old forming an important and intransigent political block opposing any effort to medically terminate life at or beyond that age? It's a terrible choice that's difficult to talk about, but will only become more difficult to talk about and take action on as scientists increasingly defy the limits of the natural aging process with accelerating supernatural scientific advancements conceivably allowing the existing population of teens to reach practical though highly-invasive immortality as a highly-invasive new species of its own.

23

24

25

26

27

So please also, while we're on the topic of Presidential and Commander-in-Chief super-aging in the next century, the Plaintiff asks you to issue declaratory relief that the Government does not and should not have a policy of supporting life beyond the age of 122.5 years old for any new "human species" capable through science and engineering of living that

28

radically long, or at least cutting life off no later than the exact age of Jeanne Calment[6], or very very soon after. The Government should not be in the business of supporting or sponsoring beating, defying, and even decimating the world record on aging -- doing so would violate this Plaintiff's RFRA religious beliefs, both from a civic secular orientation and from a sectarian religious perspective under Genesis 6:3. I ask for this declaration under the Religious Freedom and Restoration Act as a Jew subject to the even more strict Genesis 6:3 maximum age limit of 120.0 years that only one woman has ever been permitted by any global government (and Nature's G-d) to break so far. Everyone else has bent to the 120.0 year age limit, as Government should find we should continue to do with just a 2.5 year grace period forever into the future.

Please issue declaratory relief on this last question now or host a Hearing on it rather than delaying this question of maximum permissible lifespan further to 02030, 02040 or 02050, when the matter will be more complicated as more people qualify for "Calment" ages. It is better for everyone on this planet that we start to make a decision about this now rather than later, when the equivalent of modern-day vampires (aged persons that refuse to die and suck up the lifeblood possibilities and opportunities of the young) walk the Earth. The Plaintiff claims standing as a Jew concerned about this issue within federal US jurisdiction seeking to start a political party that sponsors an enforced secular worldwide maximum lifespan of 120.0 with a grace period of 2.5 years. While my standing isn't "perfect" (I don't have a specific person right now surpassing 120 or approaching 122.5 who I need to ask the Government to immediately assist in dying) I ask for you to please recognize my standing to ask for this question before the topic boils over harmfully in the upcoming future.

---

[6] The last name of Jeanne Calment breaks down for the Plaintiff into two parts: CALM (**CALM**, an acronym that breaks a hundred different ways including **C**entury **A**ssured **L**ife **M**ovements) and **Ent** (the noble species of extremely-long-lived, extremely-deliberative millenia-old animated trees in the Lord of the Rings series by J.R.R. Tolkien). The Plaintiff argues that we should not dare try to live as long as trees, but we should do everything in our power to live well until 100.0 or 120.0.

So at this instant, I ask for an exemplary Court declaration of a maximum retirement age (68.0) and a maximum lifespan limit (the Calment limit of 122.5 [120.0 base with 2.5 years grace period]) for all Commanders-in-Chief, former and current, under US Jurisdiction and under the inner and outer limits of the jurisdiction of the Religious Freedom and Restoration Act of 1993. Let's please jumpstart this discussion of human mortality and maximum lifespan by simply applying a declaration or an injunction on it to the Commander-in-Chief, and we can broaden the deliberation from there in Congressional political deliberation.

At the very least, please refer the question of a maximum lifespan convention urgently to this highly gerontocratic and resistently-duopolistic Legislative Branch we have presently to attempt to decide *before* it increasingly turns into a national or worldwide crisis in the decades and centuries that are sure to come. It is extremely healthy for us to eventually die; without it the universal experience of the cycle of life we're born into and presently accept as part of our life contract will turn into a very dangerous population spiral, an inevitable population bomb that could only be alternatively defused in theory with an enforced end to natural human infancy and childhood in all the vampire-age germ lines, with great-grandchildren for example barred permanently from natural parenthood and færtility (read: fairtility, i.e. fair fertility of males and females of any sexual orientation) in *their* generation for the sake of extending their great-grandparents lives into vampiric-perpetuity, and then only at great further risk to the religion, demography, psychology, sociology, politics, and economics of all those who remain much more naturally and modestly under the maximum age limit convention (proposed: age 122.5). Perhaps other modes of life become more tenable and popular in the fever dream imagination of science fiction, like it becoming common or preferable someday to raise growing android robotic children fed largely by the energy of virtually endless nuclear fusion instead of the more messy, resource-intensive, fundamentally human kind of children and grandchildren we

have today... but the Plaintiff argues even that would be an unlikely *Deus ex machina* to this "age less" and "vampire aging" demographic bomb problem we shall have, and in full and flagrant violation of the religious spirit that the global majority carry inspired by native, endemic religious traditions to individually in each and every generation "be fruitful and multiply" (eventually at reasonable, fractional, stable human population replacement multiples).

