David Clayman, *Pro se*

MAY 0 9 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| David Morris Clayman,<br><br>    Plaintiff,<br>  vs.<br><br>President Donald J. Trump<br>    Defendant | Case 0:25-CV-60120-SMITH<br><br>**REQUESTING EXTENSION OF TIME DUE TO ILLNESS**<br><br>**PLAINTIFF'S DRAFT RESPONSE TO MOTION TO DISMISS COMPLAINT** |

## REQUESTING EXTENSION OF TIME DUE TO ILLNESS

**0. Recent Serious Illness -- Requesting an extension of time on this Response to Motion to Dismiss**

Plaintiff respectfully requests a seven (7) day extension of time to file an amended Response in Opposition to Defendant's Motion to Dismiss. Plaintiff recently became seriously ill, leaving Plaintiff largely bedridden and unable to work for approximately five (5) of the fourteen (14) days allotted for response. Although tests for strep throat, influenza, and COVID-19 were negative, after seeing two physicians Plaintiff was ultimately diagnosed today with asthmatic bronchitis, a condition with symptoms severe enough to require time off work and cancellation of planned travel from May 7–22, 2025, to avoid exposing others to contagion.

Given that Plaintiff is still recovering, has already lost five (5) days of preparation time, is proceeding pro se for lack of assistance of counsel, and must conduct significant research to address the government's arguments, Plaintiff respectfully requests an additional seven (7) days

to submit a moderately revised and improved Response.

The rest of this document will be a copy of the Incomplete Draft Response to Motion to Dismiss that I currently have just in case my request for an extension of time for filing is summarily denied rather than granted. There are several important missing arguments in this Incomplete Draft that I know I still need to write up that I haven't had time to write just due to illness, like:

A) text making it even more clear to what extent Donald Trump in his official capacity is tied to the claims made,

B) significant public polling results on the public's broad lack of support for Presidents serving at Donald Trump's age,

C) actuarial studies on likelihood of hospitalization and serious debilitating mishaps to and frailties of the Commander-in-Chief over the years from 78 - 82 years old in which Donald Trump shall serve and ultimately become the oldest President ever allowed to occupy office if we recklessly risk allowing him to serve through this term, and

D) argumentation about the doctrine of the exhaustive nature of Presidential qualifications (vs the more logical theory of nonexhaustive qualifications) in the Constitution, and the logical limits of advancing or abjuring, accepting or rejecting, that doctrine, and the national security implications of insisting on that doctrine when the Commander-in-Chief is elderly enough to carry spiking frailty and health risk. By comparison, the list of immunities in the Constitution might have been thought to be exhaustively enumerated in the Constitution, but the Supreme Court recently ruled that the President carries wide and deep immunity from criminal process as a necessary aspect of her or his position. Why shouldn't actuarial and actual health be a similar wide and deep concern of the People, the Congress (through 10 USC §1253), and the Judicial Branch regarding

Presidents, balancing their exceptional, solitary, apex power such that "an elderly man with a poor memory" or an elderly man with a 30% actuarial risk of incapacitating hospitalization during their term and a low likelihood of major abdominal surgery survival like societally much-needed altruistic living kidney or liver donation is no longer accepted as a plausible occupant of the White House any longer, so that the law is applied in a way that matches the public's overwhelming preferences to rule out such elderly men or women from the Office of Commander-in-Chief?

I'm running out of time on sending this out. I just need another week to find enough time balanced against all my other commitments to incorporate these and other arguments into this document and give this its best shot of surviving this very untimely Motion to Dismiss challenge.

## PLAINTIFF'S DRAFT RESPONSE IN OPPOSITION TO

## DEFENDANT'S MOTION TO DISMISS

Plaintiff, proceeding pro se, respectfully opposes Defendant's Motion to Dismiss. The Defendant has filed a "kitchen sink" Motion to Dismiss, asserting virtually every conceivable defense and argument, regardless of relevance or merit, in an apparent effort to overwhelm rather than clarify the issues.

**Plaintiff states as follows:**

---

## 1. Preliminary Statement

Plaintiff respectfully submits this Response in Opposition to Defendant's Motion to Dismiss. This case raises substantial constitutional, statutory, religious, and civic questions that merit adjudication. Far from being frivolous, the Complaint presents colorable claims supported by plausible legal theories, including presidential eligibility under the 22nd Amendment and 10 U.S.C. § 1253, antitrust injury under the Sherman Act as background and as a means of responding in advance to and overcoming any "free, fair, and absolute electoral mandate" argumentation the AUSA raises, and religious burdens protected by the Religious Freedom Restoration Act (RFRA). Plaintiff also seeks forward-looking, good-faith judicial guidance to safeguard constitutional stability and national security in upcoming elections by guaranteeing that potential Commanders-in-Chief meet minimal age-related standards for their awesome solitary apex position in the chain-of-command, in a position patently unsuitable for, for example, an "elderly man with a poor memory" (see Special Counsel Robert Hur's commentary on Joseph

Biden), or an almost 79 year old man like Donald Trump with extremely high actuarial risk of frailty and hospitalization during his term in office if his term as Commander-in-Chief and President is allowed to continue. President Trump is in the same age class as Biden was and at the age of Biden and Trump, Commanders-in-Chief suffer unacceptable health risks under 10 U.S. Code §1253.

Plaintiff respectfully requests that the Court deny the Motion to Dismiss or, alternatively, grant leave to amend the Complaint.

## 2. Legal Standard

To survive a Rule 12(b)(6) motion, a complaint need only allege sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court must construe all reasonable inferences in Plaintiff's favor. Dismissal is inappropriate unless no set of facts could entitle Plaintiff to relief.

Notably, the most important key fact here for the 10 U.S. Code §1253 claim is that Trump was born on 14 June 01946, which is a broadly and publicly known fact, and is now approximately 78.9 years old, almost 11 years above the maximal age limits set for general and flag officers of the Armed Forces under 10 U.S. Code §1253, and as a result is under extraordinary risk of health debility or injury for each month and year that passes in his term, a level of risk Congress and the People have deemed unacceptable for any Commander in the Armed Forces, and by logical induction, for the Commander-in-Chief as well.

