FILED BY _____ D.C.

MAY 19 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

David Clayman, *Pro se*

## UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| David Morris Clayman, | Case 0:25-CV-60120-SMITH |
| Plaintiff, | **PLAINTIFF'S FINAL RESPONSE TO MOTION TO DISMISS COMPLAINT** |
| vs. | |
| President Donald J. Trump Defendant | |

## PLAINTIFF'S FINAL RESPONSE IN OPPOSITION TO

## DEFENDANT'S MOTION TO DISMISS

### PRELIMINARY STATEMENT

*Hearing Requested*

Plaintiff, a registered presidential and precedential candidate for the 2028 election, respectfully submits this Response in Opposition to Defendant's Motion to Dismiss [DE 20]. Defendant has styled Plaintiff's Complaint as frivolous and incoherent, arguing that it fails to state a claim, lacks standing, and constitutes a shotgun pleading. Plaintiff, proceeding pro se, vigorously disputes these characterizations and asserts that the claims presented—though novel—are legally grounded, constitutionally urgent, and articulated with sufficient specificity to proceed.

The central thrust of the Complaint is that the constitutional and statutory framework governing eligibility for military leadership—namely, 10 U.S.C. § 1253, which sets an upper age limit for general and flag officers—must logically and necessarily apply to the President in his role as Commander-in-Chief. The President holds the apex role in the chain of command and should not

be exempt from safeguards imposed on subordinates when the risks to readiness, decision-making, and continuity of command are as high or higher.

Defendant's Motion should be denied for four key reasons:

1.  Plaintiff presents colorable legal theories on matters of national importance, including military readiness, democratic fairness, and religious liberty;

2.  Plaintiff has standing based on direct electoral competition, religious burden, economic injury, and national security concerns;

3.  The Complaint is organized by distinct claims and requests identifiable relief, rendering the "shotgun pleading" label inapplicable;

4.  Defendant's Motion is untimely and procedurally defective due to failure to timely respond within the 60-day period mandated under Rule 4(i).

Plaintiff respectfully asks that the Court deny the Motion to Dismiss, permit the case to proceed to discovery, or grant leave to amend if the Court deems any clarification necessary.

Special Note: Plaintiff has worked to honor the general 20 page limit to a Motion Response set in Local Rule 7.1. The Plaintiff read the Local Rules months ago but was not recently actively aware of that page limit requirement and needed a reminder.

---

## TABLE OF CONTENTS

1.  **Preliminary Statement**

2.  **Legal Standard**

3.  **The Complaint States Plausible Claims**

    A1. Application of 10 U.S.C. § 1253 to Commander-in-Chief

A2. On Novel Legal Theories and the President's Duty to Comply with Statutory Limits

A3. The Qualifications Clause Is Not Exhaustive in the Face of National Security Risk

A4. Actuarial Risk of Incapacitation Between Ages 78 and 82

A5. Broad Public Support for Maximum Age Limits for Presidents

4. **Antitrust Framework and Duopolistic Political Injury**

5. **Constitutional Catalysis and Judicial Dialogue**

6. **Plaintiff Has Article III Standing**

   A. Electoral Standing

   B. Religious Injury and Heightened Medical Risk from Double Organ Donation

   C. Economic Injury

   D. National Security and Civic Injury

   E. Fallback Standing

7. **Defendant's Motion Is Untimely and Procedurally Deficient**

8. **Service of Process Was Properly Executed**

9. **The Complaint Is Not a Shotgun Pleading, or Can Be Amended**

10. **RFRA Must Encompass Civic Religion**

11. **Judicial Dialogue with Higher Courts Is Appropriate**

12. **Request for Civility and Admonishment**

13. **Prayer for Relief**

14. **Certificate of Service**

15. **Exhibits**

   Exhibit A: FEC Form 2 – Statement of Candidacy (David Morris Clayman)

   Exhibit B: NBC News Article – Trump on Third Term

# 1. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard does not require detailed factual allegations, but it demands more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Id. The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the Plaintiff's favor. Dismissal is inappropriate unless "no construction of the factual allegations will support the cause of action." Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).

A pro se complaint is held to less stringent standards than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520–21 (1972). Courts must liberally construe the pleadings of pro se litigants and allow for the development of potentially meritorious claims.

---

## 2. THE COMPLAINT STATES PLAUSIBLE CLAIMS

### A1. Application of 10 U.S.C. § 1253 to Commander-in-Chief

10 U.S.C. § 1253 imposes mandatory retirement for general and flag officers of the U.S. Armed Forces at age 64, with limited extension to 68. The Plaintiff argues that this statute—enacted to preserve military readiness, physical vigor, and national security—should logically and legally apply to the Commander-in-Chief, who holds apex authority in the military chain of command and whose decisions carry the most risk to national and global security.

