David Clayman, *Pro se*

FILED BY ____ D.C.
JUL 08 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. FLA - FT. LAUD.

UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| David Morris Clayman,<br><br>　　　　Plaintiff,<br>vs.<br><br>President Donald J. Trump, in his official capacity as Commander-in-Chief of the Armed Forces,<br>　　　　Defendant | Case 0:25-CV-60120-SMITH<br><br>**MOTION FOR LEAVE TO FILE TWO DAYS LATE UNDER FRCP 6(b)(1)(B)**<br><br>*My sincere apologies for being late... it was an honest, innocent mistake.* |

# MOTION FOR LEAVE TO FILE OUT OF TIME

# (TWO DAYS LATE) UNDER FRCP 6(b)(1)(B)

COMES NOW David Morris Clayman and Harmless Hands, appearing pro se, and respectfully moves the Court for leave to file the Motion to Alter or Amend Judgment under Rule 59(e) out of time, and states as follows:

1. On June 2, 2025, the Court served an Order to Dismiss with Prejudice.

2. Under the applicable rules, the response deadline should have been calculated as Monday, June 30, 2025.

3. Movant's filing was submitted today on July 2, 2025, two days after the deadline.

4. The untimely filing resulted from excusable neglect, as Movant inadvertently calculated the response deadline based on a one-month approximation (June 2 to July 2) rather than the specific 28-day period required by 59(e). Movant did not place the exact deadline on a calendar,

mistakenly relying on memory and the sense of time to revisit and finalize the drafted response.

5. Movant acted in good faith and immediately completed the filing upon realizing the error, with no intent to delay proceedings or prejudice any party. The opposing counsel, Darcie Thompson, was made aware the whole time that the Plaintiff planned to file a 59(e) motion and was expecting it.

6. The delay of two days is minimal and will not cause prejudice to any party, nor will it significantly affect the progress of this matter.

7. Movant respectfully requests the Court to accept the late-filed Motion to Alter or Amend Judgment Under 59(e) as timely under Federal Rule of Civil Procedure 6(b)(1)(B), which permits extensions for excusable neglect.

8. Movant believes that the interests of justice and a determination on the merits would best be served by granting this relief.

WHEREFORE, Movant respectfully requests that the Court grant leave to file Motion to Alter or Amend Judgment Under 59(e) out of time, and deem the filing as timely submitted, together with such other relief as the Court deems just and proper.

Respectfully submitted,

s/Plaintiff David Clayman, Currently *Pro se*
For the Center Forward Party of Hippocratic Hands, aka the Miracle Berries

David Clayman, *Pro se*

UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| David Morris Clayman, | Case 0:25-CV-60120-SMITH |
|---|---|
| Plaintiff, vs. President Donald J. Trump, in his official capacity as Commander-in-Chief of the Armed Forces, Defendant | MOTION TO ALTER OR AMEND JUDGMENT UNDER FRCP RULE 59(E) <br><br> MOTION FOR LEAVE TO FILE TWO DAYS LATE UNDER FRCP 6(b)(1)(B) |

# MOTION TO ALTER OR AMEND JUDGMENT

# UNDER RULE 59(e)

**COMES NOW** the Plaintiff, David Morris Clayman, proceeding pro se, and respectfully moves this Honorable Court pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend its judgment entered on June 2, 2025 [DE 31], generally dismissing Plaintiff's Complaint with prejudice. Plaintiff respectfully requests that the Court reconsider its ruling especially as to the dismissal of Plaintiff's Religious Freedom Restoration Act (RFRA) claim, in light of a clarifying and particularized legal and factual basis consistent with the original allegations but not fully articulated in prior briefing due to space and page limitations.

## INTRODUCTION

This motion does not seek to introduce a wholly new legal theory, but rather seeks clarification and reconsideration of the Court's prior ruling in light of a specific articulation of the religious

burden that supports Plaintiff's standing under RFRA. The original Complaint and Response brief clearly raised Plaintiff's sincerely held religious belief in preserving life and supporting life-saving policies as a practicing Jew.