The Plaintiff doesn't have mastery of all religious traditions, and doesn't know if this suggested convention of a maximum lifespan of 122.5 years will come apart under, for instance, Daoist *Xian* (immortal being) challenge, or Zoroastrian promises of eternal human life, or Native American Iroquois Federation "Sev(enth) Generation" life-concurrency suggestions or promises (when 7 natural generations are now commonly spaced 30+ years apart). The Plaintiff can only be fairly certain that this convention of death-support and mandated death when surpassing the age of 120 or 122.5 can conceivably hold by eventual convention for all Judeochrislam traditions (Judaism, Christianity, Islam) he's most familiar with, and matches the observed absolute maximum natural-ish human life expectancy we currently have in the prior millions of years of our modern human anthropological existence and all the modern thousands of years of Judeochrislam religious anthropology we have.

This issue is almost unavoidable in the distant decades and centuries ahead as human lifespan advances by organizations like the Methusaleh Foundation experimentally create the "supernatural" likelihood of wholly ending or repairing aging. At some point, extending one's life without a concrete and committed end-of-life will have to be as internationally illegal as human cloning is (for at some point in effect it becomes another type or form of continuous human cloning) or else, the Plaintiff legally, religiously, and politically argues, we'll have worse headaches and civil demographic wars to worry about as a species.

We've spent decades ignoring the glaring sustainability problems in our 50 year solvency

projections on our Social Security Fund, always kicking the can down the road. On this topic of max lifespan, we can not as easily afford to "kick the can down the road", as the consequences of doing so will only grow increasingly grisly and difficult to stomach and come to a national and global compromise on without severe, wrenching, and heart-breaking domestic unrest of the type that will probably, in some form or another, be unnecessarily painful and lethal.

Nothing here is meant to prevent in any way "transhumanist" post-human pursuits like those transhumanist discuss in their singularity quasi-religious or religious eschatology. The Plaintiff has no objection to a person making a digital simulacra of their consciousness and making that "live practically forever" in some non-human, robot form. As far as the Plaintiff is concerned, as long as the actual human (the one that's carbon-based and breathes, eats, bleeds, and takes bathroom breaks, in some form or another) accepts the embrace of death by age 100.0, 120.0, or at latest the Calment grace period age of 122.5 having a silicon-based imperfect model of oneself "living" for longer that contributes, consumes minimal resources, and doesn't cause unreasonable trouble or negative externalities on Earth does not breach his understanding of Genesis 6:3 or cause any existing law to impose a substantial burden on the Plaintiff's religious beliefs. Also, this argument of embracing death by at the latest 122.5 the Plaintiff is happy enough restricting this RFRA claim to the Planet Earth. If humans or transhumans want to leave the Earth and pursue immortality or quasi-immortality off-world, the Plaintiff doesn't object and won't ever feel the need to trouble himself to get the Calment maximum lifespan enforced off-world. No Earth-based Court even would seem to have jurisdiction over such; it would seem to be a question for the administration of justice under home rule on Mars and other future human and transhuman off-world communities.

## CONCLUSION

I mention all this to say that the center forward *Hippocratic Hands* Miracle Berries agenda will over time extend beyond corpsing tobacco smoke and serious planning for a worldwide limited Mosquito Genocide (if we can practically and affordably kill the mosquito species that can kill or maim us) to <u>any topic that substantially threatens public health and our free order</u>, even when it is presently considered by the Duopoly's cognoscenti (or even by honorable judges on the Courts who were appointed by the duopolists) to be "politically unpopular" or politically unwise to advance, like the principle of a medically strictly-enforceable "Earth-bound" maximum upper age limit.

Please do not take and warp these "<u>lesser harm</u>" policy proposals out of context. I know many of them are not common dinner table topics, and some might be easy to counterframe adversely and be easily taken out-of-context. The Plaintiff is not, for example, proposing "kill squads" or "vigilante assassins" for persons pushing over age 122.5. (<u>At least, not yet -- that civil discussion on enforcement is for some point the Plaintiff hopes that's far into the future, when particularized harm standing and suffering immediately exists, after this demographic issue has already boiled over beyond the limits permitted under Jeanne Calment's example and Genesis 6:3</u>.) The Plaintiff also supports aggressive experimentation to radically improve quality of life and extend life consistently to the age of 120.0, with a 2.5 year grace period. The Plaintiff hopes that one day anyone in our species can practically "freeze" their biological age if they wish, and freeze their biological age at any age they wish to experience and live for their remaining lifespan, whether that be 25.0 or 48.8 or like President Trump 78.6 years old, or older. The Plaintiff would appreciate it if science could make it possible to "age backward" from 78.6 to a biological age like 67.0, an age that would be actually be permissible for Commander-in-Chief military service under 10 U.S. Code §1253. If such a scientific technology existed, the Plaintiff's arguments against President Trump's ongoing service as Commander-in-Chief would be moot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

But we don't live in such a world yet of "reversible biological aging". The Plaintiff thus insists the Commander-in-Chief is ineligible to serve and precluded from serving as Commander-in-Chief on risk-of-age-related-decline grounds. At his age, Trump as Commander-in-Chief can't be trusted militarily to prosecute a war today or tomorrow against a major rival like defending Taiwan from forceful invasion by China or defending Ukraine from further forceful invasion by the Russian Federation.