No military officer may serve in the chain of command at Trump's age. That's an objective fact enforced by Congressional statute. The Plaintiff argues that Trump himself may not serve in the chain-of-command, that his Commander-in-Chief role puts him in a legal grey zone between

military and civilian, that the rules of 10 U.S. Code §1253 should apply by inductive logic to

Commanders-in-Chief who are at the apex of the chain-of-command as they are also regularly

commissioned (quadrennially per the Constitution's terms on the Electoral College), and that

public polling around the time of the 02024 Election shows that the American people never

wanted Presidents or Commanders-in-Chief that are as old as Donald Trump or Joseph Biden are

or were with as many health risks as this age class they are both in carries.

## 3. Response to Shotgun Pleading Argument

Defendant incorrectly characterizes the Complaint as a shotgun pleading. While Plaintiff's

Complaint raises multiple legal theories, they are clearly separated into distinct claims: (1)

presidential eligibility and age limits under constitutional and statutory authority; (2) antitrust

concerns under the Sherman Act, just meant to anticipate and counteract any claims of "absolute

and unreviewable elected privilege and mandate" Trump's team might raise; (3) religious freedom

claims under the Religious Freedom and Restoration Act (RFRA); and (4) proposals for

constitutional improvement catalysis, arguing that the natural pipeline for corrections and

amendments to the Constitution like Constitutional rather than Congressional Presidential age

limits on the Commander-in-Chief is severely "under-lubricated" and therefore unrealistic for

Courts to demand as a threshold matter on Presidential qualifications, particularly and especially

as the Judicial Branch all the way up to the Supreme Court remains recklessly silent and

withdrawn even as the Constitution grows increasingly out-of-step with clear public needs like

this that affect and directly harm citizens like me.

Each section ties factual allegations to legal theories, giving Defendant fair notice of the grounds

for each claim.

To the extent the Court finds any portion of the Complaint insufficiently structured, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

## 4. Response to Frivolousness Argument

Defendant's characterization of the Complaint as frivolous is mistaken. While Plaintiff acknowledges the claims are novel, novelty does not equate to frivolity. Courts have long recognized that pro se litigants may advance unconventional legal theories that still deserve consideration, especially on matters of constitutional concern. Plaintiff's arguments regarding Commander-in-Chief age limits, duopolistic party control curtailing the public's capacity to perform effective democratic oversight over Presidential age qualifications, and religious burdens are grounded in statutory text, constitutional provisions, and good-faith civic concern.

Dismissal under Rule 12(b)(6) is inappropriate where claims are arguably supported by law or factual plausibility, even if ultimately unproven.

## 5. The Case for Standing

Plaintiff has Article III standing on several independent grounds:

- **Electoral Injury**: As a registered candidate for the 2028 Presidential (Precedential) election, Plaintiff is a very direct competitor with Defendant, satisfying standing under Hollingsworth v. Perry, 570 U.S. 693 (2013). See the attached FEC Form 1 and FEC Form 2.
- **Religious Injury**: Plaintiff asserts sincere religious burdens under RFRA, including the moral duty to advocate for leadership aligned with life-preserving obligations like living kidney

or liver donation which an almost 79 year old President would very likely be unable to show servant-leadership in, as even if he could be convinced to altruistically donate he would almost certainly be medically disqualified just due to his elderly age. The President's failure and presumptive inability to lead by example on living kidney or liver donation and recruit over 50,000 other altruistic living donors is marginally placing the Plaintiff and others like him who are altruistic enough to consider prospective living donation under added stress to perform that role in the absence of Presidential leadership, without any of the air cover and popular upswell of support that having a supportive and participating Presidential living donor would bring. The President is furthermore, in failing to use his powers to fast-track, prioritize, and sign the last or the currently reintroduced End Kidney Deaths Act, directly imperiling the Plaintiff's access to compensatory funds for his own pursuit of living kidney and/or liver donation in the year 02025.

- **Economic Injury**: Plaintiff has suffered financial harm from Defendant's policies, which impairs Plaintiff's ability to fund key personal and professional commitments.

- **National Security and Civic Harm**: Plaintiff, as an American citizen, has a legitimate interest in the eligibility and fitness of the Commander-in-Chief.

First, Plaintiff is not merely a concerned citizen but is a registered Presidential and Precedential candidate for the upcoming 02028 election, as evidenced by his filed FEC Form 1 and Form 2 (attached hereto as Exhibits A and B). Plaintiff intends to run directly against Donald J. Trump, who has signaled a willingness to seek a third Presidential term, notwithstanding the 22nd Amendment's express two-term limit.

As a direct electoral opponent, Plaintiff faces an injury-in-fact that is concrete, particularized, and imminent, satisfying Article III standing requirements. See *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Plaintiff seeks a Court ruling confirming that both the 22nd Amendment and 10

U.S.C. § 1253 bar Trump's continued service as Commander-in-Chief and preclude his future candidacy in 02028.

Critically, the national security issues raised are not speculative: if 10 USC §1253 disqualifies Trump from running for Commander-in-Chief in 02028, it also disqualifies his service now. In the absence of a binding, Court-enforceable agreement from Donald Trump pledging not to seek office again — which Defendant has not produced — Plaintiff must be deemed to have direct, live-standing injury.

Second, Plaintiff independently asserts religious standing based on sincerely held beliefs protected by RFRA. As detailed in *Clayman v. United States*, No. 0:25-cv-60447 (S.D. Fla.), Plaintiff believes that national leadership must exemplify living organ donation to address the country's critical shortage of transplantable tissue.

Due to Trump's advanced age (78.9 years), he is medically unlikely to survive kidney or liver donation surgery, meaning he cannot fulfill the symbolic and civic leadership responsibilities that Plaintiff's religious and ethical beliefs require from the Commander-in-Chief. This failure exacerbates the moral and physical burden placed on Plaintiff and others who strive to uphold living donation principles.

Moreover, President Trump, in his role as Commander-in-Chief, has failed to take any meaningful action to prioritize or emergency-fast-track the End Kidney Deaths Act — legislation that would have provided Plaintiff with a refundable $50,000 tax credit to support his living organ donation efforts. This legislative inaction directly undermines the Plaintiff's ability to carry out his religious calling, and had the bill been advanced, Plaintiff would not have needed to bring his related donor incentives lawsuit in *Clayman v. United States*. Thus, the President is not only

refusing to lead by example due to disinterest in altruism or likely age-based surgical disqualification, but is also obstructing key civic supports necessary to practice and promote Plaintiff's religious beliefs around life-saving donation. This dual failure intensifies Plaintiff's particularized religious harm, especially in light of the national shortage that continues to kill nearly 100,000 Americans awaiting transplants.