The President is not exempt from national security concerns rooted in age-based physical decline. While not commissioned in the same manner as career military officers, the President is quadrennially commissioned by the people through the Electoral College to lead the Armed Forces. This commissioning, while civilian in form, produces a military function: command of

nuclear launch codes, wartime strategy, and emergency response. Thus, the legal and moral rationales for § 1253 apply even more forcefully to the Commander-in-Chief than to subordinate generals. That he is not "appointed" through military channels should not insulate him from age-based national security constraints.

The claim does not require the Court to create new law. Rather, it asks the Court to interpret existing law in a manner consistent with its purpose: protecting national defense integrity from age-related cognitive and physical fragility at the highest level. Failing to apply age limits to the President, while mandating them for lower-ranked officers, creates a dangerous exception for the most critical leadership post in the chain of command.

### A.2. ON NOVEL LEGAL THEORIES AND
### THE PRESIDENT'S DUTY TO COMPLY WITH STATUTORY LIMITS

Defendant's counsel contends that Plaintiff's argument regarding 10 U.S.C. § 1253 and its applicability to the Commander-in-Chief is "patently frivolous" and unsupported by fact or law. Plaintiff respectfully submits that such a blanket dismissal of novel legal theories is inconsistent with the very nature of legal development in the federal courts—particularly as it relates to the scope and limits of presidential power.

Until recently, there was no binding legal precedent affirmatively stating that a President of the United States enjoyed immunity from criminal prosecution for official acts. Yet in 2024, the Supreme Court issued a landmark ruling in *Trump v. United States*, 603 U.S. 593 (2024) granting expansive criminal immunity to sitting Presidents—an interpretation of constitutional silence that, until that decision, would have been widely dismissed as contrary to rule-of-law principles. What was once unthinkable became established precedent, reshaping the legal landscape in Donald Trump's favor.

The fact that a theory lacks prior case law does not render it legally frivolous. Every judicial innovation—especially those involving separation of powers or executive privilege—begins as an argument without direct precedent. What matters is whether the theory is grounded in a plausible reading of statutory or constitutional text and whether it serves a legitimate civic purpose. Plaintiff's interpretation of 10 U.S.C. § 1253 as applying to the Commander-in-Chief meets both of those criteria.

Moreover, novel doctrines and statutory applications do not always accrue to the benefit of those in power. Sometimes they serve the essential function of limiting authority and reinforcing accountability. The Supreme Court's recognition of presidential immunity demonstrates that the legal system is capable of expanding presidential privilege. Plaintiff now urges the judiciary to show that it is equally capable of clarifying the limits of that power when national security and constitutional order require it.

Accordingly, Plaintiff asks this Court not to dismiss the age-based fitness challenge under § 1253 as frivolous simply because it has not yet been litigated to final judgment. It is no more speculative than the doctrine of criminal immunity once was—and it may be far more essential to the republic's long-term stability.

### A3. THE QUALIFICATIONS CLAUSE IS NOT EXHAUSTIVE IN THE FACE OF NATIONAL SECURITY RISK

Defendant contends that Article II, Section 1, Clause 5 of the Constitution provides the exclusive list of qualifications for the Presidency and that no other eligibility standards—such as maximum age limits—can be imposed without constitutional amendment. Plaintiff respectfully disagrees and submits that this interpretation is neither required by the constitutional text nor wise as a matter of constitutional governance.

First, the Constitution is notably silent on several essential criteria we universally expect from a President. It does not specify, for instance, that the President must be a natural person. It does not require that the President be a single individual, as opposed to a triumvirate or council. Nor does it include basic functional requirements such as mental capacity, memory retention, or ability to carry out emergency decisions. Yet few jurists would be ready to argue that a corporate entity, a sentient AI, or a comatose individual could serve as President merely because the text is silent on those disqualifications. If that's not the case and the list of Commander-in-Chief and Presidential qualifications is exhaustive, given that the Constitution doesn't specifically prohibit it, the Plaintiff would like to immediately reorganize his 2028 Presidential Campaign to be a Lifesaving Trinity Triumvirate of three co-Presidents as a corporate person installed in the Presidency sharing power with each other by contractual agreement. The Plaintiff has made some early steps in that direction of reorganizing informally or formally as a Presidential Trinity, a three-person Executive similar to the Swiss Federation's Federal Council of Seven, particularly if this Court finds that the very limited list of explicit qualifications in U.S. Const. Art. II §1 5 for the Office of the Presidency in the Constitution are in fact exhaustive, which you can see at the following web address: https://www.harmlesshands.org/trinity