**Part A: Kidney Donation Duty is better typified as a Commander-in-Chief civic obligation, even more so than as a Presidential purely-civilian duty, and relates directly to the claimed course of conduct, age qualification, and role of the Commander-in-Chief**

Plaintiff respectfully submits that the Court misunderstood the nature of Plaintiff's claim regarding kidney and organ donation. The duty Plaintiff describes for a Commander-in-Chief to give his or her second kidney or a segment of liver to an American dying on the waiting list is not just a civilian expectation of charity or civic virtue—it is a **military expectation**, deeply embedded in the ethical tradition of commanding officers taking personal risk to preserve the lives of those they serve. It is aligned with the military ethic of bodily risk in service of mission success and the survival of Americans as a unified People, bonded at times like these by blood, and by guts. As such, this is part of the religiously compelled model of sacrificial leadership in a national service emergency most similar to military service, not a symbolic gesture or hypothetical.

Indeed, Plaintiff is simultaneously advancing this argument in a parallel action, **Clayman v. United States**, currently pending in the U.S. Court of Federal Claims (Case No. 1:24-cv-00595-MHS), where Plaintiff seeks legal recognition and incentive structures for living kidney donors. There, Plaintiff proposes the awarding of a symbolic decoration—a "Purple Kidney"—to living organ donors, drawing on the conceptual parallels between battlefield valor and life-preserving bodily sacrifice. In that filing, several months ago on March 18, 2025, Plaintiff wrote:

"If the Plaintiffs were in charge, for instance, of those serving in the US military for a year, the Plaintiff would consider and propose this as an extremely valuable National Service

Mission for male soldiers to volunteer to undergo, with adequate compensation awarded, lifelong veteran status benefits, and a Purple Kidney or Purple Liver Service Medal for anyone who gave to bring a fellow American back to life. It is rare for a military operation to yield this much life payoff so clearly in a nonconfrontational, harmonious, mostly non-lethal context. The Plaintiffs find it shocking that the over 2 million active-duty and reserve military service members are not approached with this proposition of giving life to dying Americans in need. The Plaintiff suspects that at least 50,000 soldiers are so service-oriented and committed to the American People that they would volunteer outright yesterday under the service recognition conditions that the Plaintiff proposes, and that an adequate number of civilian and military living donors in partnership would be drawn to this type of national service to keep the recipient backlog down to a sub-30 day transplant queue into perpetuity. The Plaintiff finally wishes to emphasize that altruistic undirected living organ donation just like military service should be explained and promoted principally as a mode and means of national community service and not principally as a means of gaining remuneration or emoluments."

This statement underscores that the analogy is not metaphorical; it is doctrinal and civic, and focused on the military side of the Commander-in-Chief's and President's duties. That case further supports the sincerity and depth of Plaintiff's position that certain forms of national service, including organ donation, are directly analogous to military duty in both bodily cost and moral obligation.

This example was meant to emphasize the religious imperative for leaders in military roles, particularly the Commander-in-Chief, to internalize and practice life-preserving sacrifice consistent with American civic religious teachings and civic expectations of military command. The failure to acknowledge this military-religious dimension of the claim when dismissing the

relevance of standing of Commander-in-Chief kidney donation mischaracterizes its legal and theological seriousness under RFRA and my approach to and pleadings for civic religion.

The Plaintiff would go so far as to argue that volunteering to undergo living kidney donation should be communal "*table stakes*" for anyone seeking to serve in the role of Commander-in-Chief and President of the United States. Unless medically disqualified, if a political candidate for high commander does not care enough about fellow Americans dying daily from dialysis to take on some bodily injury and go under the knife to save an American life for ten years at the cost of half a year to a year for their own lifespan, they have no business sending soldiers to their deaths in times of war when the risk-adjusted outcomes in terms of American lives saved are commonly far more speculative, non-specific, and less clearly efficacious, and they have no business telling crowds that they really do stand to protect seniors, the sick, the vulnerable, and the dying. Commanders-in-Chief should lead by example, not vacate their own moral and medical responsibility to save the sick and dying people they serve.