The most and only actual controversial aspect the Plaintiff is proposing on age limits are making immediate, durable changes to medical licensure to support direct medical aid in dignified dying nationwide for those rare persons (none currently exist today) between the presently almost unattainable ages of 120.0 to 122.5. These are moral positions that are or will be *religiously* necessary for many of us who have a clear political identification with a *religious dedication to* public health, whether we be Protestant, Atheist, Catholic, Jewish, Muslim, Buddhist, Zoroastrian, of the Church of Latter-Day Saints, or anything else.

Neither of the Duopoly Parties currently represent us politically in Congress on these aspects of our religious political and scientific community beliefs, and that's because of the systems of constrained only semi-democratic choice encoded in federal and state law that shackle us to the Duopoly's Pitched Popularity Contest and prevent us from stably, incrementally selecting candidates from minor parties in ranked-choice voting patterns that will take bold, lifesaving political positions reflecting underlying religious values and blend them into the national agenda through coalition governments with the more dominant, duopolistic parties.

The Plaintiff does not have all the answers on political reforms needed to make minority party competition more tenable and the duopolies less duopolistic. The Plaintiff is humble enough to know that some or even many of his suggestions may prove wrong in the end. Ranked choice, an end to gerry-mandering, and coalition governments are surely part of the solution set, as

they've been shown to work to help limit *Arrow's Impossibility Theorem* and divergence from popular majoritarian adult choice (with protected minority rights), but the mechanics of how to make this work require further deliberation and discussion in Congress and by the States as supervised by the Courts in defense of the plausibility of stable minority party (new market entrant) growth and strength. The Plaintiff just wishes to open serious conversation and some form of action on this and a legal platform to challenge the elephant-donkey centuries-old duopoly to make the launch of the *Hippocratic Hands* Party more possible and plausible, starting with the the immediate context of precluding Donald Trump from further service as Commander-in-Chief due to the chain-of-command military service age limits mandated under the statute in 10 U.S. Code §1253, which presents an overriding and exceptional "Atlassian" national security exception to the notion that the U.S. Constitution's list of qualifications for the Commander-in-Chief Presidency is comprehensive, complete, exhaustive, and imperfectible via Congressional statute and mandate.

### JUSTICIABLE VS UNJUSTICIABLE POLITICAL QUESTIONS

The Plaintiff is making the argument that all these topics are justiciable either directly or indirectly on RFRA grounds, even if they would normally be considered political questions in the exclusive province of Congress. If any of these problems or any collection of these problems won't be resolved by the Courts in the belief that the Duopolistic Congress is a better forum for these questions to be decided, the Plaintiff would still focus your attention on directing and declaring relief on reforming the duopolistic political mechanisms that determine who may serve in Congress, for instance, by declaring (a) political gerrymanders broadly and categorically illegal under the Religious Freedom and Restoration Act nationwide -- except possibly for positive racial gerrymanders to prevent unfair and unconstitutional racial vote dilution as possibly

required in some districts under the Equal Protection Clause, which is arguably, given our history, a compelling governmental and public need, but one that also must be scrutinized and conducted by "least restrictive means" under RFRA, and (b) ordering the Federal Election Commission and the Department of Justice to investigate and report back on the feasibility of ranked-choice voting, a more parliamentary voting system, and other such patterns discussed as remedies to the duopoly system to open stable pathways for minor parties to affordably and realistically develop and grow into major competitive parties of their own, without as much duopolistic restraint on political debate and life-preserving policy choices, which again, for the Plaintiff and many other Americans, is religiously compulsary to propose, advocate for, and pursue.

## GRANDFATHER'S DEATH DELAYED THIS FILING

The Plaintiff's surviving grandfather died recently on Tuesday, February 4th, 02025 CE at the ripe age of 92.5 years old, almost exactly 30.0 years before the recommended enforceable maximum age limit of 122.5.

This filing would have arrived to the Court sooner if that extenuating circumstance (familial bereavement) had not occurred, particularly if the Plaintiff had had the convenience of electronic filing access.

s/Plaintiff John Doe, Currently *Pro se*
For the Proposed Center Forward Party of
Hippocratic Hands, aka the Miracle Berries



130 Palacio Del Mar Dr.
oca Raton, FL 33433-4148

**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE LINE
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

9589 0710 5270 2417 5073 91

**Retail**

33301

**RDC 99**

U.S. POSTAGE PAID
FCM LG ENV
BOCA RATON, FL 33433
FEB 12, 2025

**$13.56**

S2324H503093-4

Clerk of Courts
US District Court for Southern District of FL
299 E. Broward Blvd., Suite 108
Ft. Lauderdale, FL 33301