Third, Plaintiff also asserts standing based on financial injury directly attributable to President Trump's policies. Plaintiff holds significant stock investments, which have suffered a decline of nearly $75,000 in value due to the destabilizing effects of President Trump's initiation and continuation of a global trade war. Plaintiff contends that these trade policies, executed arbitrarily and capriciously against the advice of almost all economists, have directly harmed his economic standing. This financial harm is not incidental but interferes materially with Plaintiff's ability to self-finance his ongoing work on a lifesaving startup, Healthy Consent, PBC in this unforgiving investment and trade climate. While this economic injury may not be directly linked to Trump's age or fitness for military command, if Trump were disqualified from service under 10 U.S.C. § 1253, it is Plaintiff's reasonable belief that market stability would improve, remedying part or all of the ongoing injury. Moreover, the trade war's erosion of global alliances critically affects national security readiness, linking economic harm back to the central issue of Trump's fitness to serve as Commander-in-Chief.

Even if the Trade War were to be miraculously temporarily resolved with all countries tomorrow or before the Court holds a Hearing or makes a final judgment on this case, the arbitrary, capricious, and vituperative character of Donald Trump on trade and diplomatic relations with other countries adds an unpredictable amount of volatility to the Plaintiff's S&P 500 index investments and will remain "priced in" under widely accepted stock market pricing theory as

persistently lower marginal asset values for the rest of Donald Trump's term, until he is fully and completely relieved of duty as Commander-in-Chief and President of our United States and faith in the United States as a reliable and predictable economic partner in global trade and domestic manufacturing and business rulemaking and trade incentive constancy can be restored.

The economic loss furthermore extends to margin interest rates which Plaintiff must pay monthly on a roughly $132,306.79 margin loan. The Plaintiff's annual interest rate on that margin loan is 5.25%, a figure that reflects the Federal Effective Funds rate controlled by the Federal Reserve plus a small fixed loan premium that Robinhood Securities applies.  The Federal Reserve has grown significantly more cautious about cutting its baseline Federal Effective Funds rate due to Trump's erratic trade and economic policies, directly costing the Plaintiff increased margin loan interest fees. On his April statement, Plaintiff paid $562.39 in margin interest. If it were not for President Trump's trade war policies that he implemented after this lawsuit was filed, the Plaintiff has cause to believe that that April monthly charge would have been lower due to a lowered federal effective funds rate under almost any other Presidency not trying to relitigate in an arbitrary and capricious manner the Hawley-Smoot tariffs of the 01930s.

Fourth, Plaintiff asserts standing grounded not only in personal injury and civic harm but also in a distinct religious and moral obligation arising from Plaintiff's identity and commitments in military support to our allies as a practicing American Jew. Jewish law and tradition impose an affirmative duty upon Jews to come to the aid of fellow Jews who are in danger or under unjust attack, especially when such attacks are existential and implicate the broader values of peace, justice, and the sanctity of life.

Volodomyr Zelensky, the President of Ukraine and himself Jewish, is presently defending Ukraine and its civilian population against an unlawful, revanchist, and expansionist invasion by

Motion

the Russian Federation. The Jewish tradition, rooted in commandments such as "Do not stand idly by the blood of your neighbor" (*Leviticus 19:16*), compels action where Jewish lives and fundamental human dignity are under threat. This religious mandate is not abstract: it demands tangible advocacy and defense of those at risk.

As a Jew with American values, Plaintiff's conscience and religious duty require Plaintiff to seek remedies through lawful means to oppose actions or omissions by governmental actors, including the President of the United States, that materially endanger a Jewish leader dedicated to the cause of peace. In circumstances where American policy or conduct undermines the defense of Ukraine, weakens opposition to unlawful aggression, or threatens the safety of Jewish leaders abroad, Plaintiff suffers not only civic injury but a deep religious and moral harm, traceable to a sacred duty to protect life and oppose injustice.

This religious obligation provides Plaintiff with a concrete, particularized, and individualized transnational interest in the matter at hand. Where government conduct affronts these obligations, Plaintiff experiences a cognizable injury sufficient to confer Article III standing, especially where no other avenue meaningfully vindicates these uniquely religious and ethical concerns. Courts have recognized that religious burdens, conscience injuries, and obligations flowing from sincere faith commitments can support standing where government actions impose upon those duties. See *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Further evidencing the harm at issue, Donald Trump, while campaigning for President in 2024, repeatedly promised that he would end the war between Russia and Ukraine "very quickly" upon assuming office. Trump publicly declared, "I will have that war settled in one day, 24 hours," emphasizing his purported ability to bring immediate peace through personal diplomacy. (*See*, e.g., Trump Speech, May 2023, CNN Town Hall: "If I'm President, I will have that war settled in

one day, 24 hours.") He reiterated similar promises in multiple campaign appearances, claiming that he alone possessed the leverage and skill to rapidly terminate hostilities.

Yet as of the date of this filing — well beyond 100 days into his current term — no such settlement has occurred. Hostilities between Russia and Ukraine have not ceased, and the conflict has in fact intensified in certain regions. Many of the voters who voted for Trump reasonably relied on the defendant's repeated public promises that urgent action would be taken to halt the war and protect civilians, including the Jewish President of Ukraine, Volodomyr Zelensky. Defendant's failure to fulfill these repeated assurances constitutes an ongoing material injury to Plaintiff's conscience interests, civic interests, and religious obligations, and independently supports Plaintiff's standing to seek redress from this Court.

Accordingly, Plaintiff respectfully submits that standing is proper not only on traditional civic and constitutional grounds but also on the basis of Plaintiff's religious duty to act in defense of a fellow Jew under threat, consistent with enduring principles of Jewish law and moral responsibility.

The Plaintiff finds it outrageous that the Plaintiff really needs to cite all these sources of particularized harm and that simple citizenship or residency is not enough to make this kind of case and have the Courts rule on this question. If I were approaching merely as a concerned citizen who was just affected by the general harms of having an overaged Commander-in-Chief and President in Office, worried about the health of the Commander-in-Chief, that should be more than enough. Everyone in our United States has a particularized right to worry about the health, health risks, and age of anyone occupying the singular Commander-in-Chief, Precedency, and Presidency role.