The absence of such exclusions in the text does not mean that such exclusions won't or shouldn't be judicially interpreted. Rather, the Constitution must be interpreted in a way that ensures its core structural purpose: securing the survival and functionality of the republic. If the Judiciary accepts the view that Article II is utterly exhaustive, it would render the courts powerless to act even in the face of an obvious and urgent national security threat—such as a Commander-in-Chief who is elderly, frail, or suffering from substantial cognitive decline, while his or her overly subordinate Cabinet recklessly fails to act under the 25th Amendment to protect the public from such frailty or decline in the Commander-in-Chief and instead act to obfuscate and hide such frailty and decline, as Commander Biden's Cabinet and Advisors did for him, and as

Commander Trump's Cabinet and Advisors did as well, particularly when Trump almost died from COVID-19 .

Indeed, Special Counsel Robert Hur recently described President Biden—Trump's immediate predecessor—as a "well-meaning elderly man with a poor memory." That precise condition, if allowed to persist or recur in the office of the Commander-in-Chief, raises grave concerns about continuity of command and strategic readiness. The Judiciary cannot responsibly close its eyes to such dangers simply because the Framers did not enumerate every possible disqualification.

The Constitution supplies necessary guardrails, but it also expects the other branches—and the courts—to act with fidelity to its spirit and to the protection of the people. When statutory tools like 10 U.S.C. § 1253 provide a rational framework for assessing age-related risk, courts should consider them not as unconstitutional innovations but as necessary supplements to constitutional silence.

Accordingly, Plaintiff asks this Court to reject the rigid and dangerous view that Article II qualifications are utterly exhaustive, and instead recognize that the preservation of national security, public trust, and the functional capacity of the Commander-in-Chief justifies careful and principled application of age-based disqualifications where warranted.

### A4. ACTUARIAL RISK OF INCAPACITATION BETWEEN AGES 78 AND 82

The Plaintiff respectfully submits that the statutory age limits found in 10 U.S.C. § 1253 are supported by extensive actuarial data on age-related health risks. Between ages 78 and 82, the likelihood of suffering a major debilitating medical event—such as stroke, cognitive impairment, or hospitalization due to chronic illness—rises significantly.

According to the U.S. Social Security Administration's actuarial tables and the National Health and Aging Trends Study, individuals aged 78 to 82 experience marked increases in both

mortality and morbidity. For example, men in this age bracket face a greater than 1 in 3 chance of hospitalization and incapacitation for a serious health event during any four-year period. The probability of cognitive decline affecting executive function—including memory, decision-making, and crisis response—also increases substantially in late septuagenarians and octogenarians.

These risks are not theoretical. They represent real dangers when applied to the Commander-in-Chief, a role requiring rapid military judgment, high-stakes negotiation, and emergency response. The President is not merely a symbolic leader but the final link in the nuclear command chain and the ultimate authority in matters of war and peace.

Therefore, applying § 1253's age limits to the Commander-in-Chief is consistent with both national security logic and scientific evidence. The legal and civic concern is not simply about chronological age, but about the probabilistic reality of frailty and incapacity during this life stage. A failure to account for this reality creates unacceptable strategic risk.

## A5. BROAD PUBLIC SUPPORT FOR MAXIMUM AGE LIMITS FOR PRESIDENTS

According to a Pew Research Center survey published on October 4, 2023, an overwhelming 79% of Americans support placing maximum age limits on elected officials in Washington, D.C., including the Presidency. This figure includes bipartisan support: 82% of Republicans and 76% of Democrats agree that age limits should be in place.[1]

Notably, this survey was conducted prior to the June 2024 presidential debate in which President Biden's memory and cognitive difficulties were widely perceived by the public and press. Thus, public support for age limits may be even stronger now.

---

[1] Pew Research Center. "Age limits for federal officials backed by most Americans." October 4, 2023. https://www.pewresearch.org/short-reads/2023/10/04/most-americans-favor-maximum-age-limits-for-federal-elected-officials-supreme-court-justices/

Only 3% of Americans said it was ideal for a president to be in their 70s or older. Nearly half preferred a president in their 50s, and another 24% in their 60s. This data illustrates that Americans strongly prefer leaders who are not in the age-risk category addressed by 10 U.S.C. § 1253.

## Older U.S. adults are more likely to prefer having an older president

*% who say it is best for a president to be in their ...*



| | 30s | 40s | 50s | 60s | 70s or older |
|---|---|---|---|---|---|
| Total | 3 | 17 | 49 | 24 | 3 |
| Ages 18-29 | 10 | 38 | 42 | 6 | 1 |
| 30-39 | 5 | 25 | 54 | 13 | 2 |
| 40-49 | 3 | 17 | 55 | 20 | 2 |
| 50-59 | 8 | 54 | 30 | 4 | |
| 60-69 | 5 | 48 | 38 | 4 | |
| 70+ | 3 | 42 | 42 | 5 | |

Note: No answer responses not shown.
Source: Survey of U.S. adults conducted June 5-11, 2023.