This Commander-in-Chief, Commander Trump, is 79 years old now, and likely unable to undergo major laparoscopic abdominal surgery safely to donate a kidney to an American stranger in need, or any of the hundreds of Americans suffering on the kidney recipient waiting list that he's surely met and interacted with in his years as Commander-in-Chief and President and as a Presidential Candidate on the campaign trail. The Plaintiff is arguing that Commander Trump is derelict in his duty to save life through leadership by example and through the personal sacrifice of going through organ donor surgery, and that tolerance of Commanders-in-Chief blithely blazing past the military forced retirement age limits set out in 10 U.S. Code §1253 directly endangers our population of soldiers and civilians for lack of leadership in kidney donation by our elected and regularly-commissioned-via-Electoral-College Commander in Chief.

**Part B: Protecting the Ukrainian (and Russian) population from Putin's heedless aggression**

This motion secondarily identifies a discrete religious obligation not fully pleaded previously due to briefing constraints: the duty under Jewish law and ethics to defend and protect fellow Jews under threat, including the Ukrainian Jewish population in general, for example President Volodomyr Zelensky and Prime Minister Denys Shmyhal of Ukraine, both Jewish leaders of a population facing violent and senseless lethal Russian territorial aggression on the false and misleading propagandistic Russian accusation that the Ukrainians are somehow associated with Nazism. Plaintiff argues that Donald J. Trump's misleading rhetoric and failure to deliver reliable, steady, consistent material and moral support to our friend and ally Ukraine substantially burdens Plaintiff's religious exercise.

Importantly, this burden arises inextricably from Defendant's conduct in his official role as **Commander-in-Chief**, again the precise capacity in which he is sued. The challenged actions are not general political statements, but assertions of supreme military authority that directly implicate the United States' wartime stance toward Ukraine. Plaintiff's concern is not over policy disagreement in the abstract, but over the religious and ethical impact of military mismanagement by the Commander-in-Chief, particularly as it affects the lives and safety of fellow Jews abroad, and potentially many more Americans as well in the future, if Putin expands his territorial aggression to another vulnerable European NATO country like Lithuania, where part of my own lineage arises from.

This burden is further underscored by the fact that Donald J. Trump was previously **impeached by the United States House of Representatives** for attempting to withhold congressionally appropriated military aid to Ukraine as leverage to extract politically damaging information from Ukrainian President Volodomyr Zelensky against his former political opponent Joseph Biden. This attempted political coercion not only undermined U.S. and Ukrainian foreign policy and

military reliability, but also directly targeted a fellow Jew—Zelensky—who is leading the Ukrainian resistance under extraordinary threat from Russian aggression. Such actions are not just politically improper; they directly impede Plaintiff's religious obligation to help protect general human and Jewish life abroad especially where and when it is aligned with U.S. humanitarian and security interests. This episode exemplifies how Defendant's conduct as Commander-in-Chief burdens Plaintiff's religious exercise as part of the American and Jewish people in the specific and substantial ways contemplated under RFRA, the precise capacity in which he is sued.

**UPDATE: Today, the day of filing, July 2, 2025, Commander Trump suspended weapons shipments to Ukraine, endangering Ukraine's self-defense.** It's not clear yet officially why these defensive weapons shipments were suspended -- it's possible that it was for legitimate national security reasons, but it's also possible and maybe even likely that Commander Trump is playing childish egotistical political games like he did in the prior Ukraine-related impeachment case. Is he extorting Ukraine for information and concessions or is he trying to conserve the US military arsenal from depletion as a national security imperative? With Commander Trump, it's almost impossible to tell. But if the age limit of 10 U.S. code §1253 were actually enforced against all Commanders in Chief including Donald Trump, Donald Trump wouldn't be able to spend 10+ years in his old age pursuing "America First" strategies that are tainted by old, endless grudges over his hurt feelings from his impeachment and Zelensky's deeply ethical refusal to concede to Trump's notably corrupt demands for dirt on Hunter Biden to defeat his competing gerontocrat Joseph Biden.