**Fallback Standing Argument**

In the event this Court finds that Plaintiff does not presently carry primary standing, Plaintiff respectfully asserts a claim for *fallback standing* as a matter of fundamental judicial fairness, religious freedom, and constitutional necessity.

The judiciary's prevailing approach to standing — which simply dismisses Plaintiffs without addressing who, if anyone, should or could assert the claim instead — is algorithmically, philosophically, and pragmatically flawed. Whenever a Court rejects a Plaintiff on standing grounds, the Court should have an affirmative obligation to answer the question: **"If not you, then who?"** The Court should be required to draft a memo identifying a concrete, realistic, and reachable path for who could take the Plaintiff's place and what steps are necessary to ensure the case is not permanently extinguished without redress.

Moreover, the Court should provide reasonable notice and incentivize that "better imagined Plaintiff" to come forward, particularly in matters of significant public or constitutional concern. A Court cannot, consistent with Article III's guarantee of a case or controversy, judicial economy, or the ethical mandate to do justice, simply terminate a potentially justiciable claim without a plan for its vindication.

Plaintiff further contends that where no "better" Plaintiff comes forward within a reasonable timeframe appropriate to the urgency of the matter, **fallback standing** must revert to the original Plaintiff. Failure to do so would create an unreviewable lacuna where no party could ever be found fit to challenge an injury, effectively immunizing unlawful conduct from judicial scrutiny — a result neither the Constitution nor common sense can tolerate.

Plaintiff cites the Religious Freedom Restoration Act (RFRA) as authority for this claim:

Plaintiff's moral and religious duty as a Jew compels action under the maxim, **"If not me, then who? If not now, then when?"** (Pirkei Avot 1:14). RFRA commands that courts must interpret law in a manner that accommodates sincere religious exercise unless the government demonstrates a compelling interest using the least restrictive means. Here, Plaintiff's exercise of religious duty mandates stepping forward where injustice is perceived and action is required; any legal standard that would categorically bar Plaintiff from acting, without offering any alternative actor or pathway to relief, violates RFRA and the First Amendment.

Thus, Plaintiff respectfully requests that, should this Court find Plaintiff lacks standing at the outset, it nevertheless condition dismissal on the following fallback mechanism:

- The Court identifies who, if anyone, could have standing to bring the claim;
- The Court directs notice to such potential parties within a fixed period;
- If no such party appears within that period, **standing reverts to Plaintiff by operation of fallback standing**.


Without such a safeguard, the judicial standing doctrine risks becoming not a gatekeeping function for real controversies, but an arbitrary barrier to justice itself.

But in sum, Plaintiff's particularized standing is further grounded in:

- Direct electoral injury as a registered opponent;
- Ongoing competition with Trump in the 02028 race;
- Unique RFRA religious burdens arising from Trump's failure to model living organ donation leadership and failure to adequately defend and support Ukraine and end the war in Ukraine fairly on the timeline he falsely, magically, and cynically claimed he could deliver;

- Economic injury impacting Plaintiff's ability to finance a lifesaving enterprise;
- And an urgent national security interest in maintaining Commander-in-Chief eligibility aligned with statutory and constitutional fitness standards.

Accordingly, dismissal on standing grounds is improper. Even if the Court finds any category of standing insufficient individually, their cumulative weight supports standing. Alternatively, Plaintiff requests the Court apply a fallback standing framework that ensures these significant constitutional questions are not left unreviewable.

## 6. The Motion to Dismiss from the Defendant's Counsel Is Untimely and Should Be Stricken Completely From the Record

The Motion to Dismiss filed by Defendant is procedurally defective and should be stricken as untimely. Defendant failed to respond within the allotted and allowed 60-day time period under the applicable rules and practice governing service of process upon the United States and its officers. Plaintiff filed and served the Complaint properly on all required parties, including:

- The White House (Office of the President);
- The Attorney General of the United States at Washington, D.C.;
- The U.S. Attorney for the Southern District of Florida.

Plaintiff has now filed proof of such service with the Court twice, and does so again in Exhibit C. Despite the Plaintiff effecting service in the ridiculously exhausting and time-consuming way that the Government requires, Defendant failed to file a timely responsive pleading and instead responded too late with a kitchen sink Motion to Dismiss full of conclusory statements.

The Defendant's attempt to justify its delay by claiming that Plaintiff failed to complete proper service is without merit. Defendant must clarify whether it relies on receipt of certified mail or the Court's docket to track service. If Defendant relies on certified mail, the record shows that service was timely and properly effected, leaving no basis for missing the sixty (60) day response deadline. If Defendant relies on the Court's docket, then Defendant was on notice of all filed documents and likewise had no excuse for failing to meet the deadline. Defendant cannot now invoke, after the fact, a clerical or electronic docketing error by the Clerk as a sufficient basis to excuse its disregard of filing deadlines that were clearly communicated to the AUSA, the White House, and the Attorney General through both certified mail and docket entries, only responding after Plaintiff was compelled to file a Motion for Default and Default Judgment.

If you have ever in this Court barred a Pro Se Defendant from filing an unacceptably untimely Motion to Dismiss, you should enforce the same set of strict timeliness rules against the Government here, without fear or favor, as the Government as Defendant should get less leeway than an untrained Pro se Defendant.

The Court should therefore find that:

1. Service was in fact completed in accordance with Federal Rule of Civil Procedure 4(i);

2. The Defendant was obligated to respond within 60 days and failed to do so;

3. Plaintiff's Motion for Default and Default Judgment was properly submitted and remains valid;

4. The Motion to Dismiss is late and should be stricken from the record as procedurally invalid.

## 7. Service Issues, If Any, Are Curable

Even if the Court finds some procedural irregularity in service, Plaintiff respectfully requests leave to cure under Rule 4(m), in line with judicial preference for decisions on the merits.

## 8. Request for Leave to Amend

In the event the Court finds any aspect of the Complaint deficient, Plaintiff respectfully requests leave to file an amended complaint under Rule 15(a). The Eleventh Circuit favors liberal amendment to cure pleading defects, particularly for pro se litigants.