**PEW RESEARCH CENTER**

Plaintiff argues that it is not only reasonable but constitutionally sound for the Judiciary to consider and reflect the will of the public in interpreting national eligibility standards—especially when overwhelming consensus aligns with national security, medical science, and good governance.

**B. Antitrust Framework and Duopolistic Political Injury**

Although not a standalone claim, Plaintiff includes antitrust context to rebut any defense that President Trump's continued candidacy represents the will of the people. Plaintiff argues that the political structure, dominated by two entrenched parties, does not permit genuinely competitive alternatives to flourish. The absence of ranked-choice voting, exclusion of independents from primaries, and lack of meaningful access to the general electorate result in constrained choice.

These observations highlight structural barriers, which in turn amplify the importance of judicial review of candidate eligibility when the electorate is denied full and fair alternatives.

**C. Constitutional Catalysis and Judicial Dialogue**

Plaintiff asks this Court to take seriously its role not merely as arbiter of present disputes but as a coequal Branch of Government entitled and uniquely qualified to jumpstart, catalyze, and facilitate open serious discussion on constitutional evolution. The age issue raised here is timely, widely debated, and potentially resolvable through a combination of interpretation and encouragement of amendment. Plaintiff proposes that District Courts may, within their discretion, communicate systemic constitutional concerns to higher courts or in public advisory addresses.

The Court has no obligation to adopt this request but should recognize that Plaintiff's desire for judicial dialogue is grounded in civic reverence, not institutional hostility.

### 3. PLAINTIFF HAS ARTICLE III STANDING

**A. Electoral Standing** Plaintiff is a declared candidate for the 2028 presidential and precedential election and has registered his candidacy with the Federal Election Commission. As such, Plaintiff is a direct political competitor to Defendant Donald J. Trump, who has repeatedly made statements suggesting interest in or openness to seeking a third term, notwithstanding the Twenty-Second Amendment. These statements—made in rallies, interviews, and campaign-style appearances—constitute a "testing of the waters" consistent with exploratory candidacy under federal election law.

Even if Defendant has not yet formally declared for 2028, his political influence, control over the Republican Party, and public musings about continuing in power render Plaintiff's claim more than speculative. Given Defendant's consistent public framing of his political future and his ongoing national dominance, it is rational and factually grounded for Plaintiff to view Trump as a likely competitor.

Plaintiff's interest is not merely academic. If Defendant remains eligible to serve in future elections—including 2028—Plaintiff will be forced to campaign against a former Commander-in-Chief whose eligibility is arguably unconstitutional under 10 U.S.C. § 1253 due to advanced age and related national security risks. In contrast, if Defendant is disqualified now under § 1253 and succeeded by his Vice President, JD Vance, Plaintiff will face a younger, statutorily eligible opponent with clearer moral and constitutional footing.

Plaintiff strongly prefers to compete in 2028 against an honorable, age-qualified adversary. The clearest and most permanent way to resolve this electoral conflict and clarify the field is for the Court to disqualify Donald Trump now—not merely in the 2028 race but as Commander-in-Chief—based on his ineligibility to serve under § 1253. Doing so would prevent a repeat of the current constitutional ambiguity and promote a stable, lawful transfer of leadership to a qualified successor.

If Commander Trump is allowed to continue "testing the waters", exploring and pursing candidacy in the 2028 race, it will siphon oxygen, attention, votes and support away from groundbreaking new candidates like the Plaintiff. That is sufficient basis for an injury-in-fact, as per *Hollander*, 566 F. Supp. 2d at 69 ("A candidate running against an allegedly ineligible candidate could, at least arguably, suffer injury-in-fact... through the siphoning of votes."). The Plaintiff asks for the Court to "nip this in the bud" now, by immediately disqualifying Commander Trump from his command role per 10 U.S. Code §1253.

There are many judicial precedents supporting "competitor standing" to challenge another direct competitor's electoral qualifications. For instance, Hollander v. McCain, 566 F. Supp. 2d 63 (D.N.H. 2008), Hassan v. Colorado, 495 F. App'x 947 (10th Cir. 2012), Robinson v. Bowen, 567 F. Supp. 2d 1144 (N.D. Cal. 2008), and Grinols v. Electoral College, No. 2:12-cv-02997 (E.D. Cal. 2013).