**Part C: A ruling on 10 U.S. Code §1253 applicability will affect who can legitimately declare candidacy under Federal Elections Commission eligibility enforcement in the 2028 Presidential Race that the Plaintiff is declared and competing in**

There is a list of likely well-known 2028 Presidential contenders listed on Ballotpedia (https://ballotpedia.org/Presidential_candidates,_2028). Even if you think Donald Trump will be successfully sidelined as ineligible to run in 2028, of the candidates listed as 2028 contenders, Steven Bannon (who will be 75 at inauguration) and Rand Paul (who would be 66 at inauguration) are both going to be unable to serve a full Commander-in-Chief term if they were to run if the enforced cut-off for Commander-in-Chief retirement is 68 years old.

The Plaintiff has a core interest and standing as a competing political candidate in making sure that no other Commander-in-Chief / Presidential candidates enter the race who would be ineligible to serve or serve the full-term they seek under 10 US Code §1253. The best way of handling that is by nipping this in the bud now, to prevent wasted time, treasure, or trust in an electoral process clouded by ineligible political candidates.

In the 2024 Election, Joe Biden, Donald Trump, Jill Stein, and Cornel West would all have been held ineligible under 10 U.S. Code §1253 for the Commander-in-Chief duties if my interpretation wins this Court over on the merits.

**Part D: The General Place of Civic Religion is Misunderstood and Incorrectly Dismissed**

Plaintiff also respectfully addresses a potential concern that the concept of 'civic religion' lacks precedent as a recognized mode of religious belief under RFRA or constitutional jurisprudence. Plaintiff acknowledges that the invocation of civic religion as a mode of religious exercise may be novel in the federal courts. However, novelty is not grounds for dismissal. RFRA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' See 42 U.S.C. § 2000bb-2(4) (incorporating 42 U.S.C. § 2000cc-5(7)(A)). The absence of case law directly embracing civic religion does not imply its ineligibility.

Plaintiff comes now again to claim precisely such civic religious standing, as part and parcel of Plaintiff's moral and religious education in the liberal arts—specifically, in the classical arts of

liberty. Civic religion is not or should not be an unfamiliar concept to the Court: it was widely recognized in the writings of Rousseau, Machiavelli, and Lincoln, and has continued relevance in the American tradition of honoring certain sacred duties and principles through public institutions, ceremonies, the fundamentals of everyday and lifelong civic duty, and the conduct of high and ordinary office stations.

Plaintiff argues that such civic religion is both sincerely held and internally consistent. It encompasses duties of national service, military sacrifice, and principled leadership, which for Plaintiff carry religious gravity, and are reinforced for the Plaintiff privately as well in his practice of principally secular Judaism. As a powerful example of the cultural foundation for civic religion, Plaintiff respectfully draws the Court's attention to the remarks of President Abraham Lincoln in his Lyceum Address at the age of 28, which predate RFRA but offer a profound articulation of reverence for American laws and Constitution as sacred objects of civic devotion:

"Let every American, every lover of liberty, every well wisher to his posterity, swear by the blood of the Revolution, never to violate in the least particular, the laws of the country; and never to tolerate their violation by others. As the patriots of seventy-six did to the support of the Declaration of Independence, so to the support of the Constitution and Laws, let every American pledge his life, his property, and his sacred honor,--let every man remember that to violate the law, is to trample on the blood of his father, and to tear the character of his own, and his children's liberty. Let reverence for the laws, be breathed by every American mother, to the lisping babe, that prattles on her lap--let it be taught in schools, in seminaries, and in colleges; let it be written in Primers, spelling books, and in Almanacs;--let it be preached from the pulpit, proclaimed in legislative halls, and enforced in courts of justice. And, in short, let it become the **political religion of the nation**; and let the old and the young, the rich and the poor, the grave and the gay, of all sexes and tongues, and colors and conditions, sacrifice unceasingly upon its altars."