## 9. RFRA Protects Civic Religion, Not Only Sectarian Religion

Plaintiff respectfully submits that the Religious Freedom Restoration Act (RFRA) must be interpreted to protect not only traditional or sectarian religious beliefs but also deeply held civic religious beliefs. Plaintiff's beliefs in the moral and patriotic obligation to protect and preserve human life — including through living organ donation — are grounded in a pluralistic and civic form of religion that resonates with many Americans, regardless of sect.

This civic religious belief is not rooted exclusively in Jewish doctrine, although Plaintiff shares overlapping values. Rather, it is a constitutional form of moral and ethical obligation derived from American traditions of public service, conscience, and a shared duty to prevent avoidable

death.

The near-universal public support for saving lives, especially through heroic altruism in times of shortage or national crisis, such as the organ transplant crisis, exemplifies a moral framework that is fundamentally religious in character even if not labeled by a sectarian name. RFRA was enacted to protect against precisely the kind of bureaucratic burdens that now fall on Plaintiff's attempt to live according to this higher civic moral law.

Accordingly, the Court should affirm that RFRA encompasses civic religion — a belief system grounded in shared human dignity and national duty — and allow Plaintiff's civic religious claims to proceed under that protection as binding precedent in the Southern District of Florida. Even most atheists and agnostics have cognizable religious beliefs, in the form of civic religion, and atheists and agnostics make up about 29% of the population, all of whom ought to be equally protected by RFRA under the banner of civic religion.

Notably, according to Pew, in the Jewish community not everyone is sure that G-d exists exactly as described in the Bible. As they state, "There are even bigger gaps [between typical US adults and Jews] when it comes to belief in God. A majority of all U.S. adults say they believe in God 'as described in the Bible' (56%), compared with about a quarter of Jews (26%). Jewish Americans are more inclined to believe in some other kind of higher power – or no higher power at all.[1]" Here's a table showing the penetration of belief in the biblical version of G-d among Jews.

|  | Jewish adults | All US adults |
|---|---|---|
| They believe in G-d of | 26% | 56% |

[1] Pew Research Center. 11 May 02021. "Jewish Americans in 2020." https://www.pewresearch.org/wp-content/uploads/sites/20/2021/05/PF_05.11.21_Jewish.Americans.pdf?utm_source=chatgpt.com

Motion

|  | | |
|---|---|---|
| the Bible | | |
| Believe in other higher power / spiritual force | 50% | 33% |
| Do not believe in any higher power / spiritual force | 22% | 10% |

Altogether, 72% of Jews do not believe exactly in the G-d of the Bible but virtually all I argue still have firm religious beliefs of a civic religious nature, whatever their belief in supernatural phenomena may be, no matter how much they doubt or even disavow the G-d of the Bible. All of us who describe ourselves as Jews hold the value of life to be sacred, where "Whoever saves one life, it is as if he has saved an entire world." *(Hebrew:* מִי שֶׁהֶצִּיל נֶפֶשׁ אַחַת מִיִּשְׂרָאֵל, כְּאִלּוּ הִצִּיל עוֹלָם מָלֵא) *(Mishnah, Sanhedrin 4:5).* That religious belief in the paramount importance of preserving life binds all Jews, but it also binds the vastly overwhelming majority of non-Jews in our United States, including all-too-marginalized atheists and agnostics who dedicate their lives to serving, preserving, and improving civic and social life. The Plaintiff argues that not only all Jews but all citizens and residents of our United States, regardless of whether they believe in the G-d of the Judeochrislam Bible or do or do not believe in another higher power or spiritual force, should all be able to claim religious freedom and restoration under the banner of civic religion for their religious ethical values, or any firm ethics rising to the level of having a civic religious character, whether civic or sectarian. There should be no doubt that the prime directives in our United States to preserve life and death are surely sufficiently of religious character, whether under the banner of sectarian thought or civic religious pluralism. The Plaintiff asks for this Court's plain, express recognition and binding acceptance of civic religion's pluralistic footing under RFRA.

It is extremely uncomfortable for the Plaintiff to be forced to work on projects like living organ

donation incentives exclusively under the exclusionary nonproselytizing banner of his sectarian Jewish religion when pluralistic civic religion he can freely and openly proselytize to and with anyone is far more appropriate to such unifying fundamentally civic "calmunity" (community) service. The Courts under RFRA can, should, and must adjudicate civic religious claims under RFRA, not just sectarian claims.

As a defensive legal fallback in this particular Court case, until such clear and binding declarations are made plainly protecting the sanctity of civic religion's place under RFRA, the Plaintiff asserts that the Court should broadly assume and accept that all civic religious beliefs the Plaintiff holds and all civic religious claims the Plaintiff makes are *also* well-supported by his sincere belief in sectarian American Jewish religion.

# 10. Judicial Branch Communication with the Supreme Court Is Wholly Proper, Necessary, and Advisable

Plaintiff respectfully asserts that the Executive Branch has no lawful authority to curtail or regulate formal and open communication between the District Courts and the Supreme Court. Plaintiff's request for an advisory opinion in the form of a "State of the Constitution" address is directed toward internal dialogue within the Judicial Branch itself. The Executive Branch has no role and no standing to object to the District Court advising its superior Court when, in the discretion of the District Court, such communication is appropriate and merited.

The federal judiciary is a separate and coequal branch of government. Just as the Assistant United States Attorney naturally advises her superior, the President, within the Executive Branch, so too may a District Judge advise the Supreme Court on matters affecting the state of constitutional

governance.

Nothing in Article III, nor in historical practice, forbids respectful advisory communication from the District Courts to the Supreme Court outside of appeals. The 1st Amendment protects the Plaintiff's right to petition Government, including the coequal Judicial branch, for relief from a grievance, and in this case the Plaintiff has a grievance that the Constitution has not been regularly maintained and amended over the last century as the Supreme Court Justices would likely advise if given a speaking forum to describe constitutional emendation needs, leading to absurd and dangerous situations like this one.