If Trump wishes to try to obviate this argument, the Assistant US Attorney representing him in his official capacity can freely file an official Affidavit from Commander Trump with the Court permanently declaring that Commander Trump has no intent to ever compete or run in the 2028 Presidential Election. Until such an Affidavit or similar adequate documentation is filed, or until this Court requires Commander Trump to make a clear judicial record statement on the matter through Testimony of his intentions, please accept the Plaintiff's contention that Commander Trump is late and deep into "testing the waters" on a run for a third term and presently intends wholeheartedly to run again in 2028 in direct competition with me, his term limits notwithstanding, making judicial interpretation of 10 U.S. Code §1253 a pregnant need for which Plaintiff has very direct and concrete "particularized harm" standing.

**B. Religious Injury and Heightened Medical Risk from Double Organ Donation** Plaintiff affirms a deeply held religious belief that those in positions of national leadership, particularly the Commander-in-Chief, bear a moral responsibility to lead by example in promoting life-saving

acts, including living organ donation. Plaintiff is actively preparing to become a living donor and is navigating the medical clearance process for both kidney and liver donation. In the absence of public leadership by a national figure, Plaintiff experiences mounting moral pressure to donate both organs—an inherently more dangerous course—rather than safely limiting his altruism to one.

Due to his advanced age, Defendant is almost certainly ineligible to serve as a living donor, medically or symbolically. As a result, he cannot reasonably be asked to demonstrate this moral leadership through surgical donation. The lack of such example undermines Plaintiff's ability to share that burden with a public figure and imposes a disproportionate religious and ethical weight upon him.

If 10 U.S.C. § 1253 were enforced, a younger Commander-in-Chief—potentially Vice President JD Vance—could take office and be called upon to lead by example, promoting a national living donation movement through both speech and deed. That moral delegation is presently blocked, heightening Plaintiff's personal sense of duty and spiritual strain. With nearly 100,000 Americans awaiting transplants, the failure of national leadership to support or model such altruism leaves a profound gap—not only in policy but in the nation's moral imagination. The deceased and living organ donor supply right now is grossly insufficient, as the Plaintiff is concurrently pleading in *Clayman v United States* (Southern District of Florida, 0:25-CV-60447-RLR). The Commander-in-Chief can kick off a paired donor exchange that could directly save the lives of as many as 6 or 7 Americans by donating one of his kidneys as soon as next month, and touch off tens or hundreds of thousands of further living donations by campaigning for such on a national level, remonstrating the public in favor of stepping up for living donation, *if* he were young enough to be surgically qualified and lead by example such a desperately needed altruistic living donor campaign.

The Plaintiff has a deep civic (and sectarian) religious duty to advocate by all available means for the preservation of life and death. The Plaintiff demands a Commander-in-Chief within "surgery-grade age limits" whom the Plaintiff can safely campaign and implore to undergo major abdominal surgery to save the lives of everyday Americans who have a deadly immediate need for a kidney or liver replacement. Every officer in the chain-of-command is qualified and presumptively eligible to step up and donate kidney or liver to an American in need *except* Commander Trump, at the head of the chain, in violation of the health and fitness guarantees associated with the age ranges permitted under 10 U.S. Code §1253.

**C. Economic Injury** Plaintiff alleges significant economic losses from trade policies under Defendant's administration, including personal investment value reduced by over $75,000 USD and higher borrowing costs affecting his margin loan on his personal investments summing to hundreds of dollars. Higher borrowing costs and a poor investment climate caused by the trade war are also affecting his business due to Commander Trump's economic policy volatility and uncertainty. The Plaintiff is currently the sole founder of a new business (*Healthy Consent, Public Benefit Corporation*) to better prevent, deter, and report sexual assault through a patent-approved useful, novel, and nonobvious de-vice (device). If specific numbers and more factual specificity is necessary to establish economic injury standing, please feel free to let me know and the Plaintiff will file a further Affidavit to that end.

**D. National Security and Civic Injury** All citizens, but especially presidential competitors, have a concrete interest in the fitness and stability of the Commander-in-Chief. National security is not a generalized grievance but a legally cognizable interest when fitness is called into question.

**E. Fallback Standing** Even if traditional standing is denied, Plaintiff requests fallback standing in cases where systemic injury is otherwise unredressable and no other qualified Plaintiff with standing steps forward a similar 10 U.S. Code §1253 claim within 30 days.

**4. DEFENDANT'S MOTION IS UNTIMELY AND PROCEDURALLY DEFICIENT**

Defendant failed to timely respond within the required 60-day window under Fed. R. Civ. P. 4(i). Plaintiff properly served all necessary parties and filed documentation. Defendant's attempt to excuse the delay lacks merit. The Motion to Dismiss should be stricken.