I don't precisely share Lincoln's total and absolute reverent submission to law, since I do believe there are some unjust laws that should rightfully attract opposition, resistance, and even civil disobedience. But I share his general civic religious reverence for the rule of law as one of many core pillars of American religion, and this early exhortation from Lincoln provides cultural and moral legitimacy for Plaintiff's sincere civic religious beliefs and places Plaintiff's legal theory within a long-standing American tradition of treating the preservation and defense of law, life, liberty, the pursuit of happiness, and property as sacred obligations. It encompasses duties of national service, military sacrifice, and principled leadership, which for Plaintiff carry religious gravity.

This political religion is reinforced and cross-pollinated for the Plaintiff in his own conscience privately by his practice of principally secular Judaism. It is not uncommon for the Plaintiff to be instructed on a religious belief through Judaism, like the "duty and right to apologize", and then to argue for that same matching right as an aspect of civic religion, or vice versa, for civic religious teachings like the responsibility to be active in democracy to flow into and cross-fertilize with Jewish secular and sectarian thought. Without being able to rely on the Courts quickly recognizing claims of civic religion, like religious dietary claims coming from vegans and vegetarians independent of direct reference to the supernatural or an organized church, the Plaintiff and other Plaintiffs similarly and differently situated would be forced to repeatedly take positions and broach them in a way that's needlessly reliant on sectarian thought and potentially divisive or inconsistent with the 1st Amendment Separation of Church and State especially for that reason.

This Court should not reject Plaintiff's numerous civic religious claims, many of which haven't heretofore been enumerated like the Civic Religious Right to Apologize mentioned above (with this right to apologize attaching when sincere even if, I would argue, it is in violation of general

judicial no contact orders), on the mere basis that no one has claimed such standing or brought such civic religious claims before. Religious innovation does not negate sincerity, and novel claims on our shared civic religion that are overdue to be heard by this and other similar Courts deserve careful and open-minded adjudication where the burden alleged is particularized and substantial.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment within 28 days of its entry. In the adjoining Motion for Leave under 6(b)(1)(B), I argue that sending this two days late on July 2, 2025 when the dismissal was issued exactly one month prior (30 days) on June 2, 2025 reflects a minor excusable mistake and neglect.

Reconsideration is appropriate where there is:

1. Newly discovered evidence;
2. A clear error of law or fact; or
3. Manifest injustice.

See **Arthur v. King**, 500 F.3d 1335, 1343 (11th Cir. 2007). A court may also consider new legal arguments where they are clarifications of prior claims and failure to consider them would result in injustice. See **Banister v. Davis**, 140 S. Ct. 1698 (2020).

## GROUNDS FOR RECONSIDERATION

Plaintiff respectfully submits the following grounds for reconsideration of the dismissal with prejudice:

**1. Failure to Consider Misunderstood Military-Religious Argument Regarding Organ Donation:** Plaintiff respectfully contends that the Court misunderstood the kidney donation

example to represent a generic or symbolic civilian duty. Plaintiff has now clarified that his religious belief draws a concrete and principled parallel between the risks of living organ donation and the risks assumed in military service. In particular, Plaintiff asserts that the Commander-in-Chief bears a religiously infused obligation to lead by sacrificial example—by giving life, if necessary, through bodily risk. The Court's prior dismissal failed to address this religious framing, resulting in a premature rejection of a serious RFRA burden.