By this one, I mean where Joseph Biden, Donald Trump's immediate predecessor, serving just less than a year ago as Commander-in-Chief in the same age range of Donald Trump while being described accurately--we later learned through his first public debate appearance--by an honorable Special Counsel Hur as a "well-meaning, elderly man with a poor memory"... a state that we would not be in if the Congressional intent in 10 U.S. Code §1253 to guarantee that the chain-of-command remains healthy and young enough to serve admirably and with only minimal health risk and the vigor to even, for instance, undergo any necessary major surgery (like urgently needed living donor surgery) were clarified and elevated to the level of obvious constitutional law, making more obvious what the Presidential qualifications and disqualifications for office are. The Plaintiff alleges that it would be perfectly reasonable for the Court to set an age qualification for the Presidency and Precedency indirectly, in the form of requiring that all Presidents and Precedents score low on the Clinical Frailty Scale, and show ability and willingness to undergo major abdominal surgery if needed, as it is needed, for instance, for lifesaving civic living donor surgery, which the Plaintiff argues firmly should be a virtual religious necessity in the

Motion

22

circumstances we have right now for any rightly placed and empowered Commander-in-Chief, unless medically disqualified.

Getting back to the point, the Plaintiff respectfully urges the Court to recognize that the Plaintiff's grievance petition to the Judicial Branch for more timely and regular open public conversation about Constitutional maintenance needs and any such internal communications within the Judicial Branch to correspond and collaborate on a meaningful, recurrent, regular public response to said citizen's grievance petition are not subject to Executive veto or interference. The Executive Branch and AUSA here should stay in its lane.

## 11. The Key Question: The Applicability of Military Age Limits to the Commander-in-Chief

As argued within the Plaintiff's Initial Complaint and subsequent filings, given the President's unique hybrid status between civilian policymaker and military leader, it is appropriate and necessary to apply military standards designed to preserve readiness, capability, and public trust, particularly when the President exercises military command. Notably, under 10 U.S.C. § 1253, Congress has imposed a mandatory retirement age of 64 years on general and flag officers, extendable by presidential discretion to 68 years, recognizing the vital importance of physical and mental fitness among those charged with critical military responsibilities.

Although the President is not commissioned through the military appointment process, he is in effect *commissioned* as Commander-in-Chief and President by the American people through the constitutional mechanism of the Electoral College, a process that recurs every four years. This public commissioning entrusts the President with powers even greater than those of generals and

admirals, without the internal safeguards of military discipline. Given that the Framers deliberately placed ultimate military command in civilian hands while simultaneously seeking to prevent abuses of power, it follows that a Commander-in-Chief who occupies a liminal position at the apex of both civil and military authority must be held to at least the same age-related fitness standards as those imposed on career military leaders.

Applying the age restrictions codified in 10 U.S.C. § 1253 to the Commander-in-Chief role would uphold the principles underlying the statute: ensuring that those vested with the highest levels of military authority possess the vigor, acuity, and judgment necessary to meet the nation's security needs. Failure to apply analogous age limits would result in a dangerous incongruity: career generals and admirals would be deemed unfit to serve past a certain age precisely because of the responsibilities they bear, yet a President exercising even more profound military powers would face no comparable fitness safeguard.

Accordingly, in view of the President's functional equivalence to a general or flag officer in his capacity as Commander-in-Chief, and in light of the public's commissioning of the President through electoral mandate, it is both reasonable and constitutionally sound to recognize that the standards embodied in 10 U.S.C. § 1253 should inform the permissible qualifications for the office. The constitutional order demands no less to preserve both effective civilian oversight and competent military command all the way up to the Atlassian position of Commander-in-Chief.

# 12. Request for Judicial Civility Notice and Admonishment of AUSA

Plaintiff respectfully requests that the Court remind all parties of the duty of civility in written submissions and admonish the AUSA to remain civil toward the Plaintiff. The Government's Motion repeatedly refers to Plaintiff's claims as "delusional," a term with psychiatric overtones that risks unnecessarily stigmatizing sincere, good-faith constitutional arguments. Especially where no evidentiary hearing has occurred, litigants — particularly pro se plaintiffs — deserve respectful engagement on the merits. A brief reminder from the Court would help preserve the dignity of the process and avoid chilling First Amendment petition rights.

Plaintiff respectfully submits that the tone and manner of Defendant's Motion to Dismiss, authored by Assistant United States Attorney Darcie A. Thompson and supervised by United States Attorney Hayden O'Byrne, falls short of the standard of civility and respect that should guide first encounters between the Government and its citizens.

Defendant repeatedly characterizes Plaintiff's arguments as "delusional," a term laden with psychiatric connotation. To call someone "delusional" is to accuse them of holding fixed, inflexible, and fundamentally false beliefs that persist despite reality or reason. See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (defining delusion as a "fixed belief that is not amenable to change in light of conflicting evidence").

Yet Defendant offers no persuasive evidence that Plaintiff's arguments — rooted in statutory analysis, constitutional interpretation, religious freedom, and national security concerns — are fixed, irrational, or wholly detached from reason. Plaintiff has shown a continuous openness to debate, clarification, and modification based on constitutional principle, statutory guidance, and persuasive counterargument.

Motion

In particular, no hearing has yet occurred. No open exchange of views has been allowed. Thus, branding Plaintiff's sincere, good-faith constitutional arguments as "delusional" before any adversarial testing of those ideas is not only inaccurate but deeply inappropriate.

A fundamental principle of a healthy constitutional democracy is that Government officers owe a heightened duty of respect and restraint in their first engagement with citizens who bring concerns to the Courts. This duty exists to preserve:

- the integrity of the judicial process,
- the dignity of citizenship,
- and the fairness of public records that will follow Plaintiffs for life, including their digital search histories and professional reputations.

Government litigants must be especially careful, given the massive informational asymmetry between ordinary citizens and state lawyers, not to inflict needlessly scarring, defamatory, or discrediting labels — particularly in first pleadings where no facts have yet been adjudicated.

If the Government succeeds in prematurely denormalizing sincere litigants through careless accusations of mental defectiveness, the chilling effect on First Amendment petition rights would be profound.

Accordingly, Plaintiff respectfully requests that this Court admonish the Defendant and the Office of the United States Attorney to use greater care and civility in their written pleadings going forward, and to avoid conclusory psychiatric labels or prejudicial personal attacks against first-time or pro se litigants unless such conclusions are supported by clear, adjudicated evidence. We don't live in a country where the *Right to be Forgotten* on search engines and social platforms is judicially recognized yet like it is in Europe. Underhanded attacks like these could be defining

lifelong, and the Plaintiff knows of no known recourse, under existing law, for defamation damages and adequate digital remediation from the AUSA, US Attorney, Attorney General, or the President in his official capacity.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.  GRANT a seven (7) day extension with permission to file an amended Response to Motion to Dismiss.