**5. SERVICE OF PROCESS WAS PROPERLY EXECUTED**

Plaintiff respectfully submits that service of process on the Defendant was properly executed in full compliance with Federal Rule of Civil Procedure 4(i). Plaintiff served all three required entities: (1) the United States Attorney for the Southern District of Florida, (2) the Attorney General of the United States in Washington, D.C., and (3) the Office of the President at the White House. Documentation of such service has been filed with the Court multiple times.

Defendant has suggested that service was insufficient, but has not demonstrated how it failed to comply with Rule 4(i), nor has Defendant alleged a lack of actual notice or prejudice. Defendant was aware of the lawsuit in sufficient time to respond and in fact did respond—albeit untimely—with a comprehensive Motion to Dismiss.

Even if the Court were to find any technical defect in service, such a defect is curable under Rule 4(m), which grants district courts discretion to extend the service deadline. The purpose of the rules is to ensure that parties receive notice and have an opportunity to be heard—not to erect procedural barriers to justice where actual notice and participation are undisputed.

Accordingly, Plaintiff asks the Court to either find that service was valid or, in the alternative, to grant leave to cure any perceived defect pursuant to Rule 4(m), in the interest of judicial economy and resolution on the merits.

## 6. THE COMPLAINT IS NOT A SHOTGUN PLEADING, OR CAN BE AMENDED

The Complaint separates its claims clearly: eligibility under § 1253, burdens under RFRA, and structural electoral flaws. Defendant's invocation of the shotgun pleading doctrine is misplaced. Plaintiff has presented a multi-claim complaint, not a single jumbled cause.

However, if the Court feels that there's adequate and sufficient truth to the shotgun pleading complaint the Assistant US Attorney has raised, the Plaintiff asks for leave to amend as necessary to slim down the Complaint, not dismissal with prejudice.

The Plaintiff asks the Court to please only require amendment if that's truly judiciously necessary. The Plaintiff has other important civic obligations to do with his time; this case is likely not the most important service work the Plaintiff is performing. The Plaintiff is currrently working night and day in a novel way to try to prevent sexual assault in the United States in a manner no one else has ever attempted. The Plaintiff hopes to prevent a huge amount of crime that Courts like yours have been handling for centuries without adequate, modern preventive tools.  If the Court assigns the Plaintiff unnecessary work to amend the Complaint any time necessary to meet that need will likely have to be stolen from foundational sexual assault prevention work, which right now likely means slower delivery of a partnership and pilot project at Florida Atlantic University in an effort to protect approximately 30,000 young students from sexual assault that presently, under current practices, affects more than 1 in 5 college-aged women.

Plaintiff respectfully requests that the Court only require amendment if truly necessary, given limited resources and the importance of other urgent public service work underway.

## 7. RFRA MUST ENCOMPASS CIVIC RELIGION

RFRA does not require sectarian orthodoxy. Plaintiff advances a civic religion rooted in altruism and national service. This moral code—while overlapping with Judaism—has universal applicability and deserves protection. The exclusion of civic religion would violate the First Amendment's inclusive scope and prevent Plaintiffs from making inclusive civic religious arguments in Court.

## 8. JUDICIAL DIALOGUE WITH HIGHER COURTS IS APPROPRIATE

The Plaintiff respectfully submits that District Courts retain the discretion to identify and communicate emerging constitutional concerns to Appellate Courts, the Supreme Court, or the public. Such communications are neither binding nor improper and are fully consistent with the Judiciary's coequal role as a Branch of Government—one to which citizens may directly petition under the First Amendment, independent of Executive Branch interference.

In this case, the Plaintiff urges the Judicial Branch to help initiate a national, timely, and ceremonial dialogue regarding overdue constitutional reforms—specifically, a proposed maximum age limit for the Commander-in-Chief. While the Plaintiff maintains that 10 U.S. Code § 1253 already provides a sound statutory basis to apply such an age limitation immediately (subject, perhaps, to a 30-day stay for Congressional review), he further believes that elevating this limitation to constitutional status—via an amendment to Article II, Section 1, Clause 5—would provide greater legitimacy, clarity, and permanence.

To that end, the Plaintiff proposes that the Judiciary consider establishing a periodic *State of the Constitution* Address, through which it might highlight needed updates to the Constitution and help restore public trust in the Judicial Branch, whose approval ratings have reached historic

lows[2]. Such an initiative would not be limited to the current matter but could serve as a broader mechanism for steady constitutional modernization and civic renewal.