2. **Clarification of RFRA Standing Through Particularized Religious Harm:** Plaintiff has now identified and elaborated a specific and particularized religious burden consistent with and arising from his original RFRA claim—namely, the religious obligation under Jewish ethics and tradition to defend fellow Jews under military threat, such as Ukrainian President Volodomyr Zelensky and Prime Minister Denys Shmyhal. These leaders are actively defending a civilian population under violent attack by a foreign aggressor. As this religious burden is both sincere and substantially affected by Defendant's military posture as Commander-in-Chief, it must be weighed under RFRA's strict scrutiny framework. Reconsideration is necessary to prevent manifest injustice in refusing Plaintiff a meaningful opportunity to be heard on this clarified theory.

3. **Recognition of Civic Religion as a Protected Religious Exercise:** Plaintiff's theory of civic religion, though novel perhaps in the courts, is deeply rooted in American political thought, moral instruction, and liberal education. The Court should not dismiss such a claim on the basis of its first appearance in case law. As Lincoln wrote in his Lyceum Address, civic reverence for the Constitution and rule of law is foundational to the American democratic project—and when sincerely held and made the basis for religious discipline, deserves the same protection RFRA extends to other unorthodox belief systems. Plaintiff has now articulated the basis, scope, and sincerity of his civic religious convictions in detail.

Even if there are not other direct precedents to point to in recognizing civic religion as a form of religious standing under RFRA protection, such civic religion is a key part of our historical

and cultural heritage, and it is a normal part of District Court authority to independently recognize, rule on and set new precedential rulings. The Plaintiff would rather argue all his cases on reliance on equivalent civic religion, like the civic religious right to apologize or the civic religious obligation to preserve life, than under equivalent Jewish obligations to apologize or Jewish obligations to preserve life, which are more divisive and don't extend hard-won religious rights to _everyone_ in the population.

There are many kinds of claims that would fit properly under naturally- and commonly-understood civic religion but not sectarian religion. One of many examples would be the civic religious dietary needs of vegetarians and vegans who feel a moral and (civically) religious obligation to eat ethically without harming animals. Vegan prisoners should be protected by civic religion under RFRA and Religious Land Use and Institutionalized Persons Act (RLUIPA). I was once denied any religiously compatible nutrition while in jail and the prison staff ignored my pleas for vegetarian food believing it not to be a religious need that they had to comply with. Failing to recognize civic religion as one major plank of religious belief prevents Americans from securing accommodation for fundamentally religious ethical beliefs that they hold, many of which like the obligation to preserve life we all hold in common, even if we sometimes disagree or debate on and need to legally and politically balance the particulars.

4. **Avoidance of Manifest Injustice from Premature Dismissal With Prejudice:** Plaintiff has raised claims that are both novel and substantial. These claims, if accepted, would support standing and preclude dismissal at the pleadings stage under Rule 12(b)(1) and Rule 12(b)(6). A dismissal with prejudice at this early juncture, without opportunity to amend or to fully develop the implications of the civic and military-religious burdens at stake, constitutes manifest injustice. Rule 59(e) provides the appropriate mechanism for correction of that injustice.

Plaintiff does not seek to burden the Court with unnecessary delay or meritless litigation. Rather, Plaintiff respectfully seeks a fair and complete hearing of claims that are directly and sincerely tied to religious belief and practice, and that are entitled to protection under RFRA.

At the very least, the Plaintiff asks this Court to alter or amend its judgment to a **dismissal without prejudice**, if not a more simple, practical, and desirable leave to amend, so that the Plaintiff may replead after changing the earlier, more complex and wide-ranging pleading from "shotgun form" to a more compact and easily digestible and answerable form.

One more important note, the Plaintiff has also done further research on the origins of and general motivation for the Congressional statutes in 10 U.S. Code §1253 mandating a fixed maximum age limit for even exceptional officers of the Armed Forces. Those new findings bear on this case, and the Plaintiff can articulate those reasons for 10 U.S. Code §1253 and how they apply to the Office of the Commander-in-Chief, as formerly occupied by Joseph Biden and as presently occupied by Donald Trump, in a new filing if permitted to refile.