2.  DENY Defendant's Motion to Dismiss;

3.  ALLOW this case to proceed to discovery and merits determination;

4.  GRANT leave, if necessary, to amend the Complaint or supplement factual allegations;

5.  CONSIDER appointment of counsel or special constitutional advisors if appropriate;

6.  ORDER that Defendant produce an enforceable commitment, if available, disavowing any intent by Donald J. Trump to run for office again, or else allow this litigation to proceed to protect the 02028 election;

7.  ADMONISH the Defendant and the United States Attorney's Office for the Southern District of Florida to maintain a tone of civility, respect, and restraint in all future filings, especially when engaging for the first time with pro se litigants raising constitutional and religious claims in good faith;

8.  STRIKE the Defendant's Motion to Dismiss as untimely and recognize Plaintiff's Motion for Entry of Default as procedurally proper and meritorious.

9.  DECLARE that RFRA protects civic religious beliefs — including the civic and moral obligation to protect human life — on equal footing with sectarian religious beliefs.

10. DECLARE that the Executive Branch has no lawful authority to interfere with, restrict, or regulate grievance petitions from citizens to the Judicial Branch of Government, or internal Judicial Branch communications, whether open or confidential, between the District Courts and the superior Appellate or Supreme Court, including 1st Amendment protected public grievances requesting open advisory opinions from District Courts to the superior Appellate Court or superior Supreme Court on matters of constitutional significance like the requested State of The Constitution Address.

11. If finding Plaintiff lacks primary standing, ADOPT and IMPLEMENT a fallback standing procedure as outlined above;

12. REQUIRE that any dismissal for lack of standing be conditioned upon the Court identifying a viable substitute Plaintiff and providing notice and opportunity for substitution within a reasonable period;

13. If no substitute Plaintiff appears within the designated period, AUTOMATICALLY REINSTATE Plaintiff's standing and permit the case to proceed on the merits, as necessary under RFRA;

14. GRANT any such other relief as the Court deems just and proper to prevent the denial of access to judicial redress in violation of the Constitution and RFRA.

Respectfully submitted,

_____
s/Plaintiff David Clayman, Currently *Pro se*

Motion

28

For the Center Forward Party of Hippocratic
Hands, aka the Miracle Berries

Motion

## EXHIBITS

**<u>Exhibit A: Form 2: Statement of Candidacy</u>**

**<u>Exhibit B: Form 1: Statement of Organization</u>**

**<u>Exhibit C: Proof of Service Showing Motion to Dismiss is Untimely</u>**

Motion

## FEC FORM 2

## STATEMENT OF CANDIDACY

### FILING FEC-1883654

**1. David Morris Clayman**

7930 Palacio Del Mar Drive
Boca Raton, FL 33433

**2. Identification Number: P80007511**

**3. Party: Independent**

**4. Office Sought: President**

**5-6. State & District of Candidate: _____ - 0**

## DESIGNATION OF PRINCIPAL CAMPAIGN COMMITTEE

**7. I hereby designate the following named political committee
as my Principal Campaign Committee for the 2028
election(s).**

**David Clayman of Harmless Hands for President &
Precedent
FEC ID #: C00901298**

7930 Palacio Del Mar Drive
Boca Raton, FL 33433

## DESIGNATION OF OTHER AUTHORIZED COMMITTEES

**8. I hereby designate the following named committee, which
is NOT my principal campaign committee, to receive and
expend funds on behalf of my candidacy.**

## DECLARATION OF INTENT TO EXPEND PERSONAL FUNDS (House or Senate Only)

**9. I intend to expend personal funds exceeding the threshold
amount (see 11 C.F.R. 400.9) by**

9A. **0.00** for the primary election, and
9B. **0.00** for the general election

**Signed as: David Morris Clayman**
**Signed by the candidate on: 04/02/2025**

**Filed: 04/02/2025**

## (End FEC FORM 2)

Generated Tue May 6 16:53:43 2025

Federal Election Commission (800) 424-9530 In Washington (202) 694-1100
For the hearing impaired, TTY (202) 219-3336 Send comments and suggestions about this site to: **webmanager@fec.gov.**

| FEC FORM 1 | STATEMENT OF ORGANIZATION | |
|---|---|---|
| | | Office Use Only |

1. NAME OF COMMITTEE (in full)  ☐ (Check if name is changed)   Example: If typing, type over the lines.   `12FE4M5`

| DAVID CLAYMAN OF HARMLESS HANDS FOR PRESIDENT & PRECEDENT |

ADDRESS (number and street)  ☐ ◄ (Check if address is changed)

7930 PALACIO DEL MAR DRIVE

| BOCA RATON | FL | 33433 | – 4148 |
| CITY ▲ | STATE ▲ | ZIP CODE ▲ |

COMMITTEE'S E-MAIL ADDRESS
☐ ◄ (Check if address is changed)

precedency@harmlesshands.org

Optional Second E-Mail Address
harmless@harmlesshands.org

COMMITTEE'S WEB PAGE ADDRESS (URL)
☐ ◄ (Check if address is changed)

www.harmlesshands.org

2. DATE   04 / 02 / 02025

3. FEC IDENTIFICATION NUMBER ▶   C 00901298

4. IS THIS STATEMENT   ☑ NEW (N)   OR   ☐ AMENDED (A)

I certify that I have examined this Statement and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer    David Morris Clayman

Signature of Treasurer _____   Date   04 / 02 / 02025

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Statement to the penalties of 52 U.S.C. §30109. ANY CHANGE IN INFORMATION SHOULD BE REPORTED WITHIN 10 DAYS.

| Office Use Only | | | | For further information contact: Federal Election Commission Toll Free 800-424-9530 Local 202-694-1100 | FEC FORM 1 (Revised 03/2022) |

FEC **Form 1** (Revised 03/2022)         Page **2**

## 5.  TYPE OF COMMITTEE:

### Candidate Committee:

(a) [✔] This committee is a principal campaign committee. (Complete the candidate information below.)

(b) [ ] This committee is an authorized committee, and is NOT a principal campaign committee. (Complete the candidate information below.)