The Plaintiff, who has never lived through a meaningful constitutional amendment (Amendment 27 being trivial, procedural, merely pay-related, and not substantive[3]), respectfully petitions this Honorable Court to consider issuing either an internal advisory communication within the Judicial Branch or an open memorandum to the public on this subject. This request is both lawful and appropriate under the rights guaranteed by the First Amendment and is offered in the spirit of civic engagement with a coequal Branch of Government.

## 9. REQUEST FOR CIVILITY AND ADMONISHMENT

Plaintiff respectfully requests that the Court issue a reminder to all counsel to maintain professionalism, restraint, and civility in written submissions, particularly in cases involving pro se litigants.

In the Motion to Dismiss, Assistant United States Attorney Darcie A. Thompson described Plaintiff's claims as "delusional." This term is not a neutral legal descriptor but one with stigmatic psychiatric connotations, implying a mental health classification characterized by "fixed, false beliefs" without any experiential or evidentiary basis or professional qualification to declare the Plaintiff so. Courts have long recognized that litigation rhetoric should not veer into ad hominem characterizations, particularly ones that lack evidentiary support and risk stigmatizing mental health.

Assistant US Attorney Thompson and US Attorney O'Byrne should not be describing the Plaintiff

---

[2] Gallup. "Americans Pass Judgment On Their Courts - Sharp decline in confidence in judiciary among the largest Gallup has ever measured." December 17, 2024. https://news.gallup.com/poll/653897/americans-pass-judgment-courts.aspx

[3] The 27th Amendment was first proposed in 1789 and took 203 years to be ratified. At our current rate, unless the Supreme Court starts to speak up and facilitate regular periodic conversation on constitutional reform, who knows if it might take another 50 or 203 years before Amendment 28 is added to the Constitution -- and the next Amendment might end up being unimportant or non-substantive like Amendment 27.

or any other Pro Se Plaintiff as delusional before even meeting with, debating, or speaking with the Plaintiff. If she were to meet with the Plaintiff, she would know that the Plaintiff is verifiably not delusional and shows a great deal of cognitive flexibility.

Plaintiff brings this action in good faith, grounded in religious beliefs, statutory interpretation, and genuine constitutional concern. The use of the word "delusional" risks prejudicing the Court's view of the Plaintiff's claims without engaging their substance, and it may have a chilling effect on the rights of future pro se litigants seeking to petition the government for redress of grievances.

Accordingly, Plaintiff asks this Court to admonish the Assistant United States Attorney to avoid stigmatizing or defamatory language in future filings and to uphold the decorum and dignity of this honorable Court.

## 10. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Deny Defendant's Motion to Dismiss;

2. Strike the Defendant's Motion to Dismiss as untimely;

3. Alternatively, grant leave to amend;

4. Declare that the President is subject to 10 U.S.C. § 1253;

5. Recognize Plaintiff's standing or apply fallback standing if no one better comes forward in 30 days;

6. Acknowledge the protection of civic religion under RFRA;

7. Encourage constitutional dialogue regarding age limits and other pressing topics affecting faith in our Institutions by issuing an advisory opinion, memorandum, or suggestion in favor of a regular Supreme Court State of the Constitution Address tradition;

8. Grant any further relief this Court deems just and proper.

9. Hearing requested

Respectfully submitted,

s/Plaintiff David Clayman, Currently *Pro se*
For the Center Forward Party of Hippocratic
Hands, aka the Miracle Berries

## CERTIFICATE OF SERVICE

I certify that on this day, May 14, 2025, I mailed by certified mail the foregoing document to the

Clerk of Courts at the US District Court in Fort Lauderdale and to opposing counsel Darcie

Thompson of the U.S. Attorney's Office, representing Commander Donald Trump in his official

regularly commissioned capacity as Commander-in-Chief.

s/Plaintiff David Clayman, Currently *Pro se*
For the Center Forward Party of Hippocratic
Hands, aka the Miracle Berries

1

## EXHIBITS

2

3 **Exhibit A:**

4 **Federal Election Commission Form 2: Statement of Candidacy for David Morris Clayman**

5 **for President - 2028 Election, for year of civic service January 20, 2029 - January 20, 2030**

6

7

8 **Exhibit B:**

9 **March 30, 2025. NBC News. "Trump tells NBC News 'there are methods' for seeking a**

10 **third term".**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FEC FORM 2
## STATEMENT OF CANDIDACY

| 1. (a) Name of Candidate (in full) | | |
|---|---|---|
| Clayman, David, Morris, , | | |

| (b) Address (number and street)   ☐ Check if address changed | 2. Candidate's FEC Identification Number |
|---|---|
| 7930 Palacio Del Mar Drive | P80007511 |

| (c) City, State, and ZIP Code | | 3. Is This Statement ☒ New (N) OR ☐ Amended (A) |
|---|---|---|
| Boca Raton | FL   33433 | |

| 4. Party Affiliation | 5. Office Sought | 6. State & District of Candidate |
|---|---|---|
| INDEPENDENT | Presidential | 00 |

### DESIGNATION OF PRINCIPAL CAMPAIGN COMMITTEE

7. I hereby designate the following named political committee as my Principal Campaign Committee for the ___2028___ election(s).
(year of election)

NOTE: This designation should be filed with the appropriate office listed in the instructions.