Lastly, I want to acknowledge freely that I believe Commander Trump did a great job for the most part handling the Iran-Israel "12 Day War". It wasn't perfect.... he seems to be greatly overstating and exaggerating with mendacity his intelligence on whether the nuclear assets of Iran were "obliterated"... but his team and he did a good job arranging for a one-time strike and deescalating Iran and Israel once that was complete, keeping the US out of an entangling Middle East war while wishing well to the Iranian people, defending our close ally Israel, and delaying Iran's nuclear power status by at least a few months. Commander Trump showed valuable competence as the Commander-in-Chief in that specific military function, playing complex diplomatic and military chords that seemed to have met immediate situational needs.... but in fairness, most of the Four- and Five-Star Flag and General Officers would also demonstrate such

competence who are also forced into mandatory retirement at the upper limit of 68 years old. Military officers aren't forced into mandatory retirement because they're shown to be incompetent or incapable the minute they turn or approach 68 years old. They're forced into retirement because of growing training, morale, strategy, and health risks and compromises that only accumulate and grow more urgent and insistent as military leaders grow ever older and ever more gerontocratic.

As I've argued elsewhere, even if Commander Trump is not as debilitated and fragile yet as Commander Biden was at the end of his term, it would be absurd if Commander Trump with such mammoth apex responsibilities and command authority at age 79 should be the only military leader in the country who escapes with unlimited legal immunity to the precautious upper limit of 10 U.S. Code §1253 set by Congress as widely accepted in the military.

I hope Commander-in-Chief Donald Trump or Vice President Vance take heed to my concern about the need for leadership over living organ donation. Vice President Vance is probably healthy enough to give a kidney to an American need. I think Commander Trump is probably too old to safely give, and I argue that that and the pressure that places on aspiring altruistic donors like me, along with his failure to adequately steadily support the people of Ukraine (including Ukrainian Jews and Russians on the other side of the fighting), should give me the standing necessary to argue for disqualifying Commander-in-Chief Trump from his role as Commander-in-Chief.

Finally, I want to emphasize that this pleading was never meant to single out Donald Trump. It's directed at any occupant of the Office of the Commander-in-Chief and any candidate for the role

of Commander-in-Chief who may compete for election to the Commandership and Presidency. I was equally or more perturbed by Joseph Biden operating in the Office of Commander-in-Chief at such an advanced age, on age-related grounds. While I have to plead about my particular injury under this particular Commander-in-Chief Donald Trump, my claim about age limits is broad and politically neutral (except perhaps for it being consistently anti-gerontocratic) and I hope bars every Commander-in-Chief, regardless of their instant health or mental status or capability, from serving in the Office of Commander-in-Chief past the mandatory retirement ages for regularly commissioned flag and general officers specified so clearly in 10 US Code §1253.

In short, I argue that I have adequate standing on at least one the grounds listed above and ask for leave to amend my case and refile, or at worst I ask for the judgment to be modified from dismissal with prejudice to ordinary dismissal without prejudice, so that I can correct the structural writing deficiencies in my original claim and refile to actually get a real decision on the merits.

Respectfully submitted,

s/Plaintiff David Clayman, Currently *Pro se*
For the Center Forward Party of Hippocratic Hands, aka the Miracle Berries

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion to Amend or Alter Judgment Under 59(e) and Motion for Leave to File Out of Time was sent out to the United States Attorney for the Southern District of Florida via electronic mail two days after the deadline date on July 2, 2025, and mailed via certified mail to the Court on the same day.

Harmlessly,

s/Plaintiff David Clayman
Currently still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@harmlesshands.org

David Glasser
Harmless Hands
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148

9589 0710 5270 3280 9647 24



Retail



RDC 99

9589 0710 5270 3280 9647 24

US District Court for the Southern District of Florida
Clerk of Courts
299 E. Broward Blvd, Suite 108
Fort Lauderdale, FL 33301