Name of Candidate: DAVID MORRIS CLAYMAN

Candidate Party Affiliation: IND    Office Sought: [ ] House   [ ] Senate   [✔] President    State:    District:

(c) [ ] This committee supports/opposes only one candidate, and is NOT an authorized committee.

Name of Candidate:

### Party Committee:

(d) [ ] This committee is a _____ (National, State or subordinate) committee of the _____ (Democratic, Republican, etc.) Party

### Political Action Committee (PAC):

(e) [ ] This committee is a separate segregated fund. (Identify connected organization on line 6.) Its connected organization is a:

[ ] Corporation    [ ] Corporation w/o Capital Stock    [ ] Labor Organization

[ ] Membership Organization    [ ] Trade Association    [ ] Cooperative

[ ] In addition, this committee is a Lobbyist/Registrant PAC.

(f) [ ] This committee supports/opposes more than one Federal candidate, and is NOT a separate segregated fund or party committee. (i.e., nonconnected committee)

[ ] In addition, this committee is a Lobbyist/Registrant PAC.

[ ] In addition, this committee is a Leadership PAC. (Identify sponsor on line 6.)

(g) [ ] This committee is an independent expenditure-only political committee (Super PAC).

[ ] In addition, this committee is a Lobbyist/Registrant PAC.

(h) [ ] This committee is a political committee with both contribution and non-contribution accounts (Hybrid PAC).

[ ] In addition, this committee is a Lobbyist/Registrant PAC.

### Joint Fundraising Representative:

(i) [ ] This committee collects contributions, pays fundraising expenses and disburses net proceeds for two or more political committees/organizations, at least one of which is an authorized committee of a federal candidate.

(j) [ ] This committee collects contributions, pays fundraising expenses and disburses net proceeds for two or more political committees/organizations, none of which is an authorized committee of a federal candidate.

Committees Participating in Joint Fundraiser

1. 
2.

FEC **Form 1** (Revised 03/2022)                                                          Page **3**

Write or Type Committee Name

DAVID CLAYMAN OF HARMLESS HANDS FOR PRESIDENT

**6.** **Name of Any Connected Organization, Affiliated Committee, Joint Fundraising Representative, or Leadership PAC Sponsor**

Mailing Address

CITY ▲                    STATE ▲                    ZIP CODE ▲

Relationship:   ☐ Connected Organization   ☐ Affiliated Organization   ☐ Joint Fundraising Representative   ☐ Leadership PAC Sponsor

---

**7.** **Custodian of Records:** Identify by name, address (phone number -- optional) and position of the person in possession of committee books and records.

Full Name          DAVID MORRIS CLAYMAN

Mailing Address     7930 PALACIO DEL MAR DRIVE

                    BOCA RATON                              FL      33433   –  4148
                    CITY ▲                    STATE ▲                    ZIP CODE ▲

Title or Position ▼

  SELF-RELIANT CUSTODIAN OF RECORDS          Telephone number   321 – 252 – 9626

---

**8.** **Treasurer:** List the name and address (phone number -- optional) of the treasurer of the committee; and the name and address of any designated agent (e.g., assistant treasurer).

Full Name
of Treasurer        DAVID MORRIS CLAYMAN

Mailing Address     7930 PALACIO DEL MAR DRIVE

                    BOCA RATON                              FL      33433   –  4148
                    CITY ▲                    STATE ▲                    ZIP CODE ▲

Title or Position ▼

  SELF-RELIANT TREASURER                    Telephone number   321 – 252 – 9626

FEC **Form 1** (Revised 03/2022)                                                                      Page **4**

Full Name of
Designated
Agent                          DAVID MORRIS CLAYMAN

Mailing Address          7930 PALACIO DEL MAR DRIVE


                                   BOCA RATON                        FL          33433    -  4148
                                          CITY ▲                            STATE ▲           ZIP CODE ▲

Title or Position ▼

   SELF-RELIANT DESIGNATED AGENT              Telephone number    321  -  252  -  9626

9.   **Banks or Other Depositories:** List all banks or other depositories in which the committee deposits funds, holds accounts, rents
     safety deposit boxes or maintains funds.


     Name of Bank, Depository, etc.


              TO BE DECIDED

Mailing Address


                                                                      CITY ▲                            STATE ▲           ZIP CODE ▲


     Name of Bank, Depository, etc.


Mailing Address


                                          CITY ▲                            STATE ▲           ZIP CODE ▲

**Optional Supplemental Information
for Lines 5(i) or (j), 6, 8 and/or 9**

FEC **Form 1S** (Revised 03/2022)                                                Page ____ of ____

5(i) or (j).    **Joint Fundraising Participant:**

1. [_____]    FEC ID number    C[_____]

2. [_____]    FEC ID number    C[_____]

3. [_____]    FEC ID number    C[_____]

4. [_____]    FEC ID number    C[_____]

6.    **Name of Any Connected Organization, Affiliated Committee, Joint Fundraising Representative, or Leadership PAC Sponsor**

[_____]

[_____]

Mailing Address    [_____]

[_____]

[_____]  [____]  [_____]–[_____]

Relationship:        CITY ▲            STATE ▲        ZIP CODE ▲

☐ Connected Organization    ☐ Affiliated Committee    ☐ Joint Fundraising Representative    ☐ Leadership PAC Sponsor

8.    **Designated Agent:** Identify by name, address (phone number – optional)

Full Name    [_____]

Mailing Address    [_____]

[_____]

[_____]  [____]  [_____]–[_____]

TITLE OR POSITION ▼        CITY ▲            STATE ▲        ZIP CODE ▲

[_____]    Telephone Number  [____]–[____]–[_____]

9.    **Banks or Other Depositories:** List all banks or other depositories in which the committee deposits funds, holds accounts, rents safety deposit boxes or maintains funds.

Name of Bank,
Depository, etc.    [_____]

Mailing Address    [_____]

[_____]

[_____]  [____]  [_____]–[_____]

CITY ▲            STATE ▲        ZIP CODE ▲



David Cla
7930 P
Boca Raton, FL 33455-4770

ED MAIL®    Retail

9589 0710 5270 3280 9451 50    RDC 99

Clerk of Court
US District Court Southern District
299 E Broward Blvd, Room 1
Fort Lauderdale, FL 33301