(a) Name of Committee (in full)

## David Clayman of Harmless Hands for President & Precedent

(b) Address (number and street)

7930 Palacio Del Mar Drive

(c) City, State, and ZIP Code

Boca Raton                                         FL        33433

### DESIGNATION OF OTHER AUTHORIZED COMMITTEES
#### (Including Joint Fundraising Representatives)

8. I hereby authorize the following named committee, which is NOT my principal campaign committee, to receive and expend funds on behalf of my candidacy.

NOTE: This designation should be filed with the principal campaign committee.

(a) Name of Committee (in full)

(b) Address (number and street)

(c) City, State, and ZIP Code

*I certify that I have examined this Statement and to the best of my knowledge and belief it is true, correct and complete.*

| Signature of Candidate | Date |
|---|---|
| *Clayman, David, Morris, ,* | 04/02/2025 |

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Statement to penalties of 2 U.S.C. §437g.

FEC FORM 2 (REV. 02/2009)



EXCLUSIVE

DONALD TRUMP

# Trump won't rule out seeking a third term in the White House, tells NBC News 'there are methods' for doing so

President Donald Trump said in a Sunday-morning phone call that he was "not joking" about a third term, adding that "it is far too early to think about it."



TRUMP SAYS HE'S "NOT JOKING" ABOUT THIRD TERM

Get more news LIVE on NBC NEWS NOW ›

March 30, 2025, 12:10 PM EDT

**By Kristen Welker and Megan Lebowitz**

WASHINGTON — President Donald Trump did not rule out the possibility of seeking a third term in the White House, which is prohibited by the Constitution under the 22nd Amendment, saying in an exclusive interview with NBC News that there were methods for doing so and clarifying that he was "not joking."

"A lot of people want me to do it," Trump said in a Sunday-morning phone call with NBC News, referring to his allies. "But, I mean, I basically tell them we have a long way to go, you know, it's very early in the administration."

ADVERTISING



"I'm focused on the current," Trump added, in some of his most extensive comments to date about serving a third term.

When asked whether he wanted another term, the president responded, "I like working."

"I'm not joking," Trump said, when asked to clarify. "But I'm not – it is far too early to think about it."

When asked whether he has been presented with plans to allow him to seek a third term, Trump said, "There are methods which you could do it."

Trump tells NBC News he's 'trying' and 'pissed off' at Putin

06:23



NBC News asked about a possible scenario in which Vice President JD Vance would run for office and then pass the role to Trump. Trump responded that "that's one" method.

"But there are others, too," Trump added.

Asked to share another method, Trump simply responded "no."

Amending the Constitution to abolish the two-term limit would be exceedingly difficult, requiring either a two-thirds vote of Congress or two-thirds of the states agreeing to call a constitutional convention to propose changes. Either route would then require ratification from three-quarters of the states.

The president pointed to his poll numbers, saying that "a lot of people would like me to" hold office for a third term.

Trump has previously commented on running for a third term in office, though Republicans have seen these comments as jokes or the president trolling his critics.

Rep. Andy Ogles, R-Tenn., crafted a resolution calling for the extension of presidential term limits, which would allow Trump to seek another term in office.

Meanwhile, Trump ally Steve Bannon said in an interview on News Nation that he believes Trump will "run and win again in 2028." Bannon said in the same interview that he thought "we'll have a couple of alternatives" in determining how Trump could seek a third term despite the two-term maximum for holding the presidency.

The White House has amplified Trump's comments likening himself to royalty, posting a picture of a fake magazine cover depicting the president with a crown after the administration shot down congestion pricing in New York City.

The White House's post to X quoted Trump's previous comments on Truth Social: "LONG LIVE THE KING!"



Kristen Welker

Kristen Welker is the moderator of "Meet the Press."

Megan Lebowitz

Megan Lebowitz is a politics reporter for NBC News.

Peter Nicholas contributed.

David Clayman / Harmless Harms
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148




9589 0710 5270 3280 9486

Retail

RDC 99

33301

US District Court for the Southern District of Florida
Clerk of Courts
299 E Broward Blvd, Suite 108
Fort Lauderdale, FL 33301

Contains X-RAYED
U.S. Marshal Se...
Post 1